**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMFM BROADCASTING, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 08-CV-1519 |
| | ) |
| CHICAGO FM RADIO ASSETS, LLC, | ) Hon. James B. Zagel |
| incorrectly captioned as | ) |
| CITADEL BROADCASTING CORPORATION | ) Magistrate Judge Morton Denlow |
| and REBECCA OSOWIEC | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT CHICAGO FM RADIO ASSETS, LLC'S MEMORANDUM IN SUPPORT
OF ITS EMERGENCY MOTION TO DISMISS COMPLAINT OR, IN THE
ALTERNATIVE, TO DISSOLVE THE *EX PARTE* TRO, AND TO CONTINUE THE
DISCOVERY AND HEARING DATES PENDING RESOLUTION OF THIS MOTION**

**INTRODUCTION**

On March 17, 2008, Plaintiff, a Delaware corporation, obtained an *ex parte* TRO through improper means. Rebecca Osowiec ("Osowiec") is employed by Chicago FM Radio Assets, LLC ("Chicago FM"), a Delaware corporation, owner and operator of WZZN (FM) in Chicago, Illinois. Chicago FM is owned by Alphabet Acquisition Corp. ("Alphabet"), a Delaware corporation, and not Citadel Broadcasting Corporation. Plaintiff, in an attempt to get before this Court without opposition, incorrectly named Citadel Broadcasting Corporation as Osowiec's employer so as to claim diversity jurisdiction. Further, Plaintiff failed to provide Defendant's counsel with a courtesy copy of its pleading, despite the fact that it had known that both inside and outside counsel represented Defendant's interests in this matter for well over a month, resulting in a request for, and this Court's grant of, an *ex parte* TRO.

In the absence of diversity jurisdiction, subject matter jurisdiction of Plaintiff's complaint is premised entirely on its claim under the Computer Fraud and Abuse Act, 18 U.S.C. §1030 et seq. ("CFAA").  But this district has held as recently as January of this year that allegations of trade secret theft and misappropriation do not rise to a colorable civil claim under the Act. Because Plaintiff fails to state a claim under the federal Act and diversity jurisdiction does not exist in this case, this Court has no jurisdiction over Plaintiff's complaint and it must be dismissed.

## ARGUMENT

### I.    LEGAL STANDARD

A motion brought under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a claim.  In ruling on a motion to dismiss, a court must draw all reasonable inferences in favor of the plaintiff, construe all allegations of the complaint in a light most favorable to the plaintiff, and must accept as true all well-pleaded facts and allegations in the complaint.  Garelli Wong & Assoc. v. Nichols, 2008 U.S. Dist. LEXIS 3288 at *9 (N.D. Ill. January 16, 2008); Bontkowski v. First Nat'l Bank of Cicero, 998 F.2d 459, 461 (7th Cir. 1993).[1]  A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true" to survive a motion under Fed. R. Civ. P. 12 (b)(6).  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1963 (2007).  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 127 S.Ct. at 1964-65 (internal quotation marks omitted).  To properly plead a cause of action, a plaintiff must "provide the grounds of his entitle[ment] to relief with [more] than just labels and conclusions,

---

[1] For the Court's convenience, all unpublished decisions are attached hereto at Ex. 1.

and a formulaic recitation of a cause of action's elements will not do." Id. at 1959 (internal quotations omitted).

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) is to dismiss claims over which a federal court lacks subject matter jurisdiction. Jurisdiction must be conferred upon a federal court. In re Chicago, Rock Island & Pac. R.R. Co., 794 F.2d 1182, 188 (7th Cir. 1986). The plaintiff bears the burden of establishing that the jurisdictional requirements have been met. Nichols, 2008 U.S. Dist. LEXIS 3288 at *10. The plaintiff must support its allegations with competent proof of jurisdictional facts. Id.

## II.     PLAINTIFF FAILS TO STATE A CLAIM UNDER THE COMPUTER FRAUD AND ABUSE ACT.

The CFAA allows a civil action to be brought. 18 U.S.C. §1030(g). A claim pursuant to the act "may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv) or (v) of subsection (a)(5)(B)." Id. In order to sufficiently plead a civil action under the Act, a plaintiff must allege both "damage" and "loss." Nichols, 2008 U.S. Dist. LEXIS 3288 at *12. Both terms have specific meanings under the Act. The CFAA defines "damage" as "impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. §1030(e)(8). Such damage must cause "some diminution of the completeness or usability of [plaintiff's] information." Worldspan v. Orbitz, LLC, 2006 WL 1069128 at *5 (N.D. Ill. April 19, 2006) citing ResDev, LLC v. Lot Builders Ass'n, 2005 WL 1924743 at *5 (M.D. Fla. Aug. 10, 2005). The mere taking of information does not constitute "damage" as contemplated by the Act. Orbitz, 2006 WL 1069128 at *5, cited by Nichols, 2008 U.S. Dist. LEXIS 3288 at *15; ResDev, 2005 WL 2005 WL 1924743 at *5. "Loss" under the Act  means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its

3

condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. 18 U.S.C. §1030(e)(8). "Loss" as contemplated by the Act deals with costs that "are directly associated with, or with addressing, an unauthorized computer access event." ResDev, 2005 WL 1924743 at *4. Therefore, lost profit or lost trade secret value is not compensable "loss" under the Act. Id. at *5.

In this case, Plaintiff conclusorily alleges trade secret theft and misappropriation, coupled with a formulaic recitation of the statutory provisions. This is not sufficient to state a claim for relief under the Act. Nichols is directly on point with the present case. In Nichols, the plaintiff brought a claim pursuant to the CFAA, alleging that after his resignation defendant Nichols "compiled significant amounts of [plaintiff's] confidential and proprietary client and candidate information by entering the Database without proper authority to do so." 2008 U.S. Dist. LEXIS 3288 at *7. Plaintiff further alleged that Nichols attempted to send this information to his personal e-mail account and/or copied it for his personal use, including contacting candidates. Id. at *8. The Court, following the analyses set forth in ResDev and Orbitz, held that allegations of misappropriation of trade secrets do not rise to the level of a violation under the Act because such conduct cannot show "damage" as defined by the Act, i.e. "impairment to the integrity or availability of data, a program, a system, or information." Id. at *17.

Here, Plaintiff has made virtually identical allegations to those made by the plaintiff in Nichols. There is no allegation of the type of "damage" cognizable by the Act. Additionally, Plaintiff has not alleged "loss" as defined by the Act. Plaintiff does not allege – as it cannot based on its own version of the "facts" – any loss related to impairment of its computer system. Plaintiff speaks only of losses in the form of "investigation" or "lost business or opportunities." Compl. at ¶65. These types of "loss" are clearly not the type contemplated by the

Act.  ResDev, 2005 WL 1924743 at *5.  Because Plaintiff's allegations of misappropriation do not rise to a level of a violation of the CFAA, Count II of Plaintiff's complaint must be dismissed.

### III.    PLAINTIFF CANNOT SHOW DIVERISTY JURISDICTION.

In its complaint, Plaintiff alleges diversity jurisdiction as an alternate ground for conferring subject matter jurisdiction upon this Court.  Compl. at ¶5.  But diversity jurisdiction does not exist because Citadel Broadcasting Corporation is not Osowiec's employer and therefore is not the proper party to this action.  Federal diversity jurisdiction requires total diversity as between all parties in the case.  28 U.S.C. §1332; Jumah v. Sharma, 292 F. Supp. 2d 1121, 1122 (N.D. Ill. 2003).  For purposes of establishing citizenship, a corporation is deemed to be a citizen of the state in which it is incorporated and of the state in which it has its principal place of business.  28 U.S.C. §1332(c).

As alleged in the complaint, Osowiec began working for WZZN-FM, a radio station in Chicago.  Compl. at ¶¶ 35, 36.  WZZN-FM is owned by Chicago FM, a wholly owned subsidiary of Alphabet.  Both Chicago FM and Alphabet are Delaware corporations; Plaintiff is a Delaware corporation.  See SEC filings attached at Ex. 2.[2]  Because there is not complete diversity in this action, this Court has no basis for exercising subject matter jurisdiction and the remainder of Plaintiff's complaint must be dismissed.

### IV.    ALTERNATIVELY, IN THE EVENT THAT THIS COURT DOES NOT DISMISS THE COMPLAINT, THE EXISTING TRO SHOULD DISSOLVED OR MODIFIED.

Defendant respectfully requests that the *ex parte* TRO granted by this Court on March 17, 2008 be dissolved because it was improperly granted.  Alternatively, at a minimum,

---

[2] Citadel Broadcasting Corporation is the direct parent corporation of Alphabet.  Ex. 2.

the TRO should be modified because it is overly broad and is not narrowly tailored to the claims stated and the relief sought in the complaint.

The circumstances in which an *ex parte* order should be granted are "extremely limited." Am. Can Co. V. Mansukhani, 742 F.2d 314, 321 (7th Cir. 1984). An *ex parte* TRO is an "extraordinary and drastic" remedy that should be granted only upon a clear showing of need. David White Instruments, LLC v. TLZ, Inc., 2002 WL 31741235 (N.D. Ill. Dec. 4, 2002). As explained by the Supreme Court, "the stringent restrictions . . . on the availability of *ex parte* TROs reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted to both sides of a dispute." Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, 415 U.S. 423, 438-39 (1974). Consequently, TROs should be granted *ex parte* "only when notice to the adverse party is impossible "either because the identity of the adverse party is unknown or because a known party cannot be located in time for a hearing." Am. Girl LLC v. Nameview, Inc., 381 F. Supp. 2d 876 (E.D. Wis. 2005), citing Am. Can Co., 742 F.2d at 322. Neither circumstance exists here.

At least as of February 21, 2008, Plaintiff was aware that this firm represented Chicago FM for purposes of this action. See communication from Susan Benton to Lauren Wood dated February 21, 2008, attached hereto at Exhibit 3. In fact, Plaintiff specifically asked Ms. Benton on March 10, 2008 whether Winston & Strawn would accept service for this very lawsuit. See e-mail correspondence dated March 10, 2008 at Ex. 4. Ms. Benton was out of the country at the time but Winston & Strawn LLP continued to represent Chicago FM. Additionally, Plaintiff sent a letter to Osowiec with regard to her obligations to Plaintiff, and copied Jacqueline Orr, Citadel's General Counsel, on that letter. See letter dated February 15,

2008 at Ex. 5.  Despite this knowledge, neither Winston & Strawn nor Ms. Orr was served with copies of the complaint or any accompanying motion papers.

Moreover, there is no emergency in this case.  Chicago FM hired Osoweic in December 2007, and by its own admission, Plaintiff had knowledge of that hire as early as January 17, 2008, two full months before this "emergency" filing.  An *ex parte* TRO may be granted without notice only if it appears that imminent, irreparable injury will result.  Fed. R. Civ. P. 65.  Plaintiff's own delay and inaction belies Plaintiff's claim of the emergency nature of this matter and "imminent irreparable injury."  Thus the  TRO should be set aside.

If the court does not set aside the TRO, the Court should modify it by striking subparagraphs (a) and (d) which enjoin Osowiec from

(a)    Violating, directly or indirectly, Rebecca Osowiec's Employment Agreement with Clear Channel Broadcasting, Inc., specifically the section relating to Osowiec's non-disclosure, non-competition, and non-solicitation agreement with Clear Channel;

(d)    Soliciting or attempting to provide media advertising to Broadway In Chicago, Natural Hair Growth, Paramount Theatre, and other unknown customers.

The TRO as drafted by Plaintiff's counsel is not narrowly tailored to the claims and relief sought in the Complaint.  Subsection (a) of the TRO restrains Osowiec from working in *any capacity* at WZZN-FM.  While the agreement purports to do just that by its overboard and unenforceable non-compete provision, such a provision is not enforceable under Illinois law and Plaintiff does not seek to enforce it in its complaint.  And, despite the language of the TRO, there is no non-solicitation provision in the Agreement.[3]  The complaint explicitly states that Osowiec

---

[3] Plaintiff is not seeking enforcement of the non-compete provision, which prohibits Osowiec from working in any capacity with any radio station (see Compl. at ¶23).  Such a provision is so broad as to be void and unenforceable under Illinois law.  Lawrence & Allen v. Cambridge Human Resources Group, Inc., 685 N.E.2d 434, 443 (Ill. App. Ct. 2nd Dist. 1997) (restrictive covenant unlimited in activity held to be unenforceable); Arpac Corp. v. Murray, 589 N.E.2d 640, 652 (Ill. App. Ct. 1st Dist. 1992) (non-competition agreement which prohibited former employee from

is breaching her contract with Clear Channel in one of only two ways: 1) "removing from, retaining or failing to return Clear Channel's confidential information" and/or 2) "using or disclosing Clear Channel's confidential information." Compl. at 45. The complaint does not seek relief from any alleged breach of the non-compete provisions of the agreement. Therefore subparagraph (a) should be struck.

Moreover, the TRO is overbroad in that it seeks to restrain Osowiec from soliciting "other unknown" customers. TRO at 1(d). How are Osowiec or Chicago FM to comply with such a vague order? Again, the effect of this subparagraph is to prohibit Osowiec from providing any service at WZZN. Such an order is inconsistent with the claims and demands of the complaint as well as Illinois law. Telxon Corp. v. Hoffman, 720 F. Supp. 657, 665 (1989) (non-compete held unenforceable a matter of law because "[a]s written, the agreement would prevent [defendant] from working as a competitor as a janitor"); North American Paper Co., v. Unterberger, 526 N.E.2d 621, 623 (Ill. App. Ct. 1st Dist. 1988) (Holding that non-compete is unenforceable because "Unterberger is prohibited from associating with any competitor in any capacity whatsoever, even if Unterberger's job were merely menial and he had absolutely nothing to do with sales or purchasing.") The complaint seeks an injunction prohibiting use or disclosure of alleged trade secrets and proprietary information. If any portion of the TRO is allowed to stand, it should be limited to the protection of confidential information (subparagraphs (b) and (c)). Sections 1(a) and 1(d) of the *ex parte* TRO should be struck.

---

working in any capacity in the shrink wrap industry held to be unenforceable); Telxon Corp. v. Hoffman, 720 F. Supp. 657, 665 (1989) (non-compete held unenforceable a matter of law because "[a]s written, the agreement would prevent [defendant] from working as a competitor as a janitor"); North American Paper Co., v. Unterberger, 526 N.E.2d 621, 623 (Ill. App. Ct. 1st Dist. 1988) (Holding that non-compete is unenforceable because "Unterberger is prohibited from associating with any competitor in any capacity whatsoever, even if Unterberger's job were merely menial and he had absolutely nothing to do with sales or purchasing.")

**V.    THIS COURT SHOULD CONTINUE THE EXPEDITED DISCOVERY DEADLINE AND PRELIMINARY INJUNCTION HEARING PENDING RESOLUTION OF THIS MOTION.**

As part of the March 17, 2008 TRO, this Court ordered expedited discovery, including response to any written discovery within three days of service. Plaintiff served discovery on Defendant Chicago FM at approximately 4:30 p.m. on March 18, 2008 thus the due date for Chicago FM's responses is March 21, 2008. The Court also scheduled hearing on Plaintiff's preliminary injunction hearing for March 25, 2008. Because resolution of this Motion could potentially dismiss the case, defendant respectfully submits that substantial resources would be saved if the Court continued the deadline for responding to the written discovery and the date of the preliminary injunction hearing until after resolution of the instant Motion.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant Chicago FM respectfully requests that Plaintiff's complaint be dismissed in its entirety for lack of subject matter jurisdiction.  Pending the Court's decision on this Motion, Defendant Chicago FM respectfully requests that the deadline to respond to written discovery and the hearing on Plaintiff's preliminary injunction motion be continued.   Additionally, should the Court find that subject matter jurisdiction has been established, Defendant Chicago FM respectfully requests that: 1) the March 17, 2008 *ex parte* TRO be dissolved because it was improperly granted; or 2) modified by striking subparagraphs (b) and (c).

Respectfully submitted,

CHICAGO FM RADIO ASSETS, LLC

By: _____/s/ Susan M. Benton_____

Susan M. Benton
Sean Nash
Jason Frazer
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600
sbenton@winston.com
snash@winston.com
jfrazer@winston.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, one of the attorneys for Chicago FM Radio Assets, LLC., hereby certifies that a true and correct copy of the foregoing MEMORANDUM IN SUPPORT OF ITS EMERGENCY MOTION TO DISMISS COMPLAINT OR, IN THE ALTERNATIVE, TO DISSOLVE THE TRO, AND TO CONTINUE THE DISCOVERY AND HEARING DATES was served via electronic filing on March 20, 2008 to**:**

Yvette A. Heintzelman
Justin K. Beyer
Seyfarth Shaw LLP
131 South Dearborn Street
Suite 2400
Chicago, Illinois 60603


_____/s/ Sean Nash_____
Sean Nash

CHI:2064537.3

## INDEX OF EXHIBITS

Unpublished Cases ................................................................................................................Exhibit 1

SEC Information ................................................................................................................Exhibit 2

Letter to L. Wood from S. Benton dated 2/21/08 ............................................................Exhibit 3

Email to S. Benton from C. Garcia dated 3/10/08 ...........................................................Exhibit 4

Letter to B. Osowiec from L. Wood dated 2/15/08 .........................................................Exhibit 5

# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31741235 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

**H**David White Instruments, LLC v. TLZ, Inc.
N.D.Ill.,2002.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
DAVID WHITE INSTRUMENTS, LLC, f/k/a David
White Formation, Plaintiff,
v.
TLZ, INC. d/b/a Toolz, and Toolz Limited,
Defendants.
**No. 02 C 7156.**

Dec. 4, 2002.

*REPORT AND RECOMMENDATION*

NOLAN, Magistrate J.
**\*1** Plaintiff David White Instruments LLC, formerly
known as David White Formation, LLC seeks a
temporary restraining order ("TRO") to prevent
defendants TLZ, Inc. d/b/a Toolz and Toolz Limited
[FN1] ("Toolz") from continuing to make, use, sell or
offer for sale certain optical surveying instruments
that allegedly infringe plaintiff's design patent and
trade dress. The motion was referred to this Court for
an evidentiary hearing and a Report and
Recommendation as to whether the motion should be
granted. In making its recommendation on this
matter, the Court has considered the facts and
documents set forth in the complaint, the motion for a
TRO and Toolz's opposition brief, as well as the
witness testimony and exhibits presented at a hearing
on October 27, 2002. For the reasons set forth below,
the Court recommends that plaintiff's motion for a
TRO be denied.

> FN1. For purposes of this motion for TRO
> only, plaintiff does not seek relief against
> Toolz Limited of Hong Kong. Tr. 203, 254.

FACTUAL BACKGROUND

David White has been supplying optical and laser
instruments to the building and construction
industries since 1895. On May 24, 2002, CST/berger,
a worldwide venture with 270 employees and over
1,000 products, purchased substantially all of the
assets of David White, LLC, including its "patents,
trademarks, trade secrets, trade names, names,
brands, methods of doing business and other
intellectual property and all good will associated with
any of the foregoing."PX A; Tr. 44, 46-47. Plaintiff
David White Instruments, LLC was formed as an
affiliate of CST/berger to sell the David White
product line. Dubrick Tr. 41; Def. Mem., p. 1. As part
of the sale, plaintiff purchased and was assigned
United States Design Patent No. D440,506 (" '506
patent"); Dubrick Tr. 46. Plaintiff's AL8 Series
automatic levels are sold pursuant to the design
claimed in the '506 patent. Dubrick Tr. 50, 53.
Plaintiff also manufactures and sells manual levels
and level-transits under the name "Meridian."
Plaintiff says that it based its decision to purchase the
David White product line on consumer recognition of
the product designs and the "substantial good will
that has been developed over many years in the
David White trademark and unique and distinctive
instrument designs." Pl. Mem., p. 5; Dubrick Tr. 48.

Toolz is a small privately-owned company founded
in 1998. Soucy Decl. ¶ 2. Toolz first manufactured
only laser products but in 2001, it decided to enter the
optical measurement market as well. Shortly after
making this decision, Toolz was approached about
acquiring the David White assets and, in February
2002, it signed a confidentiality agreement in that
regard. Soucy Decl. ¶ 11; Soucy Tr. 205, 221; PX 5.
In the spring of 2002, Toolz bid on certain of the
David White assets but the bid was not accepted.
Then, at the August 2002 National Hardware Show in
Chicago and again at the September 2002 Handy
Hardware Show in Houston, Toolz displayed and
offered for sale automatic and manual levels similar
to the ones offered by plaintiff under the David White
label.

**\*2** On October 4, 2002, plaintiff filed a complaint
and a motion for a TRO with respect to its AL8 and
Meridian Series optical levels. Specifically, plaintiff
claims that Toolz' automatic levels infringe the David
White AL8 Series automatic levels embodied in the
'506 design patent, and that Toolz' manual levels and
level-transits infringe the David White Meridian
Series trade dress.[FN2]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 31741235 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

FN2. For purposes of this motion for a TRO, the Court will not distinguish between the product prototypes shown at the trade shows and the finished products, which differ primarily with respect to labeling and color. Tr. 22-23.

DISCUSSION

A TRO is an "extraordinary and drastic" remedy that should only be granted upon a clear showing of need. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir.1999). A plaintiff seeking a TRO or preliminary injunction must show: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if the preliminary injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed.Cir.2001). Plaintiff's TRO motion can only be granted if it establishes both of the first two factors; i.e., likelihood of success on the merits and irreparable harm. *Id.* If plaintiff establishes the first factor by making a clear showing of both validity and infringement, it is entitled to a rebuttable presumption of irreparable harm. *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1363 (Fed.Cir.2001).

A. Likelihood of Success

1. Design Patent Infringement

To demonstrate a likelihood of success on the merits of its design patent infringement claim, plaintiff must show that, in light of the presumptions and burdens that will inhere at a trial on the merits, (1) plaintiff will likely prove that Toolz infringes the '506 patent, and (2) plaintiff's infringement claim will likely withstand Toolz' challenges to the validity of the '506 patent. *Amazon.com*, 239 F.3d at 1351. If Toolz raises a substantial question concerning either infringement or invalidity by asserting an infringement or invalidity defense that plaintiff cannot prove "lacks substantial merit," the preliminary injunction should not issue. *Id.* at 1350-51.

Infringement of the '506 design patent requires a showing that the accused design is "substantially the same" as the claimed design such that an ordinary purchaser-in this case, professional builders, contractors and carpenters-would be deceived into thinking that one is the other. *Contessa Food Products, Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1377 (Fed.Cir.2002); *Payless Shoesource, Inc. v. Reebok International Limited*, 998 F.2d 985, 990 (Fed.Cir.1993). Design patents only cover the novel features of the patented design; that is, "the novelty which distinguishes the patented design from the prior art."*Contessa Food Products*, 282 F.3d at 1377;*Odd*z*On Products, Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404 (Fed.Cir.1997). In addition, design patents only protect the ornamental as opposed to the functional features of the patented design. *Unidynamics Corp. v. Automatic Products Int'l, Ltd.*, 157 F.3d 1311, 1323 (Fed.Cir.1998); *Odd*z*On*, 122 F.3d at 1405 ("[t]he patentee must establish that an ordinary person would be deceived by reason of the common features in the claimed and accused designs which are ornamental").

*3 Plaintiff identifies four features of the '506 patent which it claims are both novel-i.e., not reflected in the prior art-and non-functional: (1) the "rounded-delta" level vial recess; (2) the raised semi-cylindrical midsection; (3) the proximal body member with a flat top, a flat bottom and rounded sides; and (4) the overall proportions and relationships of the components. Pl. Mem., p. 11. The overall proportions and relationships of the components cannot be considered a point of novelty because it improperly merges the "ordinary observer" and "point of novelty" tests. *See, e.g*., *Contessa Food Products*, 282 F.3d at 1377 ("it is legal error to merge the two tests, for example by relying on the claimed overall design as the point of novelty"). In addition, plaintiff describes the design of the compensator housing as the proximal body member with a flat top, a flat bottom and rounded sides, but the actual patented design has beveled sides on the top portion of the telescope nearest the eyepiece and a step on the bottom. The Toolz automatic level has neither of these features, raising a substantial question as to whether the Toolz product infringes the '506 patent in this regard.

With respect to the rounded-delta level vial recess and raised semi-cylindrical midsection, Toolz presented evidence that both features are dictated by function. Daniel Hill, Toolz' Product Manager and a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31741235 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

former engineering geologist, testified that bubble vials are often recessed to ensure that they stay level; indeed, he identified and presented at the hearing several other automatic levels with recessed bubble vials in a similar location on the product. Hill Tr. 143, 161-63; DX 21, 22, 23. As for the raised semi-cylindrical midsection housing the peep sight, Hill testified that it is helpful to have this feature on top so that it is near the telescope line of sight. He also stated that the center placement allows for easier focus on far objects, and that the rounded housing both protects the peep sight from breaking and allows water to run off the sides to prevent puddling. Hill Tr. 158-60, 192. In addition, plaintiff's advertisements for the automatic level state that the "[s]ighting scope and bubble vial are built into the housing for greater durability."PX G.

On the other hand, plaintiff presented Edward Ellison, Manager of David White Product Integration, who testified that the rounded-delta shape around the recessed level bubble vial and the rounded shape of the raised semi-cylindrical midsection housing the peep sight are both ornamental. Ellison Tr. 85-88. However, Ellison is not an engineer or industrial designer and did not design the product at issue, so his opinion on this issue does not carry significant weight. Ellison Tr. 106-07. Hill did testify that at least with respect to the peep sight, the rounded shape promoted aesthetic continuity. Hill Tr. 192-93. Nevertheless, Toolz has raised a substantial question as to whether plaintiff's identified points of novelty are functional in nature, which precludes a finding that plaintiff has a reasonable likelihood of success on its design patent infringement claim for purposes of a TRO.[FN3] *See Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 661, n. 6 (7th Cir.1995) (to establish functionality, accused infringer need only establish that the feature is "at least one of a few superior designs for its *de facto* purpose").

> FN3. Toolz has also challenged the validity of the '506 patent, claiming that the patent depicts "an obvious combination of well-known design features."Def. Mem., p. 13. Given the Court's findings on the infringement question, it need not reach the issue of validity at this preliminary stage of the litigation. This decision does not prevent Toolz from asserting any validity challenge

raised during the TRO proceedings or from relying on admissible evidence presented at the TRO hearing in support of its invalidity defense at trial.

2. Trade Dress Infringement

*4 "Trade dress" refers to "the total image of a product, including features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques."*Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633, 636 (7th Cir.1999) (internal quotations omitted). To demonstrate a likelihood of success on its trade dress infringement claim, plaintiff must show that (1) it has a protectable trade dress; that is, its trade dress has acquired secondary meaning; and (2) the similarity of Toolz' trade dress is likely to cause the purchasing public to be confused as to source. *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.,* 529 U.S. 205, 214 (2000). The Court addresses each in turn.

a. Secondary Meaning

A product acquires secondary meaning when "in the minds of the public, the primary significance of [the dress] is to identify the source of the product rather than the product itself."*Qualitex Co. v. Jacobson Products Co.,* 514 U.S. 159, 163 (1995). Consumers must care that the product including the design or dress comes from a particular source and "must desire the product with the particular feature because it signifies that producer."*Thomas & Betts,* 65 F.3d at 658-59. To establish secondary meaning, courts consider "direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying."*Spraying Systems Co. v. Delavan, Inc.,* 975 F.2d 387, 393 (7th Cir.1992); *Bretford Manufacturing, Inc. v. Smith System Manufacturing Co.,* 116 F.Supp.2d 951, 956 (N.D.Ill.2000).

Plaintiff claims that it has sold and advertised its Meridian Series manual levels and level-transits for nearly two decades, which creates a presumption of secondary meaning. Gregory F. Dubrick, Vice President of David White Instruments, LLC, testified that plaintiff's due diligence in connection with the asset purchase revealed strong consumer recognition of the David White product line. Dubrick Tr. 43.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                       Page 4
Not Reported in F.Supp.2d, 2002 WL 31741235 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

However, Dubrick was unable to identify any specific customer surveys to that effect. Dubrick Tr. 71-72. Thus, plaintiff has not presented sufficient evidence that the public has come to associate the trade dress with the David White label. *See Bretford, 116 F.Supp.2d at 956* (evidence that the plaintiff had used a design for a number of years insufficient to demonstrate secondary meaning absent evidence that consumers recognized the design as "indicative of origin"). And plaintiff's advertising arguably promotes the functional features of the product as opposed to its distinctive trade dress. PX G (promoting product clarity, accuracy, precision and ease of use).*See also Schwinn Bicycle Co. v. Ross Bicycles, Inc., 870 F.2d 1176, 1190 (7ᵗʰ Cir.1989)* ("it is well-established that trade dress protection does not extend to features already shared by different brands on the market").

**\*5** On the other hand, plaintiff has presented evidence that the Meridian Series has generated a high volume of sales and revenues over the years, and has a longstanding reputation for manufacturing reliable, high-quality instruments. Pl. Mem., pp. 19-20; Dubrick Tr. 54-55. Plaintiff has also raised at least some question as to whether Toolz deliberately copied the Meridian Series levels. Hill Tr. 185-86. But even assuming that this was sufficient to establish secondary meaning, plaintiff has failed to demonstrate a likelihood of success on the issue of customer confusion.

b. Likelihood of Confusion

In determining whether there is a likelihood of confusion, the Seventh Circuit has considered several factors to be important: (1) similarity of the trade dresses; (2) similarity of the products; (3) area and manner of advertising and use; (4) degree of care likely to be used by consumers; (5) strength of plaintiff's trade dress; (6) whether any actual confusion exists; and (7) defendant's intent to palm off its goods as those of plaintiff. *See, e.g., Ty, Inc. v. Jones Group, Inc., 98 F.Supp.2d 988, 998 (N.D.Ill.2000)*. There is a high degree of similarity in the overall appearance of the levels manufactured by plaintiff and Toolz, and both parties are marketing to the same consumers; indeed, they both attended the same trade shows in August and September of this year. Dubrick Tr. 58-59, 61; Light Tr. 135-36; Hill Tr. 187-88.

However, the evidence indicates that those customers and potential customers are sophisticated and that they exercise a significant degree of care in purchasing level products, which cost between $225 and $425. Ellison Tr. 130-31; Def. Mem., pp. 22-23. In addition, Toolz has prominently marked its products and the outer packaging with the RoboToolz and Porter-Cable marks.ᶠᴺ⁴ DX 1, 2, 14, 15. These factors undermine any claim that Toolz is trying to "palm off" its products as those of plaintiff, and weigh against a finding of likely confusion. *See, e.g., Pampered Chef, Ltd. v. Magic Kitchen, Inc., 12 F.Supp.2d 785, 795 (N.D.Ill.1998)* (defendant's use of its identifying mark "necessarily makes us seriously doubt whether it could be accused of attempting to 'palm off' [the alleged infringing product] as [plaintiff's] or trying to confuse the public into thinking that the latter company was the origin of its two [products]"); *Dorr-Oliver, Inc. v. Fluid-Quip, Inc., 94 F.3d 376, 383 (7ᵗʰ Cir.1996)* ("in the case of a high-priced, single-purchase product, there is generally no likelihood of confusion when the manufacturer's name is clearly displayed on the product").

> FN4. Toolz and Porter-Cable have entered into a licensing agreement under which Toolz may use the Porter-Cable mark on its products. Soucy Decl. ¶ 12.

On balance, plaintiff has not presented sufficient evidence that the sophisticated contractors, professional builders and carpenters who purchase its levels and level-transits will likely be confused as to the source of the products. Thus, plaintiff has failed to demonstrate a reasonable likelihood of success on its trade dress infringement claim.

B. Irreparable Harm and Public Interest

**\*6** Having determined that plaintiff presented insufficient evidence of a reasonable likelihood of success on the merits of its infringement claims, the Court need not address the issues of irreparable harm and public interest.*Thomas & Betts, 65 F.3d at 664;Glaxo Group Ltd. v. Ranbaxy Pharmaceuticals, Inc., 262 F.3d 1333, 1339 (Fed.Cir.2001)*. Nevertheless, the Court notes that these factors also weigh against granting a TRO.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31741235 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

Irreparable harm is harm that cannot be compensated by money damages.*Hybritech Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1457 (Fed.Cir.1988). Irreparable harm may be established by showing that the alleged infringer is financially irresponsible or might be judgment-proof at the end of the litigation. *Cordis Corp. v. Medtronic, Inc.,* 780 F.2d 991, 996 (Fed.Cir.1985). Plaintiff has made some showing that it will suffer harm in the form of lost profits and good will if the Court does not issue a TRO. However, plaintiff has not made an adequate showing that it cannot be compensated with money damages in the absence of a TRO. *August Storck K.G. v. Nabisco, Inc.,* 59 F.3d 616, 619 (7th Cir.1995) ("[d]amages in trademark cases are hard to measure, but the possibility of compensation offers sufficient protection to a trademark owner, when an injunction bids fair to stifle competition and injure consumers in order to ward off occasional confusion"). On these facts, the Court cannot say that the balance of harm tips in plaintiff's favor, and a TRO is not appropriate. *See Illinois Tool Works, Inc. v. Grip-Pak, Inc.,* 906 F.2d 679, 683 (Fed.Cir.1990) ("hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating"; court may properly deny injunction where "a grant might destroy [the defendant] while a denial would leave [the plaintiff] a going concern"); *Flotec, Inc. v. Southern Research, Inc.,* 16 F.Supp.2d 992, 1012 (S.D.Ind.1998) (denying preliminary injunction where plaintiff would suffer irreparable harm in the absence of an injunction but defendant, a "significant new competitor," would be shut down for a substantial period of time if the injunction was granted).

The public interest also weighs against granting a TRO in this case. "When deciding whether to grant or withhold equitable relief a court must give high regard to the interest of the general public, which is a great beneficiary from competition."*August Storck,* 59 F.3d at 619. The public's interest in competition and product availability carries the day given plaintiff's inability to show a reasonable likelihood of success on its infringement claims. *Id.*

## CONCLUSION

For the reasons stated above, plaintiff's motion for a TRO (Docket Entry # 8-2) should be denied. The district court has advised that counsel has ten days from the date of service of this Court's Report and Recommendation regarding plaintiff's supplemental motion for TRO to file objections to this Report and Recommendation with the Honorable John W. Darrah. *SeeFed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1).* Failure to object constitutes a waiver of the right to appeal. *Lorentzen v. Adnerson Pest Control,* 64 F.3d 327 (7th Cir.1995).

N.D.Ill.,2002.
David White Instruments, LLC v. TLZ, Inc.
Not Reported in F.Supp.2d, 2002 WL 31741235 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2008 US DIST. LEXIS 3288



Cited
As of: Mar 19, 2008

**GARELLI WONG & ASSOCIATES, INC., Plaintiffs, vs. WILLIAM M. NICHOLS, Defendant.**

**07 C 6227**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2008 U.S. Dist. LEXIS 3288*

**January 16, 2008, Decided**
**January 16, 2008, Filed**

**COUNSEL:** [*1] For Garelli Wong & Associates, Inc., Plaintiff: David N. Michael, Mark Douglas Brookstein, Gould & Ratner, Chicago, IL; Robert G. Riegel, Jr., Fowler White Boggs Banker PA, Jacksonville, FL.

For William M. Nichols, Defendant: Daniel Patrick Hogan, LEAD ATTORNEY, McCabe & Hogan, Palatine, IL.

**JUDGES:** Charles P. Kocoras, United States District Judge.

**OPINION BY:** Charles P. Kocoras

**OPINION**

**MEMORANDUM OPINION**

CHARLES P. KOCORAS, District Judge:

Before this Court is Defendant's motion to dismiss Plaintiff's three-count Complaint. For the following reasons, Defendant's motion is granted.

**BACKGROUND**

According to the allegations of the complaint, which we must accept as true for purposes of this motion, Plaintiff Garelli Wong and Associates, Inc. ("Garelli Wong") is an Illinois corporation. Garelli Wong operates three Illinois offices located in the cities of Chicago, Schaumburg, and Oakbrook. Garelli Wong provides temporary and permanent accounting and financial personnel and services to its clients. The company has devoted substantial time and expense to identify clients receptive to Garelli Wong's services by finding the decision makers within their clients' organizations, cultivating their client relationships and learning [*2] their clients' needs and preferences, determining how those needs match the capabilities of its employees, and by working out client-specific pricing and service arrangements.

Garelli Wong employees who are temporarily assigned to work for clients are referred to as its "consultants," and prospective consultants are termed "candidates." Garelli Wong created a database ("the Database") that contains candidate and client activity tracking information (including billing rates; margins; candidate identities and status; employee information; client identities and the names of client contacts; decision makers; and requirements). Garelli Wong does not share this information with its competitors but rather has made efforts to maintain the confidentiality of the information

contained in the Database. The Database is housed in a secure server and can only be accessed by an authorized user who enters a personalized password. Garelli Wong's employees use the information in the Database to expand client relationships and build goodwill.

Around April 2006, MPS Group, Inc. ("MPS") purchased and became the owner of Garelli Wong. As owner, MPS acquired Garelli Wong's existing assets, which included any [*3] employment agreements that Garelli Wong had with its employees. Defendant William Nichols ("Nichols") was one such employee who had entered into an employment agreement with Garelli Wong prior to the purchase.

Nichols, an Illinois resident, began working as a Senior Staffing Consultant out of Garelli Wong's Chicago office around December 1, 2003. In that capacity, Nichols was Garelli Wong's primary contact with certain of its clients and prospective clients. Nichols met with candidates and clients and used the Database in an effort to match the candidates' and clients' needs, preferences, and requirements. In doing so, Nichols developed personal relationships with certain clients, employees, candidates, and consultants whom Garelli Wong recruited. From these relationships, Nichols acquired knowledge about the clients' hiring managers, who according to Garelli Wong are often the most important client contacts. Nichols' employment with Garelli Wong also allowed him to obtain information about Garelli Wong's pool of screened consultants who serve its clients, including the rates Garelli Wong pays to its various consultants, the mark-up on those rates, and the flexibility Garelli Wong has [*4] for different clients on project-specific, or sometimes client-specific, placement.

When Nichols began working for Garelli Wong he signed a Confidentiality and Non-Solicitation Agreement ("the Agreement") "that would be governed by, construed, and enforced in accordance with the laws of the state of Illinois." Paragraph 2 of the Agreement states:

Except as permitted by this Agreement or with the written consent of the Company, the Employee shall not at any time during or after employment with the Company, divulge, disclose or communicate, directly or indirectly, to any person, corporation or other entity, or use for his/her own benefit or for the benefit of anyone other than the Company, any of the Company's trade secrets or confidential or proprietary information, including, but not limited to, Client or Potential Client identities and contacts; Client or Potential Client lists; Client or Potential Client financial, business or personal information; other information relating to Client or Potential Client accounts, feedback or directions; financial and business information relating to the Company and its transactions; and any other confidential information relating to the Company, its [*5] business, or its Clients or Potential Clients, including the Company's candidate database.

Employee agrees that all confidential and proprietary information shall belong to and be the sole and exclusive property of the Company.

Paragraph 3 of the Agreement states:

Immediately upon termination of employment with the Company, the Employee shall return to the Company all materials that relate to the Company, its business, its Clients or Potential Clients which came into the Employee's possession during the Employee's employment by the Company.

Paragraph 4 of the Agreement states that for the six-month period following the end of Nichols' employment with Garelli Wong, he would not, for the benefit of any "Competitive Business":

directly or indirectly perform services for or solicit (or assist other persons or entities to perform services for, or solicit) any Client for which the Employee, during the one-year period prior to the termination of the Employee's employment with the Company: 1) performed services, 2) had any direct Client or Potential client, or 3) received financial credit for any placements.

After MPS purchased Garelli Wong, Nichols entered into a Restricted Stock Agreement (the [*6] "RSA") with

MPS. The RSA specifically provided that, for purposes of the restrictive covenants set forth in the RSA, the term "Employer" included subsidiaries or affiliates of MPS. As per the RSA, Nichols was entitled to 1,500 unvested shares of MPS Group's common stock, which had a vesting date (the "Vesting Date") of March 7, 2008. If Nichols ended his employment prior to the Vesting Date, he forfeited all 1,500 shares. Nichols also agreed to a restrictive covenant clause in the RSA, which states, in part:

> In consideration of being offered the Award herein, Employee hereby agrees that during his...employment with the Company...and for the period of twelve (12) months immediately following the termination of Employee's employment such that Employee is no longer employed in any capacity with the...Company...Employee shall not, either directly or indirectly...engage in or assist others in...:

> (c) entering into, engaging in, being employed by, being connected to, consulting or rendering services for, any enterprise that is offering or performing services similar to, or in competition with, business or services offered or performed by Employer at the time of the termination of Employee's employment [*7] from the Employer...within a 50 square mile radius of each office to which Employee was assigned or, if in management, each office or offices under Employee's managerial authority, at any time during the twelve (12) month period immediately preceding the termination of Employee's employment from the Employer...

On September 28, 2007, Nichols voluntarily resigned from employment with Garelli Wong. According to the complaint, Nichols is currently working in direct competition with Garelli Wong. Prior to his resignation, Garelli Wong alleges that Nichols compiled significant amounts of Garelli Wong's confidential and proprietary client and candidate information by entering the Database without proper authority to do so. According to Garelli Wong, Nichols attempted to send this information to his personal e-mail account and/or copied it for his personal use.

Garelli Wong alleges that immediately following Nichols' resignation, he contacted a Garelli Wong candidate and attempted to recruit that candidate for a position on behalf of his new and current employer. In order to contact that candidate, Nichols used information to which only Garelli Wong employees had access.

In October 2007, Garelli [*8] Wong learned that Nichols had solicited and attempted to recruit a Garelli Wong candidate. Garelli Wong also learned that Nichols contacted or was trying to contact one or more Garelli Wong clients to set up meetings. Garelli Wong believes that Nichols is now working for a new company in a capacity similar to the position he held with Garelli Wong and is using the confidential and proprietary information he obtained from Garelli Wong to contact, solicit, recruit, or attempt to solicit and recruit Garelli Wong's candidates in order to compete against Garelli Wong for those clients.

On November 2, 2007, Garelli Wong filed a three-count complaint against Nichols. The complaint sets out two breach of contract claims and one violation of federal law. The first count alleges that Nichols violated the Agreement he entered into with Garelli Wong. The second count alleges Nichols breached the RSA he entered into with MPS. The final count states that Nichols violated the Computer Fraud and Abuse Act ("CFAA"), *18 U.S.C. § 1030 et seq.* Nichols filed a motion to dismiss Garelli Wong's complaint pursuant to *Federal Rules of Civil Procedure 12(b)(1)* and *(6).* Nichols argues that Garelli Wong's CFAA [*9] count fails to state a claim upon which relief can be granted and contends that if the CFAA claim is dismissed, Garelli Wong's two remaining counts should be dismissed pursuant to *Fed. R. Civ. P. 12(b)(1)* because federal jurisdiction would not be present.

## LEGAL STANDARD

*Fed. R. Civ. P. 12(b)(6)* evaluates the legal sufficiency of a plaintiff's complaint. *Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990).* In ruling on a motion to dismiss, a court must draw all reasonable inferences in favor of the plaintiff, construe all allegations of a complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Bontkowski v. First Nat'l*

*Bank of Cicero, 998 F.2d 459, 461 (7th Cir. 1993); Perkins v. Silverstein, 939 F.2d 463, 466 (7th Cir. 1991).* To be cognizable, the factual allegations contained within a complaint must raise a claim for relief "above the speculative level." *Bell Atlantic Corp. v. Twombly, -- U.S. --, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007).* However, a pleading need only convey enough information to allow the defendant to understand the gravamen of the complaint. *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 627 (7th Cir. 1999).*

The [*10] purpose of a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(1)* is to dismiss claims over which a federal court lacks subject matter jurisdiction. Jurisdiction is the "power to decide" and must be conferred upon a federal court. *In re Chicago, Rock Island & Pac. R.R. Co., 794 F.2d 1182, 1188 (7th Cir. 1986).* The plaintiff bears the burden of establishing that the jurisdiction requirements have been met. *see Kontos v. U.S. Dep't of Labor, 826 F.2d 573, 576 (7th Cir. 1987).* When a defendant moves for dismissal pursuant to *Fed. R. Civ. P. 12(b)(1)*, the plaintiff must support its allegations with competent proof of jurisdictional facts. *Thomson v. Gaskillwsa, 315 U.S. 442, 446, 62 S. Ct. 673, 86 L. Ed. 951 (1942).*

With these principles in mind, we consider the instant motion.

## DISCUSSION

### I. Computer Fraud and Abuse Act

The subject matter jurisdiction of Garelli Wong's complaint is premised entirely upon its CFAA count. As such, we will look to the sufficiency of this claim first. As Nichols correctly points out, the complaint does not specify the sections of the statute upon which it relies. However, *18 U.S.C. § 1030(g)* mandates that a civil action pursuant to the CFAA "may be brought only if the conduct involves 1 [*11] of the factors set forth in *clause (i), (ii), (iii), (iv)*, or *(v) of subsection (a)(5)(B).*" The allegations in Garelli Wong's complaint contain language that could apply to violations of *§ 1030(a)(5)(B)(i)* as it pertains to *§1030(a)(5)(A)(i), (ii)*, and *(iii)*:

Whoever-

(5)(A)(i) knowingly causes the transmission of...information...and as a result of such conduct, intentionally causes **damage** without authorization, to a protected computer;

(ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes **damage;** or

(iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes **damage...; and**

(5)(B)(i) by conduct described in clause (i), (ii), or (iii) of subparagraph (A), caused ... **loss** to 1 or more persons during any 1-year period...aggregating at least $ 5,000 in value.

(emphasis added).

A point of contention between the parties exists at to whether a plaintiff must allege both damage and loss in order to sufficiently plead a civil action under the CFAA or whether pleading damage or loss is enough. A thorough reading of the text above shows that it is necessary for a plaintiff to plead both damage [*12] and loss in order to properly allege a civil CFAA violation.

The CFAA defines "damage" as "impairment to the integrity or availability of data, a program, a system, or information." *18 U.S.C. § 1030(e)(8).* "Loss" is defined under the CFAA to mean:

any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or

Case 1:08-cv-01519    Document 17-2    Filed 03/20/2008    Page 12 of 40

Page 5
2008 U.S. Dist. LEXIS 3288, *12

information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.

*18 U.S.C. § 1030(e)(11).*

Incorporating these definitions into its argument, Nichols contends that his alleged unauthorized acts of copying and emailing Garelli Wong's computer files did not impair the integrity or availability of the information in the Database and did not cause any interruption to the computer service. More pointedly, Nichols' argument is that one cannot be held civilly liable under the CFAA for copying information from a computer without authority to do so; a violation requires more.

**A. Damage**

According to Nichols, Garelli Wong's CFAA count should be dismissed because the complaint does not and cannot allege [*13] damage or loss as defined by the CFAA. Nichols cites *Airport Centers, LLC v. Citrin* in support of his position that the unauthorized copying and emailing of files from a computer is not enough to form the basis of a civil action under the CFAA. *440 F.3d 418 (7th Cir. 2006)*. In *Citrin,* the defendant was employed by the plaintiff and given a company laptop to use and record data he collected while working. *Id.* at 419. The defendant then quit his job with the plaintiff and began working for himself. *Id.* Before returning the laptop to the plaintiff, the defendant deleted all the data on it and installed a secure-erasure program to prevent recovery of the deleted files. *Id.* In finding that the plaintiff had sufficiently stated a civil claim under the CFAA, the Seventh Circuit confirmed that installing a program intended to erase and delete files is sufficient to show damage as it is defined under the CFAA because the installation of such a program impairs the integrity or availability of data, programs, or information on the computer. *Id.*

Although the principal discussion in *Citrin* involved the meaning of the term "transmission" as used in § 1030(a)(5)(B)(i), the damage referred to the computer [*14] files (as opposed to the physical computer), that is, the deletion of data stored in the computer. The statutory requirement of *damage* was satisfied since the defendant's acts impaired the integrity or availability of data. No similar allegation is made in the instant case.

In further support of his position, Nichols cites *ResDev v. Lot Builders* and *Worldspan v. Orbitz, LLC,* two unpublished cases, which discuss "integrity" as it is used in the CFAA's definition of damage. *2005 U.S. Dist. LEXIS 19099, 2005 WL 1924743 (M.D. Fla. Aug. 10, 2005); 2006 U.S. Dist. LEXIS 26153, 2006 WL 1069128 (N.D. Ill. April. 19, 2006).* We believe the discussion of "integrity" in these cases lends guidance in the instant matter. In *ResDev,* defendants allegedly visited their former employer's website and accessed information that was not password protected. *2005 U.S. Dist. LEXIS 19099, 2005 WL 1924743 at *1.* The plaintiff in *ResDev* sought to recover damages under the CFAA based on the defendants viewing of the information and the information's alleged trade secret value. *Id.* Ultimately, the *ResDev* court held that the CFAA's use of the word "integrity" to define damage required "some diminution in the completeness or useability of data or information on a computer system" and concluded that [*15] the defendants' alleged conduct "did not come within the CFAA's meaning[;]" and therefore did not violate the CFAA. *2005 U.S. Dist. LEXIS 19099, [WL] at *5.*

The *Orbitz* court's analysis of the *ResDev* court's discussion of "integrity" is also worth mentioning. In *Orbitz,* the court found that the plaintiff's complaint "merely parrot[ed] the 'causing damage' text of the CFAA in conclusory fashion and fail[ed] to allege any facts indicating that the completeness, useability, or availability of [the plaintiff's] data was impaired." *Orbitz, 2006 U.S. Dist. LEXIS 26153, 2006 WL 1069128 at *5.* As a result, the *Orbitz* court rejected the plaintiff's argument that "the mere 'taking of information' constitute[d] 'damage' under the CFAA." *Id.*

Garelli Wong cites several district court cases in opposition of Nichols' arguments. However, we find none of these cases persuasive. First, Garelli Wong cites *George S. May Intern. Co. v. Hostetler,* a 2004 case decided by this court, where we held: "we see no principled reason, nor has [defendant] offered one, why infringement of copyrighted material taken from a protected computer system would not qualify as impairment of the integrity of the copyrighted information." *2004 U.S. Dist. LEXIS 9740, 2004 WL 1197395, *4.* In *Hostetler,* the plaintiff [*16] alleged that the defendant used his access to his company's computer system to take several copyrighted documents with him when he ended his employment and, then, later used these documents to the detriment of his former employer.

*2004 U.S. Dist. LEXIS 9740, [WL] at *3.* As our holding in *Hostetler* makes clear, the defendant in *Hostetler* did not provide us with any reasons on which to base a finding in its favor. *2004 U.S. Dist. LEXIS 9740, [WL] at *4.* We also point out that the CFAA was amended after the decision in *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121. (W.D.Wash. 2000),* a case relied on in *Hostetler.* Such reliance is no longer compelling in light of the statutory amendments and other cases decided post-amendment.

Similarly, we are not inclined to follow *Pacific Aerospace & Electronics, Inc. v. Taylor,* which Garelli Wong cites to show that misappropriation is considered to be damage or loss under the CFAA. The *Taylor* court conducted an extensive review of the CFAA before it explained that "caselaw supports an employer's use of the CFAA's civil remedies to sue [its] former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's [*17] computer systems." *295 F. Supp. 2d 1188, 1195 (E.D.Wash. 2003).* The conclusion reached in *Taylor* does not take into account that a civil violation of the CFAA requires "impairment to the integrity or availability of data, a program, a system, or information" and "interruption in service." *18 U.S.C. § 1030.* Allegations of trade secret theft and misappropriation do not suggest such a violation. Furthermore, the *Taylor* court partly based its conclusion on *Shurgard,* which we no longer find influential for reasons given above.

Ultimately, we find that *ResDev* and *Orbitz* set out the correct analysis to be performed in deciding whether allegations are sufficient to properly plead damage under the CFAA. Though Garelli Wong would like us to believe that recent amendments to the CFAA are intended to expand the use of the CFAA to cases where a trade secret has been misappropriated through the use of a computer, we do not believe that such conduct alone can show "impairment to the integrity or availability of data, a program, a system, or information." *18 U.S.C. § 1030(e)(8).* Therefore, we conclude that Garelli Wong has failed to sufficiently plead damage under the CFAA.

**B. Loss**

As previously mentioned, [*18] Nichols believes that Garelli Wong's CFAA count should be dismissed because the complaint does not and cannot allege loss as defined by the CFAA. Garelli Wong cites *Patriot Homes, Inc. v. Forest River Housing, Inc.* for the proposition that

it asserted a cognizable claim under the CFAA by alleging that it suffered "losses" in excess of $ 5,000 as a result of Nichols' conduct. *2006 U.S. Dist. LEXIS 45486, 2006 WL 1752143, *4 (N.D. Ind. June 21, 2006).* Nichols counters with the discussion set out in *ResDev* that it is not enough to simply allege any monetary expenditure to assert a cognizable claim under the CFAA; instead, "loss" is limited to costs that are "directly associated with, or with addressing, an unauthorized computer-access event." *2005 U.S. Dist. LEXIS 19099, 2005 WL 1924743 at *4.* The Supreme Court recently clarified that to properly plead a cause of action, a plaintiff must "provide the 'grounds' of his 'entitle[ment] to relief' [with] more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly, 127 S. Ct. at 1959.* In its current form, the complaint states only that "Defendant's conduct caused losses to Garelli Wong in excess of $ 5,000" with no further elaboration. While we [*19] agree with Nichols that Garelli Wong does not presently allege loss, we disagree that it cannot do so. Conceivably, Garelli Wong could provide the necessary information in an amended complaint (consistent with its obligations under *Fed. R. Civ. P. 11* that such an allegation is made only after reasonable inquiry into its factual foundation). However, in light of our conclusions that both damage and loss are necessary to state a cause of action under the CFAA and that Garelli Wong cannot allege damage, dismissal of Count III is warranted even though Garelli Wong could address the deficiencies within its allegations of loss in an amended complaint.

**II. State Law Claims**

The sole jurisdictional basis asserted for Counts I and II is the supplementary jurisdiction provided by *28 U.S.C. § 1367(a).* When a district court dismisses all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over the remaining claims. *28 U.S.C. § 1367(c)(3).* In our circuit, the preferred course of action is to relinquish jurisdiction in such circumstances without good reasons to do otherwise. *Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 727 (7th Cir. 1998).* [*20] Garelli Wong has not offered a compelling reason for us to maintain jurisdiction over its state-law claims, and in light of the early stage of this case, we will decline to exercise jurisdiction over Counts I and II. Therefore, those counts are dismissed for lack of subject matter jurisdiction.

2008 U.S. Dist. LEXIS 3288, *20

**CONCLUSION**

For the foregoing reasons, Count III of Garelli Wong's complaint is dismissed for failure to state a claim. Counts I and II are dismissed for lack of subject matter jurisdiction.

/s/ Charles P. Kocoras

Charles P. Kocoras

United States District Judge

Dated: January 16, 2008

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1924743 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**C**Resdev, LLC v. Lot Builders Ass'n, Inc.
M.D.Fla.,2005.
Only the Westlaw citation is currently available.
United States District Court,M.D. Florida.
RESDEV, LLC, Plaintiff,
v.
LOT BUILDERS ASSOCIATION, INC., Michael
Shannon Boswell & Brad Lukens, Defendants.
No. 6:04-CV-1374ORL31DAB.

Aug. 10, 2005.

Barbara Rudolph Smith, Herbert L. Allen, Allen,
Dyer, Doppelt, Milbrath & Gilchrist, P.A., Orlando,
FL, for Plaintiff.
Matthew David Pardy, Kim, Pardy & Rodriquez,
P.A., and Daniel P. Osterndorf, Daniel H. Coultoff,
Gronek & Latham LLP, Orlando, FL, for Defendants.

ORDER

PRESNELL, J.
*1 This case is before the Court on Defendants Lot
Builders Association Inc.'s, Michael Boswell's, and
Brad Luken's (collectively, "Lot Builders") Motion
for Summary Judgment (Doc. 52), Plaintiff ResDev
LLC's Cross Motion for Summary Judgment (Doc.
53), and Resdev's and Lot Builder's respective
Oppositions (Docs. 73 and 71).

I. BACKGROUND

ResDev has sued Lot Builders for violation of the
Computer Fraud and Abuse Act, 18 U.S.C. § 1030
("CFAA"), on ground that Lot Builders absconded
with ResDev's "scattered-lots database," a
computerized resource on available residential
lots.[FN1]Lot Builder's principals, two former ResDev
employees, acknowledge that, after leaving ResDev's
employ, they visited its website and were able to
access information that was not password protected.
Based on that event and others, ResDev claims that
Lot Builders committed unauthorized computer
access in violation of the CFAA, and ResDev seeks
to recover, *inter alia,* damages based on the
information's alleged trade secret value. Lot Builders
asserts, in response, that ResDev has not suffered

cognizable loss.

> FN1. ResDev has also sued Lot Builders in
> state court on various unfair-competition
> claims.

II. STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if
the pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a
judgment as a matter of law."FED. R. CIV. P. 56(c).
Whether a fact is material depends on the substantive
law of the case. *Anderson v. Liberty Lobby, Inc.,* 477
U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986). If there is an absence of evidence on a
dispositive issue for which the nonmoving party
bears the burden of proof, that party must "go beyond
the pleadings and by ... affidavits, or by the
depositions, answers to interrogatories, and
admissions on file, designate specific facts showing
that there is a genuine issue for trial."*Celotex Corp. v.
Catrett,* 477 U.S. 317, 324-25, 106 S.Ct. 2548, 91
L.Ed.2d 265 (1986) (internal quotations and citation
omitted). Summary judgment is mandated against the
nonmoving party who thereafter fails to present
sufficient evidence to establish a genuine issue of fact
for trial. *Id.* at 322, 324-25.

In this review, the Court must consider all inferences
drawn from the underlying facts in a light most
favorable to the nonmoving party, and resolve all
reasonable doubts against the moving party.
*Anderson,* 477 U.S. at 255. If a material issue of fact
exists, the court must not decide it, but rather, must
deny summary judgment and proceed to trial.
*Environmental Def. Fund v. Marsh,* 651 F.2d 983,
991 (5th Cir.1981).[FN2] But "there is no issue for trial
unless there is sufficient evidence favoring the
nonmoving party for a jury to return a verdict for that
party. If the evidence is merely colorable, or is not
significantly probative, summary judgment may be
granted."*Anderson,* 477 U.S. at 249-50 (citations
omitted).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 2
Not Reported in F.Supp.2d, 2005 WL 1924743 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

FN2. Unless reversed, decisions of the Fifth Circuit prior to October 1, 1981 are binding precedent on this Court. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

## III. LEGAL ANALYSIS

**\*2** This case turns primarily on statutory construction. In that regard, there are certain basic rules this Court must follow.

There is a presumption that, in drafting a statute, Congress said what it meant and meant what it said. *American Bankers Ins. Group v. United States,* 408 F.3d 1328, 1332 (11th Cir.2005). Indeed, "[t]he first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute." *Shotz v. City of Plantation, Florida,* 344 F.3d 1161, 1167 (11th Cir.2003). Words carry their ordinary meaning, unless otherwise defined. *American Bankers,* 408 F.3d at 1332. If Congress has used clear statutory language, a court need not consider extrinsic materials, such as legislative history, and certainly should not derive from such materials a meaning that is inconsistent with the statute's plain meaning. *Shotz,* 344 F.3d at 1167. The only exception is this narrow one: "courts my reach results inconsistent with the plain meaning of a statute 'if giving the words of a statute their plain and ordinary meaning produces a result that is not just unwise but is clearly absurd." ' *CBS Inc. v. PrimeTime 24 Joint Venture,* 245 F.3d 1217, 1228 (11th Cir.2001) (citation omitted).

Even where Congress has used statutory language that is not entirely transparent, courts are to resort, in the first instance, to canons of construction-time-tested interpretive rules developed to determine the meaning of individual statutory terms from a methodical inquiry into their broader, statutory context. *Id.* at 1225.In construing a statute's meaning and application to a particular case, a court should resort to extrinsic materials, such as legislative history, only if the statutory language either produces a clearly absurd result or presents a substantial ambiguity. *See Shotz,* 344 F.3d at 1367;*CBS Inc.,* 245 F.3d at 1225.

### A. Relevant Excerpts of the CFAA's Statutory Text

(a) Whoever-

...

(5)(A)(i) knowingly causes the transmission of ... information ... and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

(ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage; and

(B) by [such] conduct described in ... subparagraph (A) caused ...-

(i) *loss* to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value;

(ii) the modification or impairment, or potential modification or impairment of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

(iii) physical injury to any person;

(iv) a threat to public health or safety; or

(v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security.

**\*3** ...

shall be [subject to criminal penalties].

(e) As used in this section-

...

(8) the term *"damage"* means any impairment to the integrity or availability of data, a program, a system, or information;

...

(11) the term *"loss"* means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service;

...

(g) Any person who suffers *damage* or *loss* by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv) or (v) of subsection (a)(5)(B). Damages for a violation involving only conduct described in subsection (a)(5)(B)(i) are limited to economic damages. * * *

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1924743 (M.D.Fla.)
(Cite as: Not Reported in F.Supp.2d)

No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

18 U.S.C. § 1030 (emphasis added).

## B. Construction of the CFAA's Relevant Statutory Text

At the outset, subsection (g) cites two explicitly-defined injuries-"damage" or "loss"-either of which a plaintiff must suffer, as a result of a CFAA violation, in order to maintain a cause of action for "compensatory damages." Id. (g). A further precondition is that the alleged violation involve one of five enumerated factors. Id. For example, if a hospital patient suffers "damage"-an "impairment to the ... availability of ... information"-by reason of a CFAA violation, the patient may maintain a civil action against the violator for compensatory damages, if the violation also involved "impairment ... of care" or "physical injury." Id. (g), (e)(8), (a)(5)(B)(ii)-(iii)(g). In this regard, the CFAA's private cause of action is principally defined by a two-part injury requirement; a plaintiff must suffer a certain type of root injury, which is not sufficient to support a civil action, unless one of five operatively-substantial effects occurs. Id. (a)(5)(B)(i)-(v), (g).

A plaintiff who has suffered injuries fitting subsection (g)'s two-part injury requirement may, in turn, obtain "compensatory damages and injunctive relief or other equitable relief." Id. (g). In ordinary legal parlance, "compensatory damages" are "[d]amages sufficient in amount to indemnify the injured person for the loss suffered." BLACK'S LAW DICTIONARY 416 (8th ed.2004). And in ordinary practice, "compensatory damages are not restricted to actual loss of time or money; they cover both mental and physical aspects of injury-tangible and intangible." ELEVENTH CIRCUIT PATTERN JURY INSTRUCTIONS (CIVIL CASES), Federal Claims Instruction 1.2.1 (1999). Subsection (g), however, further limits the available damages to "economic damages," if a violation involved only conduct which caused "loss" aggregating at least $5,000 in a 1-year period. Id. So it is fairly clear that, for conduct which results only in "loss," the only available measure of damages is actual monetary loss. 18 U.S.C. § 1030(g). Thus, besides requiring "damage" or "loss," subsection (g)'s terminology

provides two additional limits in regard to damages-damages must be "compensatory" and, for "loss," can only be "economic." Id.

### 1. ResDev's Principal Position

*4 In the instant case, ResDev claims, as its greatest loss, an amount equal to Lot Builders' revenues, about $175,000, which ResDev sees as resulting from Lot Builder's unauthorized obtainment of ResDev's scattered-lots database. ResDev also acknowledges that the viability of its civil action hinges on subsection (a)(5)(B)(i). ResDev, therefore, assumes that Lot Builder's allegedly ill-gotten revenues qualify as "loss" aggregating over $5,000 in a 1-year period. See id.(a)(5)(B)(i). ResDev's position, however, does not fit the CFAA's meaning of "loss."

The CFAA defines "loss" in terms of "any reasonable cost." Id. (e)(11). "Cost" ordinarily means an "amount paid or charged for something; price or expenditure." BLACK'S LAW DICTIONARY 371 (8th Ed.2004). The CFAA's "loss" definition goes on to list costs that are similar in that they are all directly associated with, or with addressing, an unauthorized-computer-access event. Among those costs are: "any revenue lost, cost incurred, or other consequential damages incurred *because of interruption of service.*" 18 U.S.C. § 1030(e)(11) (emphasis added). By use of the term "cost" and its listing potential injuries directly associated with, or with addressing, an unauthorized-computer-access event, the CFAA plainly enumerates a narrow grouping of "loss" distinct from-and thus excluding-the far greater range of losses that could flow from a violation of the CFAA. ResDev's position, that "loss" can cover a trade secret's exclusivity value, disregards the ordinary meaning of statutory terms, fails to account for surrounding context, and runs counter to the *"expression unius..."* canon of construction, which translates as "the expression of one implies the exclusion of others." See Barnhart v. Peabody Coal Co., 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003) (indicating that *expressio unius* cannon has force "when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence.").

Furthermore, to the extent ResDev asserts that sufficient "damage" or "loss" can open the door to a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

broader class of damages, ResDev's position both ignores subsection (g)'s wording: "[a]ny person *who suffers damage or loss* by reason of a violation of this section may maintain a civil action against the violator to obtain *compensatory damages,*"18 U.S.C. § 1030(g)(emphasis added); and also ignores the selection of factors listed in subsection (a)(5)(B). Each of the explicitly-defined root injuries-"damage" or "loss"-is an immanently foreseeable effect of unauthorized computer access, and subsection (a)(5)(B)'s five-factor list includes things which clearly may result from "damage" or otherwise constitute "loss." ResDev's position fails to acknowledge that allegedly ill-gotten revenues from a trade secret are neither a "but-for" nor a proximate consequence of "damage," and nor do they fit within the grouping of "loss." In that regard, ResDev's position conflicts with the CFAA's language, where the *sine qua non* of the private cause of action-either of two explicitly-defined root injuries-narrows the available "damages" to "compensatory damages"-those damages which result from, or constitute, an explicit type of injury.

**\*5** Although ResDev cites two cases that appear to support its position, neither is helpful. In *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.,* 119 F.Supp.2d 1121 (W.D.Wash.2000), the district court considered a version of the CFAA predating its most recent version. On or after October 26, 2001, Congress amended the CFAA, in relevant part, by defining the term "loss" in subsection (e)(11).*See* USA Patriot Act of 2001, Pub.L. No. 107-56, § 814(d)(5). That rendered subsection (g)'s reference to "damage" and "loss" a reference to two defined terms, which was not previously the case. See 18 U.S.C. § 1030 (1996). Whereas ResDev's principal alleged loss-trade secret value-may have been considered an actionable loss under the CFAA's previous version, its current version precludes that interpretation.[FN3]

> FN3. Another thing that detracts from *Shurgard* is its heavy reliance on legislative history. *Id.* at 1126-29.For instance, based on legislative history, *Shurgard* adopted an unusual and extraordinary interpretation of the word "integrity" within the CFAA's definition of "damage"-*i.e.,*"any impairment to the integrity or availability of data ... or information."It found "integrity" to

contemplate the loss of a trade secret's exclusivity value. *Id.* at 1126-27."Integrity," however, ordinarily means "wholeness" or "soundness," OXFORD ENGLISH REFERENCE DICTIONARY 731 (Rev. 2nd ed.2002), and contemplates, in this context, some diminution in the completeness or useability of data or information on a computer system. This Court finds no meaningful ambiguity that might weigh in favor of relying on legislative history, especially when it predates the CFAA's more recent amendments. And, whether real or apparent, there appears to have been a recent up-tick in cases looking ill upon such analyses. *See e.g., Exxon Mobil Corp. v. Allapattah Servs. Inc.,* 545 U.S. 546, ----, 125 S.Ct. 2611, 2626, 162 L.Ed.2d 502, ---- (2005) (favorably mentioning the view that legislative-history analyses are akin to "looking over a crowd and picking out your friends.").

As to the second case, it is unfortunate that in *Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.,* the court failed to analyze the effect of the CFAA's 2001 amendments and relied on both *Shurgard* and another case dealing with an earlier version of the statute. *See Four Seasons Hotels,* 267 F.Supp.2d 1268, 1322 (S.D.Fla.2003) (otherwise relying on *EF Culture Travel, B.V. v. Explorica, Inc.,* 274 F.3d 577, 585 (1st Cir.2001), which defined "loss" as "detriment, disadvantage, or deprivation from failure to keep, have or get.").[FN4] In the end, however, it is Congress' words and definitions that generally control statutory meaning. *See American Bankers,* 408 F.3d at 1332. The CFAA's amendment and current language were not meaningfully analyzed, nor perhaps even flagged as a concern, in *Four Seasons Hotels,* and the absence of meaningful analysis renders that case unpersuasive.

> FN4. In an unpublish, non-precedential opinion, the Eleventh Circuit affirmed the district court's liability determination without discussion.

2. ResDev's Secondary Position

In its Opposition (Doc. 73), ResDev claims, as a

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2005 WL 1924743 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.2d)**

fallback, that it has incurred loss by having to undertake extensive and costly efforts in response to Lot Builder's unauthorized computer access. It is undisputed that Lot Builder's principals no longer work at ResDev's place of business. Accordingly, remote access is the ongoing threat that apparently causes ResDev concern.[FN5] As an indication of the threat's magnitude, ResDev points out that one of Lot Builder's principals helped design ResDev's computer system, knows "the type of security he placed on the computers at ResDev, how the security was set up, how many levels of security were in place and where the vulnerabilities in ResDev's security existed."Based on the view that its computers "will never be truly secure" until it sets up "a new security framework," ResDev estimates that the ultimate cost of responding to the threat will probably exceed $150,000, exclusive of interim cost for security evaluation and implementation.

> FN5. The Court finds utterly meritless ResDev's suggestion that a CFAA violation occurs every time Lot Builders accesses its own computers and allegedly looks at information belonging to Resdev. Such access, if it can be called that, is conduct from which ResDev could not, as a matter of law, reasonably suffer "damage" or "loss" within the CFAA's meaning.

Whether by strategy or a lack of notice, Lot Builders has not clearly addressed ResDev's cost-of-response estimates. Lot Builders has indicated, however, that the extent of its remote access has been one or more visits to ResDev's website; that, each time, the visit to the website occurred under attorney supervision; and that the purpose of the visits was to show how ResDev's website is not adequately secured. Lot Builders, therefore, may have challenged (albeit vaguely) whether its conduct could give rise to cognizable loss.

**\*6** In that regard, the CFAA provides potential redress for "loss," which includes "any reasonable cost" of responding to a violation. 18 U.S.C. § 1030(e)(11), (g). To enable a cause of action, however, the "loss" from a violation must aggregate at least $5,000 to 1 or more persons in a 1-year period. *Id.* (a)(5)(B)(i), (g). The CFAA, in addition, explicitly rejects any notion that it provides a cause of action for negligent computer hardware or

software design. *Id.* (g).

Based on the current state of the record, the Court cannot say that either party has revealed the absence of a material issue of fact. Yet it is evident that, at least insofar as ResDev seeks to recoup the cost of building a new computer system with far greater security, the reasonableness of ResDev's alleged "loss" will be an issue. The parties, however, simply have not presented the issue in a manner in which this Court could reasonably consider it. Nevertheless, as the threshold viability of ResDev's cause of action depends on a minimum amount of "loss," the Court will consider, if filed by September 12, 2005, further pre-trial motions on that issue, even though the dispositive-motion's deadline has passed.

**IV. CONCLUSION**

For the foregoing reasons, it is therefore

ORDERED that Lot Builder's Motion for Summary Judgment (Doc. 52) is GRANTED in part and DENIED in part; ResDev's Motion for Summary Judgment (Doc. 53) is DENIED; and ResDev's claim is dismissed to the extent it seeks compensatory damages for alleged injuries that do not constitute "loss" within the meaning of the CFAA.

DONE and ORDERED.

M.D.Fla.,2005.
Resdev, LLC v. Lot Builders Ass'n, Inc.
Not Reported in F.Supp.2d, 2005 WL 1924743 (M.D.Fla.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                                           Page 1
Slip Copy, 2006 WL 1069128 (N.D.Ill.)
**(Cite as: Slip Copy)**

**C** Worldspan, L.P. v. Orbitz, LLC
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
WORLDSPAN, L.P., Plaintiff,
v.
ORBITZ, LLC, Defendant.
No. 05 C 5386.

April 19, 2006.

John Nicholas Gallo, Daniel Moore Twetten, Kyle
David Rettberg, William F. Conlon, Sidley Austin
LLP, Chicago, IL, for Plaintiff.
Paul Evans Chronis, Aron J. Frakes, Jeffrey J.
Bushofsky, Mark Jacob Altschul, McDermott, Will &
Emery LLP, Chicago, IL, for Defendant.

*MEMORANDUM OPINION*

GRADY, J.
**\*1** Before the court is defendant's motion to dismiss
the complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6). For the reasons explained below,
the motion is granted.

*BACKGROUND*

In this action, plaintiff Worldspan, L.P.
("Worldspan") alleges that defendant Orbitz, LLC
("Orbitz") violated the Consumer Fraud and Abuse
Act and breached the contract between the parties.
The complaint alleges the following facts, which are
taken as true for purposes of the instant motion.

Worldspan is a company that gathers and maintains
worldwide electronic travel data and provides travel
agencies, travel service providers, and corporations
with access to this data. Worldspan provides its
customers with real-time access to schedules, fares,
availability, and other travel data as well as the
ability to process reservations and issue tickets for
the products and services of travel suppliers such as
airlines, hotels, car-rental companies, tour companies,
and cruise lines. In the travel industry, Worldspan is
referred to as a "computer reservations system," or

CRS. As a CRS, its primary source of revenue is
"segment fees," which are fees that an airline or other
travel supplier pays to a CRS for each flight (or
equivalent travel service) that is booked through the
CRS. Worldspan passes a portion of the segment fees
along to its travel agency customers in order to
induce those agencies to use Worldspan's services.

*The Creation of Orbitz and Its Agreement with
Worldspan*

Orbitz is an online travel agency that was created and
developed in late 1999 and early 2000 pursuant to a
partnership among five airlines: American,
Continental, Delta, Northwest, and United. In order
for Orbitz to launch and operate its Web site, Orbitz
signed agreements with several companies, including
Worldspan, to provide necessary information and
infrastructure.

In August 2000, Worldspan and Orbitz entered into
an "Agreement for CRS Access and Related
Services" (the "Agreement"). Pursuant to the
Agreement, in exchange for Orbitz's payment of a
certain percentage of flight segments booked through
any CRS, Worldspan agreed to provide Orbitz with
(1) information about the availability of airline
segments; (2) the capability to book and issue airline
tickets; and (3) a shopping engine that would display
to Orbitz's users a comparison of available flight
routing options and pricing for international
itineraries.

Also in furtherance of the launch of Orbitz's Web
site, Orbitz and Worldspan in 2000 each individually
entered into contracts with ITA Software, Inc.
("ITA"). Pursuant to its agreement with ITA, Orbitz
paid ITA a fee for ITA to provide a shopping engine
that would display to Orbitz's users a comparison of
available flight routing options and pricing for
domestic itineraries. Pursuant to its agreement with
Worldspan, ITA in turn paid a fee to Worldspan to
obtain availability and other data for Orbitz and other
ITA customers.

*Orbitz's Development of the "Direct Connect" Model
and the Renegotiated, Amended Agreement with*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 2
Slip Copy, 2006 WL 1069128 (N.D.Ill.)
**(Cite as: Slip Copy)**

*Worldspan*

**\*2** Although Orbitz initially contracted with
Worldspan for the use of Worldspan's services, its
business model involves a reduction of dependence
on CRSs. According to the complaint, one of the
primary purposes of Orbitz is to allow bookings to be
made directly with certain airlines without the
involvement of a CRS (such as Worldspan). These
non-CRS bookings are part of Orbitz's "direct-
connect" business model; the goal under this model is
to obtain the data traditionally provided by a CRS
through other means and then book airline tickets
through direct connections to the airlines rather than
through a CRS. The direct-connect model is
"significant" to Worldspan because "when Orbitz
books a [flight] segment directly with an airline,
Worldspan does not receive any revenue whatsoever
from the airline."(Complaint ¶ 17.) <u>FN1</u>

> <u>FN1.</u> According to Worldspan, Orbitz has
> publicly misrepresented that it can operate
> its direct-connect program and deliver the
> services historically provided by a CRS
> without the involvement of a CRS. In
> Worldspan's view, "Orbitz relies on CRS
> services for each and every airline segment
> booked through Orbitz, even where Orbitz
> characterizes them as 'Direct Connect'
> segments."(Complaint ¶ 20 .)

Shortly before the summer of 2001, Orbitz indicated
its intent to proceed with its plans to implement the
direct-connect model, and it began renegotiating its
agreement with Worldspan-specifically, the terms
under which Orbitz could use Worldspan's data in
connection with the direct-connect bookings.
Worldspan states that prior to and during the
renegotiation process, it "made clear to Orbitz that
[Orbitz] was not authorized to use Worldspan's
availability data in connection with Direct Connect
segments until the parties had negotiated appropriate
compensation to Worldspan for such use."(*Id.* ¶ 29.)

In November 2001, Worldspan and Orbitz executed
an "Amended and Restated Agreement for CRS
Access and Related Services" (the "Amended
Agreement"). The parties were not able to reach
agreement on all terms. Section 4.4 of the Amended
Agreement provided: "ITA Subscription Fee. The
parties agree to use their diligent best efforts to reach

a definitive agreement by December 31, 2001
whereby Orbitz shall pay Worldspan a subscription
fee in exchange for access to Worldspan's availability
information on air carrier seat inventory."(Complaint,
Ex. A, at 9.)

During 2002, Worldspan continued to attempt to
resolve "the manner in which Orbitz would be
permitted to use Worldspan's availability
data."(Complaint ¶ 31.) In the meantime, Orbitz
moved forward with its direct-connect program.
American was the first airline to become a direct-
connect customer of Orbitz, in August 2002.
Worldspan alleges that even though it had previously
"warned" Orbitz that Orbitz could not use
Worldspan's data in connection with direct-connect
segments, and it had "informed" ITA that ITA could
not use this data on behalf of Orbitz in connection
with these segments, Orbitz "stole" this availability
data for the American direct-connect flights and
failed to compensate Worldspan for the data.

*The First Amendment to the Amended Agreement*

"In August 2002, when Worldspan learned that
Orbitz was improperly using Worldspan's availability
data in connection with the Direct Connect program,
Worldspan informed Orbitz that its access to the
Worldspan system would be terminated unless
Orbitz's improper conduct ceased."(*Id.* ¶ 41.)This
notice led to further negotiations between the parties
regarding Orbitz's use of the availability data. The
result was the "First Amendment" to the Amended
Agreement. In Worldspan's view, the First
Amendment altered the Amended Agreement "in at
least three significant ways."(*Id.* ¶ 48.)First, Orbitz
agreed to book all of its "Airline Non-Direct Connect
Segments" through Worldspan.<sup>FN2</sup>(Complaint, Ex. B,
§ 4(a).) Second, Orbitz agreed to not "directly or
indirectly acquire or use any products or services
from a CRS other than Worldspan to support or use
with the Orbitz Website for Airline Direct Connect
Customers."(Orbitz's Memorandum in Support of
Motion to Dismiss, Ex. A, First Amendment, § 4(c).)
Third, the First Amendment provided that "Orbitz
shall not use the Worldspan System to search for
fares, rates, schedules or itineraries that involve
Airline Direct Connect Segments," and required
Orbitz to "discontinue all access, either directly or
through ITA, to the Worldspan System" with respect
to Airline Direct Connect Segments for a particular

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

airline within ninety days of that airline becoming a participant in the Direct Connect program. (*Id.,* §§ 4(c)(vii) & 6(a).) The First Amendment further provided that in the event Orbitz (or ITA on behalf of Orbitz) continued to access Worldspan's availability data after the end of that ninety-day period, Orbitz would be required to pay Worldspan a "monthly processing fee" as specified in a schedule to the First Amendment.

> FN2. The First Amendment defines an "Airline Non-Direct Connect Segment" as "each direct or through flight booked by means of the Orbitz Website that is not an Airline Direct Connect Segment."(Complaint, Ex. B, at 12.) An "Airline Direct Connect Segment" is defined as "each nonstop or direct airline flight booked by means of the Orbitz Website with an Airline Direct Connect customer using that carrier's internal airline reservation system and not using a CRS or global distribution system."(*Id.*)

*The Alleged "Misconduct"*

**\*3** The complaint alleges that, since the execution of the First Amendment, "Orbitz has repeatedly stolen Worldspan's data and violated the [Amended Agreement] and First Amendment."(Complaint ¶ 58.) First, beginning in January 2004 and continuing through at least part of February 2004, Orbitz obtained "Power Shopper" data from Worldspan when it was not authorized to do so by issuing repeated data queries during overnight periods. Second, Orbitz sent "far in excess" of the 500 queries per day it was permitted to send to Worldspan regarding airline taxes and surcharges. Third, Orbitz improperly used Worldspan's seatmap data for direct-connect flights. Worldspan also alleges that Orbitz used Galileo, a CRS, as well as ITA, which in Worldspan's view has now become a CRS, in violation of the First Amendment.

Worldspan filed the complaint in this action on September 19, 2005. Count I is a claim for violation of the Consumer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A)(iii). Counts II-IV are claims for breach of contract. In Count V, Worldspan seeks to enjoin Orbitz from accessing Worldspan's seatmap data and from using ITA and Galileo.

Orbitz now moves to dismiss the complaint. Also pending is Worldspan's motion to transfer and consolidate.

*DISCUSSION*

A. *Orbitz's Motion to Dismiss*

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure § 1356, at 354 (3d ed.2004).* When evaluating such a motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Hentosh v. Herman M. Finch Univ. of Health Sciences,* 167 F.3d 1170, 1173 (7th Cir.1999). Dismissal is appropriate only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." ' *Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir.1997).

Worldspan's only federal claim is for violation of the Computer Fraud and Abuse Act (the "CFAA"), 18 U.S.C. § 1030. Worldspan alleges that Orbitz violated § 1030(a)(5)(A)(iii), which prohibits the intentional access of a protected computer [FN3] "without authorization" and thereby "caus[ing] damage." The CFAA is a criminal statute, but it permits a civil action by "[a]ny person who suffers damage or loss" from conduct prohibited by the statute if the plaintiff can satisfy one of five factors. 18 U.S.C. § 1030(g). The factor relevant to Worldspan's claim is whether defendant's conduct caused "loss to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value."18 U.S.C. § 1030(a)(5)(B)(i).

> FN3. The CFAA defines a "protected computer" as, *interalia,* a computer that is used in interstate or foreign commerce or communication. 18 U.S.C. § 1030(e)(2).

Orbitz's first argument for dismissal of Count I is that the documents attached to Worldspan's complaint contradict Worldspan's allegation that Orbitz accessed Worldspan's computers "without authorization," as required by § 1030(a)(5)(A)(iii).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Amended Agreement and its amendments are attached to Worldspan's complaint and thus considered part of the pleadings.

**\*4** The Amended Agreement states: "During the Term of this Agreement, WORLDSPAN will provide Orbitz ... with access to the WORLDSPAN System for purposes of the operation of the Orbitz Website and in accordance with the provisions of this Agreement."(Complaint, Ex. A, at 2.) In its response to Orbitz's motion, Worldspan concedes that "Orbitz was permitted access to Worldspan's computer and the use of information found there for some purposes, but Orbitz exceeded the permitted access and misused the seat map data."Worldspan argues that it nevertheless has stated a claim for violation of the CFAA because, in its view, accessing a computer "without authorization" includes "exceeding the degree of permissible access."(Worldspan's Mem. in Opposition to Motion at 4 .)

As the Seventh Circuit has noted, see _International Airport Centers, L.L.C. v. Citrin,_ 440 F.3d 418, 420 (7th Cir.2006), the CFAA explicitly distinguishes between the act of accessing a computer "without authorization" and the act of "exceeding authorized access." The CFAA provides a definition for the latter phrase. To "exceed authorized access" is "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."18 U.S.C. § 1030(e)(6).

In the complaint, Worldspan alleges that Orbitz accessed its computers "without authorization" in violation of § 1030(a)(5)(A)(iii). As noted above, § 1030(a)(5)(A)(iii) addresses the intentional access of a protected computer solely "without authorization" and not in excess of authorized access. In other words, that subsection does not prohibit "exceeding authorized access." It is significant that the language of § 1030(a)(5)(A)(iii) contrasts with that of other subsections of the statute, which target both types of access.

Worldspan argues that case law supports its position that "unauthorized access" includes "exceeding authorized access." The cases Worldspan cites in support of its argument, however, do not stand for that proposition. They involved alleged violations of other subsections of the statute, which do prohibit

"exceed[ing] authorized access," in contrast to the subsection involved here. In any event, even assuming those decisions support Worldspan's construction of the statute, we are disinclined to follow them because such an interpretation of the phrase "without authorization" would ignore the carefully-drawn statutory distinction between wholly unauthorized access and access beyond that which is authorized.

We agree with Orbitz that the allegation that Orbitz accessed Worldspan's computers "without authorization" is belied by the Agreement, which permits Orbitz to access Worldspan's computers. "It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."_Northern Ind. Gun & Outdoor Shows, Inc. v. City of South Bend,_ 163 F.3d 449, 454 (7th Cir.1998) (citing, interalia,_Bell v. Lane,_ 657 F.Supp. 815, 817 (N.D.Ill.1987) (stating that where exhibits attached to a complaint negate its allegations, a court is not required to credit the unsupported allegations)). Moreover, it is clear from the language of the CFAA that accessing a computer "without authorization" does not include "exceed[ing] authorized access." Because Worldspan has not adequately alleged that Orbitz accessed its computers "without authorization," Count I must be dismissed.

**\*5** An alternative ground for dismissal is Worldspan's failure to allege that Orbitz's conduct caused damage, as required by § 1030(a)(5)(A)(iii). The term "damage" is defined by the CFAA as "any impairment to the integrity or availability of data, a program, a system, or information."18 U.S.C. § 1030(e)(8). The CFAA does not define "integrity," but the dictionary definition is "an unimpaired or unmarred condition: entire correspondence with an original condition: SOUNDNESS."Webster's Third New International Dictionary 1174 (1971). The use of the word "integrity" "contemplates, in [CFAA] context, some diminution in the completeness or useability of data or information on a computer system."_Resdev, LLC v. Lot Builders Ass'n,_ No. 6:04-CV-13740RL31DAB, 2005 WL 1924743, at \*5 n. 3 (M.D.Fla. Aug.10, 2005). Given these definitions of "damage" and "integrity," we reject Worldspan's argument that the mere "taking of information" constitutes "damage" under the CFAA.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                         Page 5
Slip Copy, 2006 WL 1069128 (N.D.Ill.)
**(Cite as: Slip Copy)**

Orbitz correctly asserts that the complaint merely parrots the "causing damage" text of the CFAA in conclusory fashion and fails to allege any facts indicating that the completeness, useability, or availability of Worldspan's data was impaired. The conduct that is alleged is the mere "access" of Worldspan's computer system. One cannot draw the reasonable inference from this allegation that the integrity or availability of Worldspan's data was impaired, especially considering that the Amended Agreement authorized Orbitz to access the data in accordance with the contract terms. Accordingly, Worldspan's failure to adequately allege damage is an alternative ground for dismissal of the complaint. We need not reach Orbitz's remaining argument.

We have dismissed the federal claim in this case. In this circuit, "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on their merits." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 727 (7th Cir.1998). We see no reason to continue to exercise supplemental jurisdiction, see 28 U.S.C. § 1367(c); therefore, the state law claims are dismissed for lack of subject matter jurisdiction. (The dismissal is without prejudice to the refiling of the state-law claims in state court.)

B. *Worldspan's Motion to Transfer and Consolidate*

Around the same time Worldspan filed the instant complaint against Orbitz, Orbitz filed a complaint against Worldspan in the Circuit Court of Cook County. Worldspan removed that case to federal court; the case was assigned to Judge Bucklo and given case number 05 C 5972. Worldspan then filed a motion in the instant case to transfer 05 C 5972 to our docket and to consolidate that case with this proceeding. On April 3, 2006, Judge Bucklo granted Orbitz's motion to remand 05 C 5972 to the state court. Therefore, Worldspan's motion to transfer and consolidate will be denied as moot.

*CONCLUSION*

\*6 Defendant's motion to dismiss the complaint is granted. Plaintiff's motion to transfer and consolidate is denied as moot.

N.D.Ill.,2006.
Worldspan, L.P. v. Orbitz, LLC
Slip Copy, 2006 WL 1069128 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2**

Case 1:08-cv-01519     Document 17-2     Filed 03/20/2008     Page 26 of 40

***SEC Info***   Home     Search     My Interests     Help     Sign In     *Please **Sign In***

# Citadel Broadcasting Corp · 10-K · For 12/31/07 · EX-21

**Filed On 2/29/08 4:19pm ET · SEC File 1-31740 · Accession Number 1193125-8-43693**

| Find | | in this filing. | ▓ Show docs searched and every "hit". ▓ |
|---|---|---|---|

Help...   *Wildcards:* **?** (any letter), ***** (many). ***Logic:*** for Docs: **&** (and), **|** (or); for Text: **|** (anywhere), **"(&)"** (near).

| As Of | Filer | Filing | As/For/On | Docs:Pgs |
|---|---|---|---|---|
| 2/29/08 | Citadel Broadcasting Corp | 10-K | 12/31/07 | 8:237 |

## Annual Report · Form 10-K
## Filing Table of Contents

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1: 10-K | Annual Report | HTML | 1,462K |
| 2: EX-10.9 | Amended Form of Stock Option Agreement | HTML | 73K |
| **3: EX-21** | **List of Subsidiaries** | **HTML** | **32K** |
| 4: EX-23.1 | Consent of Deloitte & Touche Llp | HTML | 6K |
| 5: EX-31.1 | Certification of Chief Executive Officer Pursuant to Rules 13a-14(A) | HTML | 12K |
| 6: EX-31.2 | Certification of Principal Financial Officer Pursuant to Rules 13a-14(A) | HTML | 12K |
| 7: EX-32.1 | Section 906 Certification of Chief Executive Officer | HTML | 7K |
| 8: EX-32.2 | Section 906 Certification of Principal Financial Officer | HTML | 8K |

## EX-21 · List of Subsidiaries

*This is an EDGAR HTML document rendered as filed.  [ Alternative Formats ]*

---

<div style="border:1px solid black; display:inline-block">**List of Subsidiaries**</div>

**Exhibit 21**

| | |
|---|---|
| Citadel Broadcasting Company | Nevada |
| Alphabet Acquisition Corp. | Delaware |
| Minneapolis Radio LLC[1] | Delaware |
| Minneapolis Radio Assets, LLC[2] | Delaware |
| Radio License Holding III, LLC[3] | Delaware |
| KLOS Radio, LLC[1] | Delaware |
| KLOS Syndications Assets, LLC[4] | Delaware |
| KLOS-FM Radio Assets, LLC[4] | Delaware |
| Radio License Holding XII, LLC[5] | Delaware |
| San Francisco Radio, LLC[1] | Delaware |
| SF License, LLC[6] | Delaware |
| San Francisco Radio Assets, LLC[6] | Delaware |
| Radio License Holding VIII, LLC[7] | Delaware |
| DC Radio, LLC[1] | Delaware |
| DC Radio Assets, LLC[8] | Delaware |
| Radio License Holding VII, LLC[9] | Delaware |
| WPLJ Radio, LLC[1] | Delaware |
| Radio License Holding IX, LLC[10] | Delaware |
| Chicago FM Radio Assets, LLC[1] | Delaware |
| Radio License Holding V, LLC[11] | Delaware |
| Radio Networks, LLC[1] | Delaware |
| Network Licenses, LLC[12] | Delaware |
| International Radio, Inc.[12] | Delaware |
| Radio Watermark, Inc.[12] | Delaware |
| Radio Today Entertainment Inc.[12] | New York |
| Detroit Radio, LLC[1] | Delaware |
| Radio License Holding I, LLC[13] | Delaware |
| Atlanta Radio, LLC[1] | Delaware |
| Radio License Holding II, LLC[14] | Delaware |
| Radio Assets, LLC[1] | Delaware |
| LA Radio, LLC[1] | Delaware |
| LA License, LLC[15] | Delaware |

---

[1]   Subsidiary of Alphabet Acquisition Corp. (a Delaware corporation)
[2]   Subsidiary of Minneapolis Radio LLC (a Delaware corporation)
[3]   Subsidiary of Minneapolis Radio Assets, LLC (a Delaware corporation)
[4]   Subsidiary of KLOS Radio, LLC (a Delaware corporation)
[5]   Subsidiary of KLOS-FM Radio Assets, LLC (a Delaware corporation)
[6]   Subsidiary of San Francisco Radio, LLC (a Delaware corporation)
[7]   Subsidiary of San Francisco Radio Assets, LLC (a Delaware corporation)
[8]   Subsidiary of DC Radio, LLC (a Delaware corporation)
[9]   Subsidiary of DC Radio Assets, LLC (a Delaware corporation)
[10]   Subsidiary of WPLJ Radio, LLC (a Delaware corporation)
[11]   Subsidiary of Chicago FM Radio Assets, LLC (a Delaware corporation)
[12]   Subsidiary of Radio Networks, LLC (a Delaware corporation)
[13]   Subsidiary of Detroit Radio, LLC (a Delaware corporation)
[14]   Subsidiary of Atlanta Radio, LLC (a Delaware corporation)

Case 1:08-cv-01519    Document 17-2    Filed 03/20/2008    Page 28 of 40

15      Subsidiary of LA Radio, LLC (a Delaware corporation)

| | |
|---|---|
| Radio License Holding VI, LLC[15] | Delaware |
| WBAP-KSCS Radio Acquisition, LLC[1] | Delaware |
| WBAP-KSCS Acquisition Partner, LLC[1] | Delaware |
| WBAP-KSCS Radio Group, Ltd.[16] | Texas |
| WBAP-KSCS Assets, LLC[17] | Delaware |
| Radio License Holding IV, LLC[18] | Delaware |
| Chicago Radio Holding, LLC[1] | Delaware |
| Chicago Radio, LLC[19] | Delaware |
| Chicago Radio Assets, LLC[20] | Delaware |
| Radio License Holding XI, LLC[21] | Delaware |
| Chicago License, LLC[21] | Delaware |
| NY Radio, LLC[1] | Delaware |
| NY License, LLC[22] | Delaware |
| NY Radio Assets LLC[22] | Delaware |
| Radio License Holding X, LLC[23] | Delaware |
| Aviation I, LLC[24] | Nevada |
| Oklahoma Radio Partners, LLC[24] | Alabama |

[16]   Subsidiary of WBAP-KSCS Acquisition Partner, LLC (a Delaware corporation)
[17]   Subsidiary of WBAP-KSCS Radio Group, Ltd. (a Texas corporation)
[18]   Subsidiary of WBAP-KSCS Assets, LLC (a Delaware corporation)
[19]   Subsidiary of Chicago Radio Holding, LLC (a Delaware corporation)
[20]   Subsidiary of Chicago Radio, LLC (a Delaware corporation)
[21]   Subsidiary of Chicago Radio Assets, LLC (a Delaware corporation)
[22]   Subsidiary of NY Radio, LLC (a Delaware corporation)
[23]   Subsidiary of NY Radio Assets LLC (a Delaware corporation)
[24]   Subsidiary of Citadel Broadcasting Company (a Nevada corporation)

Filing Submission   -   Alternative Formats (Word / Rich Text, HTML, Plain Text, SGML, XML, et al.)

Copyright © 2008 *Fran Finnegan & Company*  All Rights Reserved.
*www.secinfo.com* - Wed, 19 Mar 2008 18:03:39.0 GMT - *Help at SEC Info*

***SEC Info***   Home    Search    My Interests    Help    Sign In    *Please **Sign In***

# Citadel Broadcasting Corp · 10-K · For 12/31/07

**Filed On 2/29/08 4:19pm ET   ·   SEC File 1-31740   ·   Accession Number 1193125-8-43693**

| Find | | in this filing. | ▓ Show docs searched and every "hit". ▓ |
|---|---|---|---|

Help...   *Wildcards:* **?** (any letter), **\*** (many). *Logic:* for Docs: **&** (and), **|** (or); for Text: **|** (anywhere), **"(&)"** (near).

| As Of | Filer | Filing | As/For/On | Docs:Pgs |
|---|---|---|---|---|
| 2/29/08 | Citadel Broadcasting Corp | 10-K | 12/31/07 | 8:237 |

---

## Annual Report  ·  Form 10-K
## Filing Table of Contents

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1: 10-K | Annual Report | HTML | 1,462K |
| 2: EX-10.9 | Amended Form of Stock Option Agreement | HTML | 73K |
| 3: EX-21 | List of Subsidiaries | HTML | 32K |
| 4: EX-23.1 | Consent of Deloitte & Touche Llp | HTML | 6K |
| 5: EX-31.1 | Certification of Chief Executive Officer Pursuant to Rules 13a-14(A) | HTML | 12K |
| 6: EX-31.2 | Certification of Principal Financial Officer Pursuant to Rules 13a-14(A) | HTML | 12K |
| 7: EX-32.1 | Section 906 Certification of Chief Executive Officer | HTML | 7K |
| 8: EX-32.2 | Section 906 Certification of Principal Financial Officer | HTML | 8K |

---

## 10-K  ·  Annual Report
### Document Table of Contents

| ***Page*** | *(sequential)* | *(alphabetic)* | Top |
|---|---|---|---|
| 1 | 1st Page | • Alternative Formats (RTF, XML, et al.) | |
| " | Table of Contents | • Business | |
| " | Part I | • Certain Relationships and Related Transactions, and Director Independence | |
| " | Item 1. Business | • Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | |
| " | Item 1a. Risk Factors | | |
| " | Item 1b. Unresolved Staff Comments | • Controls and Procedures | |
| " | Item 2. Properties and Facilities | • Directors, Executive Officers and Corporate Governance | |
| " | Item 3. Legal Proceedings | | |
| " | Item 4. Submission of Matters to A Vote of Security Holders | • Executive Compensation | |
| " | Part Ii | | |

Table of Contents

*PART I*

ITEM 1. BUSINESS

In January 2001, Citadel Broadcasting Corporation, a Delaware corporation (the *"Company"*), was formed by affiliates of Forstmann Little & Co. (*"FL&Co."*) and acquired substantially all of the outstanding common stock of our predecessor company in a leveraged buyout transaction. Citadel Broadcasting Company, a Nevada company and wholly-owned subsidiary of Citadel Broadcasting Corporation, is referred to as *"Citadel Broadcasting."*

On February 6, 2006, the Company and Alphabet Acquisition Corp., a wholly-owned subsidiary of the Company (*"Merger Sub"*), entered into an Agreement and Plan of Merger with The Walt Disney Company (*"TWDC"*) and ABC Radio Holdings, Inc., formerly known as ABC Chicago FM Radio, Inc. (*"ABC Radio"*), a Delaware corporation and wholly-owned subsidiary of TWDC (the *"Agreement and Plan of Merger"*). The Agreement and Plan of Merger was subsequently amended as of November 19, 2006. The Company refers to the Agreement and Plan of Merger, as amended, as the *"ABC Radio Merger Agreement."*

The Company, Merger Sub, TWDC and ABC Radio consummated the (i) separation of the ABC Radio Network business and 22 ABC radio stations (collectively, the *"ABC Radio Business"*) from TWDC and its subsidiaries, (ii) spin-off of ABC Radio, which holds the ABC Radio Business, and (iii) merger of Merger Sub with and into ABC Radio, with ABC Radio surviving as a wholly-owned subsidiary of the Company (the *"Merger"*).

Prior to June 12, 2007, pursuant to the Separation Agreement by and between TWDC and ABC Radio, dated as of February 6, 2006 and amended on November 19, 2006 (the *"Separation Agreement"*), TWDC consummated a series of transactions to effect the transfer to ABC Radio and its subsidiaries of all of the assets relating to the ABC Radio Business and the transfer to other TWDC's subsidiaries and affiliates the remaining assets not relating to the ABC Radio Business. In connection with those transactions, TWDC or one of its affiliates retained cash from the proceeds of debt incurred by ABC Radio on June 5, 2007 in the amount of $1.35 billion (the *"ABC Radio Debt"*). Following these restructuring transactions by TWDC, and immediately prior to the effective time of the Merger on June 12, 2007, TWDC distributed all of the outstanding common stock of ABC Radio pro rata to TWDC's stockholders through a spin-off (the *"Spin-Off"*). In the Spin-Off, each TWDC stockholder received approximately 0.0768 shares of ABC Radio common stock for each share of TWDC common stock that was owned on June 6, 2007, the TWDC record date for purposes of the Spin-Off.

Immediately following the Spin-Off and pursuant to the ABC Radio Merger Agreement, on June 12, 2007, Merger Sub was merged with and into ABC Radio, with ABC Radio continuing as the surviving corporation and becoming a wholly-owned subsidiary of the Company. Immediately thereafter, the separate corporate existence of Merger Sub ceased, and ABC Radio was renamed Alphabet Acquisition Corp. The Merger became effective on June 12, 2007, at which time each share of ABC Radio common stock was converted into the right to receive one share of the Company's common stock. As a result, the Company issued 151,707,512 shares of its common stock to TWDC's stockholders. Immediately following the Merger, the Company's pre-merger stockholders owned approximately 42.5%, and TWDC's stockholders owned approximately 57.5% of the outstanding common stock of the Company.

Also, on June 12, 2007, to effectuate the Merger, the Company entered into a new credit agreement (the *"Senior Credit and Term Facility"* as described more fully under the Item 7. *"Senior Debt"* section below) with several lenders to provide debt financing to the Company in connection with the payment of the special distribution on June 12, 2007 immediately prior to the closing in the amount of $2.4631 per share to all pre-Merger holders of record of Company common stock as of June 8, 2007 (the *"Special Distribution"*), the refinancing of Citadel Broadcasting's existing senior credit facility, the refinancing of the ABC Radio Debt and the completion of the Merger.

4

Table of Contents

The Company's consolidated balance sheet as of December 31, 2007 includes the acquired assets and assumed liabilities of ABC Radio. The Company's consolidated statements of operations and of cash flows also include the operating results of the ABC Radio Business subsequent to the closing date of June 12, 2007. Other than the estimated fair value of FCC licenses, which has been completed as of December 31, 2007, the allocation of the purchase price of ABC Radio to assets acquired and liabilities assumed is based on a preliminary determination as of December 31, 2007. Pro forma amounts for 2007 and 2006 have been adjusted for the results of ABC Radio and any significant dispositions. For additional information regarding the determination of these pro forma amounts, see Note 3 to the consolidated financial statements.

In connection with the consummation of the transactions contemplated by the Separation Agreement and the ABC Radio Merger Agreement, as of June 12, 2007, the Company, TWDC, and ABC Radio entered into a Tax Sharing and Indemnification Agreement (the *"Tax Sharing and Indemnification Agreement"*) that allocates (i) the responsibility for filing tax returns and preparing other tax-related information and (ii) the liability for payment and the benefit of refund or other recovery of taxes. The Tax Sharing and Indemnification Agreement also provides for certain additional representations, warranties, covenants and indemnification provisions relating to the preservation of the tax-free status of TWDC's internal restructuring and the distribution of ABC Radio common stock to the stockholders of TWDC in the Spin-Off.

Citadel is the third largest radio broadcasting company in the United States based on net broadcasting revenue. The Company now operates in two reportable segments in accordance with guidance provided by Statement of Financial Accounting Standards (*"SFAS"*) No. 131, *Disclosures about Segments of an Enterprise and Related Information*. Radio stations serving the same geographic area (i.e., principally a city or combination of cities) that are owned and/or operated by the Company are referred to as a market, and the Company aggregates the markets in which it operates into one reportable segment (*"Radio Markets"*). In addition, the Company also owns and operates the ABC Radio Network (*"Radio Network"*), which produces and distributes a variety of radio programming and formats and syndicates across approximately 4,000 station affiliates and 8,500 program affiliations, and is a separate reportable segment as defined by SFAS No. 131.

*Radio Markets*

As of February 22, 2008, we owned and operated 165 FM and 58 AM radio stations, with a national footprint reaching more than 50 markets located in 27 states and the District of Columbia. The Radio Markets generate substantially all of their revenue from the sale of advertising to local, regional and national spot advertisers. We have a well-clustered radio station portfolio that is diversified by programming formats, geographic regions, audience demographics and advertising clients. We face more competition in the larger markets that rank in the top twenty in the country based on total market revenue. However, our stations are dominant in middle and smaller markets, where we rank first or second in audience share in 28 of our 54 metropolitan markets rated by The Arbitron Ratings Company (*"Arbitron"*). Our top 25 markets accounted for approximately 71% of the 2007 Radio Markets segment revenue as reported. On a pro forma basis for the year ended December 31, 2007, adjusted for the results of ABC Radio and any significant dispositions, our top 25 markets contributed approximately 76% of Radio Markets segment revenues. For additional information regarding the determination of these pro forma amounts, see Note 3 to the consolidated financial statements. For the year ended December 31, 2007, the Radio Markets segment contributed approximately 80% on a pro forma basis of our consolidated pro forma net revenues and represented approximately 79% of total assets. Since the allocation of the purchase price of ABC Radio to assets acquired and liabilities assumed is based on a preliminary determination, except for the estimated fair value of FCC licenses, which has been completed as of December 31, 2007, goodwill of approximately $634.1 million related to ABC Radio has not yet been allocated among the segments.

*Radio Network*

We believe that the Radio Network business' programming appeals to a broad audience. The Radio Network business produces and distributes a variety of programs and formats to affiliates, including syndicated

5

Table of Contents

talk and music programs. The Radio Network has 7 of the top 10 and 14 of the top 25 programs in network radio according to RADAR® 95, December 2007 (Audiences to Commercials Within Programs). Our Radio Network syndicated programming features popular personalities including Paul Harvey, Sean Hannity, Tom Joyner and Michael Baisden.

The Radio Network business provides its affiliates with selected proprietary and syndicated content, including *ABC News*, a leading product in radio news, nine 24-hour music formats and targeted programming for urban and Hispanic formatted stations, enabling affiliates to meet their programming needs on a cost-effective basis. In exchange for the right to broadcast the Radio Network programming, its affiliates remit a portion of their advertising time, and in some cases an additional cash fee. In general, the Radio Network business distributes its proprietary content on a non-exclusive basis to several stations in a market on both a branded and non-branded basis. The syndicated content, as well as the 24-hour formats, are generally offered on an exclusive basis to one station in a market. The Radio Network also generates advertising revenue by embedding a defined number of advertising units in its syndicated programs, which it sells to advertisers at premium prices. In certain cases, the Radio Network business compensates its affiliates in major markets for carrying specific programming in order to ensure that such programming has the desired national coverage or to maintain a desired commercial inventory level.

The Radio Network business generates substantially all of its revenue from the sale of advertising time accumulated from its affiliate stations. The Radio Network divides the aggregated inventory into packages focused on specific demographic groups and sold to its advertiser clients who want to reach the listeners who comprise those demographic groups. The Radio Network business has 15 targeted advertising networks, which offer advertisers the opportunity to efficiently reach a variety of demographic groups on a national basis. By purchasing airtime on a network basis rather than station by station, advertisers are able to efficiently and effectively reach their desired demographic on a national and regional basis. Since the Radio Network business generally sells its advertising time on a national network basis rather than station by station, the Radio Network generally does not compete for advertising dollars with its radio station affiliates.

The Radio Network is also the exclusive sales representative for the ESPN Radio Network content, providing both sales and distribution services. ESPN produces the network's programming which includes ESPN SportsCenter; *Mike & Mike In The Morning*, hosted by Mike Greenberg and former NFL player Mike Golic, as well as national broadcasts of Major League Baseball, the NBA, and Bowl Championship Series. The ESPN Radio Network Sales Representation Agreement, entered into as of June 12, 2007, the closing date of the Merger, sets forth the terms under which the Radio Network acts as the exclusive sales representative for the ESPN Radio Network. The Radio Network provides a sales staff to solicit and negotiate the sale of advertising on behalf of the ESPN Radio Network and to manage the advertising trafficking, billing and collection functions in exchange for 20% of all net sales generated on behalf of the ESPN Radio Network for the initial two-year term of the agreement. The agreement will be renewed for two successive one-year renewal periods if certain sales levels are achieved.

For the year ended December 31, 2007, the Radio Network segment contributed approximately 20% on a pro forma basis of our consolidated pro forma net revenues and represented approximately 2% of total assets. For additional information regarding the determination of these pro forma amounts, see Note 3 to the consolidated financial statements. Additionally, since the allocation of the purchase price of ABC Radio to assets acquired and liabilities assumed is based on a preliminary determination, except for the estimated fair value of FCC licenses, which has been completed as of December 31, 2007, goodwill of approximately $634.1 million related to ABC Radio has not yet been allocated among the segments.

6

# EXHIBIT 3

# WINSTON & STRAWN LLP

<table>
<tr><td>43 RUE DU RHONE<br>1204 GENEVA, SWITZERLAND</td><td>35 WEST WACKER DRIVE<br>CHICAGO, ILLINOIS 60601-9703</td><td>200 PARK AVENUE<br>NEW YORK, NEW YORK 10166-4193</td></tr>
<tr><td>99 GRESHAM STREET<br>LONDON EC2V 7NG</td><td>(312) 558-5600</td><td>25 AVENUE MARCEAU<br>75116 PARIS, FRANCE</td></tr>
<tr><td>333 SOUTH GRAND AVENUE<br>LOS ANGELES, CALIFORNIA 90071-1543</td><td>FACSIMILE (312) 558-5700</td><td>101 CALIFORNIA STREET<br>SAN FRANCISCO, CALIFORNIA 94111-5894</td></tr>
<tr><td></td><td>www.winston.com</td><td>1700 K STREET, N.W.<br>WASHINGTON, D.C. 20006-3817</td></tr>
</table>

SUSAN M. BENTON
(312) 558-5957
sbenton@winston.com

February 21, 2008

**VIA FAX AND US MAIL**

Lauren Wood
Corporate Counsel
Law & Government Affairs
Clear Channel
200 East Basse Road
San Antonio, TX 78209

Re:    **Becky Osowiec**

Dear Ms. Wood:

We represent WZZN-FM and have reviewed your letter to John Gallagher dated February 15, 2008 regarding Becky Osowiec's agreement with Clear Channel.

First, be assured that Ms. Osowiec has not disclosed any Clear Channel proprietary or confidential information to WZZN, nor would WZZN accept such information.

Second, we assume that the Non-Compete Agreement you reference contains terms similar to those contained in the Savier agreement. The non-compete terms of that agreement prohibit the former employee from being employed by a radio station in Chicago. Such a restriction is unenforceable under Illinois law.

Finally, Clear Channel has known of Ms. Osowiec's employment by WZZN since December, 2007. This belated attempt to require Ms. Osowiec to immediately cease her employment with WZZN finds no support under Illinois law.

WINSTON & STRAWN LLP

Lauren Wood
February 21, 2008
Page 2

Please call me if you have questions or would like to discuss this matter.

Very truly yours,

Susan M. Benton

SMB:tm

cc:    J. Orr, Esq.
       M. Fowler

CHI:2050425.1

# EXHIBIT 4

**Morrison, Tierney**

| | |
|---|---|
| **From:** | Garcia, Christopher A. [CGarcia@seyfarth.com] |
| **Sent:** | Monday, March 10, 2008 9:28 AM |
| **To:** | Benton, Susan |
| **Subject:** | Clear Channel |

Sue,

Will you accept service of process for Citadel?

Christopher A. Garcia

Seyfarth Shaw LLP
131 South Dearborn Street
Suite 2400
Chicago, IL 60603-5577
312.460-5950
312.460.7950 (facsimile)
cgarcia@seyfarth.com

Any tax information or written tax advice contained herein (including any attachments) is not intended to be and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer. (The foregoing legend has been affixed pursuant to U.S. Treasury Regulations governing tax practice.)

This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). If you are not the intended recipient, any disclosure, copying, distribution, or use of the contents of this information is prohibited and may be unlawful. If you have received this electronic transmission in error, please reply immediately to the sender that you have received the message in error, and delete it. Thank you.

**EXHIBIT 5**



February 15, 2008

**VIA OVERNIGHT MAIL**

Becky Osowiec
12528 Anand Brook Drive
Orland Park, IL 60467

<div align="center">

**RE:  Covenant Not to Compete**

</div>

Dear Ms. Osowiec:

Please be reminded that pursuant to the Confidentiality, Trade Secrets and Non-Compete Agreement entered into between you and Clear Channel Broadcasting, Inc., ("Clear Channel") on May 8, 2006, you are prohibited from competing with Clear Channel in the Chicago, Ilinois market ("Designated Market Area") for a period of 180 days following the termination of your employment with Clear Channel, which was effective December 4, 2007.

Clear Channel has learned that you have accepted employment with WZZN-FM in the Designated Market Area. This action puts you squarely in breach of your Agreement, which remains fully enforceable. During the course of your employment by Clear Channel, you were exposed to and learned of various trade secrets and other confidential and proprietary information, which if disclosed to a competitor could cause immediate financial harm to Clear Channel. If the information is disclosed to a competitor, we will seek legal redress. Please be advised that unless your employment with WZZN-FM ceases immediately, Clear Channel reserves the right to use every means available to enforce its rights under the Agreement.

Please provide written assurances by 5:00 PM, Thursday, February 21, 2008, that you will honor your commitment. Clear Channel reserves the right to pursue all remedies available in law and equity.

Sincerely,

Lauren Wood
Corporate Counsel

cc:  WZZN-FM General Manager – Chicago, IL
     Citadel Broadcasting Corporation – New York, NY