**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AMFM BROADCASTING, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 08-CV-1519 |
| | ) |
| CHICAGO FM RADIO ASSETS, LLC, | ) Hon. James B. Zagel |
| incorrectly captioned as | ) |
| CITADEL BROADCASTING CORPORATION | ) Magistrate Judge Morton Denlow |
| and REBECCA OSOWIEC | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT CHICAGO FM RADIO ASSETS, LLC'S REPLY MEMORANDUM IN
SUPPORT OF ITS EMERGENCY MOTION TO DISMISS COMPLAINT OR, IN THE
ALTERNATIVE, TO DISSOLVE THE *EX PARTE* TRO, AND TO CONTINUE THE
DISCOVERY AND HEARING DATES PENDING RESOLUTION OF THIS MOTION**

**INTRODUCTION**

Plaintiff's Response brief exhorts this Court to deny Chicago FM's motion on a series of false premises.  Plaintiff argues that jurisdiction is proper in this case, stating that Chicago FM has cited no evidence of the lack thereof.  Plaintiff's argument completely ignores the fact that even the named Defendant Citadel Broadcasting corporation ("Citadel") is a Delaware corporation as established in a public 10-K filing.  Plaintiff supplies no evidence whatsoever for its assertion that Citadel is a Nevada corporation.[1]  Plaintiff had a duty to determine the correct state of incorporation prior to filing is Complaint and utterly failed to do so.

---

[1] Citadel Broadcasting Company, an entity which has no relation to WZZN-FM, Chicago FM Radio Assets, LLC or Alphabet Acquisition Corp., except that it is also within the Citadel family of companies, is a Nevada corporation. Declaration of Jacquelyn J. Orr at ¶7 ("Orr Decl."), attached at Ex. 1.

Plaintiff also asserts that it has filed a claim under the Computer Fraud and Abuse Act (CFAA) by merely reciting the statute, arguing that the fact it alleged Osowiec "deleted e-mails" is enough.  Plaintiff is mistaken.  First, it miscites the holding espoused in <u>Garelli Wong & Assoc. v. Nichols</u>, 2008 U.S. Dist. LEXIS 3288 at *9 (N.D. Ill. January 16, 2008) in support of its argument.  Then it cites to cases decided before <u>Nichols</u>, ignoring the fact that its cited cases relied on Judge Kocoras prior decision in <u>George S. May Int'l Co. v. Hostetler</u>, 2004 WL 1197395 (N.D. Ill. May 28, 2004), which he expressly rejected in <u>Nichols</u>.

Finally, Plaintiff argues that the TRO is narrowly tailored.  However, Plaintiff ignores the fact that it does not have a non-solicitation agreement with Osowiec, and now seeks to impose such a prohibition through injunctive action.  Moreover Plaintiff completely ignores that the non-compete at issue in this case is unenforceable because it is overbroad and seeks to protect information that is not protectable.

Note that, after the filing of the instant Motion to Dismiss, Clear Channel, through its subsidiary Capstar Radio Operating Company, filed a complaint and TRO motion against Citadel and four individuals who worked for Capstar prior to hire by another Citadel station in New York City.  The complaint was filed in the United States District Court  for the Southern District of New York, 08 CIV 2976 (the "New York Litigation").  The hire of these four individuals by Citadel in New York is cited in the Complaint in the instant case at paragraphs 8 and 9.  The emergency TRO motion was presented to Judge Lewis Kaplan on Monday, March 24, 2008.  The transcript of the hearing on the emergency TRO motion ("Hearing Transcript") is attached hereto as Exhibit 2.  In that hearing, Clear Channel's counsel made numerous admissions which demonstrate that the "confidential information" alleged to establish a

protectable interest in that case as well as the instant case is not, in fact, confidential, and there is no basis on which to enforce Osowiec's non-compete agreement with Plaintiff.

## **ARGUMENT**

### I.    **DIVERSITY JURISDICTION DOES NOT EXIST IN THIS CASE.**

Plaintiff asserts that Chicago FM has provided no evidence that Citadel is the wrong party named in this case.  On the contrary, Chicago FM has provided in its initial memorandum in support ("Memorandum") Citadel's SEC 10-K statement which clearly states that Citadel is not Osowiec's direct employer. Memorandum at Ex. 2.  The 10-K expressly provides that Citadel purchased ABC Radio Holdings, Inc. which, by Plaintiff's own admission, included WZZN-FM radio station.  See Compl. at ¶ 7.  The 10-K filing further provides that ABC Radio was spun off and was renamed Alphabet Acquisition Corp.  Ex. 2 at p. 6.  As a result, Alphabet, through its wholly-owned subsidiary Chicago FM Radio Assets, LLC, owns and operates WZZN.  It is clear that a court may take judicial notice of a SEC filing on a motion to dismiss.  Stavros v. Exelon Corp., 266 F.Supp.2d  833, 844 n.8 (N.D. Ill 2003).  However, so that there can be no confusion, Defendant further submits the Declaration of Jacquelyn J. Orr. See Ex. 1.

Moreover, even if Citadel was the correctly named party, diversity is still defeated because Citadel is a Delaware corporation, as provided in the 10-K.  Ex. 2 at p. 6, Orr Decl. at ¶ 3. The only Nevada corporation in the Citadel family is Citadel Broadcast Company, which has no ownership interest in WZZN-FM.  Orr Decl. at ¶8.  Significantly, Plaintiff admitted in a TRO hearing against Citadel in the New York Litigation on Monday, March 24, 2008, that its representation that Citadel is a Nevada corporation may be wrong, that Citadel may be a Delaware corporation, and that they "must have gotten it mixed up" at some point. Hearing

Transcript at p. 3-4, Ex. 2.   As stated in its initial memorandum, Plaintiff bears the burden of establishing that the jurisdictional requirements have been met.   Plaintiff has not carried its burden.

## II.     PLAINTIFF FAILS TO STATE A CLAIM UNDER THE COMPUTER FRAUD AND ABUSE ACT.

Plaintiff asserts that it has stated a claim under the CFAA, citing two 2005 cases, C.H. Robinson Worldwide, Inc., v. Command Transp., LLC, 2005 US. Dist. LEXIS 28063 (N.D. Ill. Nov. 16, 2005) and Charles Schwab & Co., Inc. v. Carter, 2005 U.S. Dist. LEXIS 5611,  in support.   It is not surprising that Plaintiff would cite these cases because its counsel was the counsel of record in both cases heard before Judge Amy St. Eve.   However, in both of those cases the Court relied on Judge Kocoras prior decision in Hostetler in support of its holding that allegations of misappropriation is enough to state a claim under the CFAA.   C.H. Robinson, 2005 U.S. Dist. LEXIS 28063 AT *9; Carter, 2005 U.S. Dist. LEXIS 5611 at *9.     However, Judge Kocoras expressly overturned his Hostetler decision in Nichols on the grounds that the defendant in Hostetler provided no basis upon which to base a finding in its favor, and the fact that the CFAA was amended after the decision in Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121, a case upon which Judge Kocoras relied in Hostetler. Nichols, 2008 U.S. Dist. LEXIS 3288 at *16-17.   As result, Judge Kocoras held that reliance upon Hostetler was "no longer compelling in light of the statutory amendments and other cases decided post amendment."   Nichols, 2008 U.S. Dist. LEXIS 3288 at *16.   To the extent that the cases cited by Plaintiff relied upon decisions expressly rejected in Nichols, those cases are no longer the law in this District.

Moreover, the cases cited by Plaintiff relied on another non-binding precedent, Aerospace Electronics, Inc. v. Taylor, 295 F.Supp.2d 1188, 1195 (E.D. Wash. 2003)  which the

Nichols court rejected because "conclusion reached in Taylor does not take into account that a civil violation of the CFAA requires "impairment to the integrity or availability of data, a program, a system, or information," and because Taylor "partly based its conclusion on Shurgard, which [Nichols court] no longer find[s] influential." 2008 U.S. Dist. LEXIS 3288 at *16-17. The Nichols case makes clear that in light of the amendments to the CFAA, ResDev and Orbitz set out the correct analysis and clearly holds that misappropriation cases are no longer actionable under the CFAA. Id. at *17.

Perhaps recognizing this fatal flaw, Plaintiff misstates the holding in Nichols, stating that the Court held "[the] statutory requirement of damage was satisfied since the defendant's acts impaired the integrity or availability of the data." Pl. Resp. Br. at 3. This is not what the court held in Nichols. The portion cited by Plaintiff was a discussion of a Seventh Circuit case, Airport Centers, LLC v. Citrin, 440 F.3d 418 (7th Cir. 2006) where the court found that plaintiff had sufficiently stated a claim under the CFAA. Nichols, 2008 U.S. Dist. LEXIS 3288 at *13-14. In Citrin, the Seventh Circuit held that a claim was alleged under the CFAA because the former employee installed a program intended to erase and delete files. 440 F.3d at 419. In so holding, the Citrin court made the distinction between information that was deleted, but was still recoverable, and information that was completely erased by virtue of a viral program. In particular, the Court stated:

> Ordinarily, pressing the "delete" key on a computer (or using a mouse click to delete) does not affect the data sought to be deleted; it merely removes the index entry and pointers to the data file so that the file appears no longer to be there, and the space allocated to that file is made available for future write commands. Such "deleted" files are easily recoverable. But Citrin loaded into the laptop a secure-erasure program, designed, by writing over the deleted files, to prevent their recovery.

<u>Citrin</u>, 440 F.3d at 419.  The <u>Nichols</u> court went on to distinguish <u>Citrin</u>, stating that the plaintiff in <u>Nichols</u> had failed to make a similar allegation. 2008 U.S. DIST. LEXIS 3288   at *14.

Similar to <u>Nichols</u>, this case similarly fails.  There is no allegation that Osowiec installed a program to erase the e-mails and thereby make them unrecoverable.  Indeed, there is no allegation that the e-mails contained any information that is confidential and therefore protectable.   Compare <u>C.H. Robinson</u>, 2005 U.S. Dist. LEXIS 28063 at *9 (alleging that defendants copied software program for competing employer to which it had exclusive rights); <u>Carter</u>, 2005 U.S. Dist. LEXIS 5611 at *9 (allegations that defendant e-mailed confidential information to competitor concerning data sources used in plaintiff's research in developing proprietary business models).  Because this case is on point with <u>Nichols</u>, Plaintiff has failed to make a claim under the CFAA.  And because there is no CFAA claim, there is no supplemental jurisdiction over the state law claims.

### III.    THE EXISTING TRO SHOULD IS OVERLY BROAD.

Finally, Plaintiff asserts that this Court properly granted the TRO.  Plaintiff argues in a conclusory fashion that it presented proper notice of its emergency motion by sending the document to Citadel's registered agent.  But this certainly does not excuse the failure to issue a courtesy copy to Citadel's counsel of whom Plaintiff admits it was well aware.  Resp. Br. at 6.  Instead it sent a courtesy copy to the Radio station at 4:30 on a Friday afternoon for a Monday hearing, despite the fact that Winston & Strawn's offices are directly across the street from the Radio Station.  See Resp. Br. Ex. 4.[2]  Such unfair tactics should not be allowed.

---

[2] A telling fact here is that Clear Channel again failed to provide notice to citadel's New York counsel and General Counsel with courtesy copies of its emergency motion in the New York Litigation.  See e-mail from Jacquelyn Orr dated March 22, 2008 at Ex. 3.

Additionally, Plaintiff argues that the TRO was narrowly tailored because it is clear that "Osowiec is in breach of her non-compete and non-solicitation agreements." Resp. Br. at 6. There are a number of glaring misrepresentations in this statement. First, Osowiec's agreement with Plaintiff does not contain a non-solicitation provision. Rather, as argued in the initial memorandum, it contains an overbroad non-compete which shuts Osowiec out of the radio industry for 180 days. Enforcement of this non-compete – which the TRO purports to do and Plaintiff urges this Court to do – would require Osowiec to resign from Defendant after working for WXZZN-FM since December 4, 2007, almost 4 months ago. Resp. Br. at p. 6. Illinois law does not permit such injunctive action. Telxon Corp. v. Hoffman, 720 F. Supp. 657, 665 (1989) (non-compete held unenforceable a matter of law because "[a]s written, the agreement would prevent [defendant] from working as a competitor as a janitor"); North American Paper Co., v. Unterberger, 526 N.E.2d 621, 623 (Ill. App. Ct. 1st Dist. 1988) (Holding that non-compete is unenforceable because "Unterberger is prohibited from associating with any competitor in any capacity whatsoever, even if Unterberger's job were merely menial and he had absolutely nothing to do with sales or purchasing.").

Second, Clear Channel admitted the following in the New York Litigation:

1.    that the supposed proprietary information – Tapscan, Best Rate, and Radio Fusion – are available to any purchaser from a third-party vendor (Hearing Transcript, pp. 6, 323);

2.    that customer identities are not confidential and indeed are identified to listeners of the various radio stations (Hearing Transcript, pp. 7, 9, 22);

3.    that pricing of radio advertising is not confidential in that the advertisers themselves share pricing of competitors to obtain the best pricing for themselves (Hearing Transcript, pp. 19-21); and

    4.    The sales methods used by Account Executives in radio are
not confidential (Hearing Transcript, pp. 11-19, 22).

Because of the lack of any protectable interest, Judge Kaplan of the Southern District of New

York denied Clear Channel's motion for TRO.  Id. at 36-37.

        Finally, Plaintiff states that it offered evidence in its declarations that Osowiec

misappropriated trade secrets.  However, the only allegations in the Complaint and declarations

that speak to any alleged misappropriation by Osowiec is that the Director of Sales declares that

"upon information and belief" he believes Osowiec took confidential information with her.

Denton Decl. at ¶ 13.  Nowhere does he state that he has any proof of misappropriation.  Clearly

this is not sufficient evidence that Plaintiff will likely succeed on the merits of its

misappropriation and conversion claims.  For all of the reasons stated above and in the initial

memorandum, should this Court find that Plaintiff has established jurisdiction, it should follow

the Southern District of New York's recent ruling on the exact same matters and dissolve the *ex

parte* TRO.

## CONCLUSION

    For the foregoing reasons, Defendant respectfully requests that Plaintiff's complaint be

dismissed in its entirety for lack of subject matter jurisdiction.  Pending the Court's decision on

this Motion, Defendant respectfully requests that the deadline to respond to written discovery

and the hearing on Plaintiff's preliminary injunction motion be continued.  Additionally, should

the Court find that subject matter jurisdiction has been established, Defendant respectfully

requests that: 1) the March 17, 2008 *ex parte* TRO be dissolved because it was improperly

granted; or 2) modified by striking subparagraphs (b) and (c).

Respectfully submitted,

CHICAGO FM RADIO ASSETS, LLC

By: ___/s/ Susan M. Benton___

Susan M. Benton
Sean Nash
Jason Frazer
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600
sbenton@winston.com
snash@winston.com
jfrazer@winston.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, one of the attorneys for Chicago FM Radio Assets, LLC., hereby certifies that a true and correct copy of the foregoing MEMORANDUM IN SUPPORT OF ITS EMERGENCY MOTION TO DISMISS COMPLAINT OR, IN THE ALTERNATIVE, TO DISSOLVE THE TRO, AND TO CONTINUE THE DISCOVERY AND HEARING DATES was served via electronic filing on March 20, 2008 to:

Yvette A. Heintzelman
Justin K. Beyer
Seyfarth Shaw LLP
131 South Dearborn Street
Suite 2400
Chicago, Illinois 60603

_____/s/ Sean Nash_____
Sean Nash

CHI:2066491.2

## **INDEX OF EXHIBITS**

Jacquelyn J. Orr Declaration...................................................................................................Exhibit 1

New York Litigation TRO Hearing Transcript..........................................................................Exhibit 2

3/22/08 Email from Jacquelyn Orr ...........................................................................................Exhibit 3

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AMFM BROADCASTING, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 08-CV-1519 |
| | ) |
| CHICAGO FM RADIO ASSETS, LLC, | ) Hon. James B. Zagel |
| incorrectly captioned as | ) |
| CITADEL BROADCASTING CORPORATION | ) Magistrate Judge Morton Denlow |
| and REBECCA OSOWIEC | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF JACQUELYN J. ORR

1.      My name is Jacquelyn J. Orr.  I am employed by Citadel Broadcasting Corporation ("Citadel") as General Counsel, Vice President, and Secretary.  My office is located 142 West 57th Street, 11th Floor, New York, New York 10019.

2.      Based upon my experience and personal knowledge, I am qualified and authorized to make this declaration.

3.      Citadel Broadcasting Corporation is a Delaware Corporation with its principal place of business in Nevada.

4.      Alphabet Acquisition Corp. is a wholly-owned subsidiary of Citadel.

5.      Alphabet Acquisition Corp. is a Delaware corporation with its principal place of business in Nevada.

6.      Chicago FM Radio Assets, LLC, the corporate entity that operates WZZN-FM, is a wholly-owned subsidiary of Alphabet Acquisition Corp.   Chicago FM Radio Assets, LLC is a Delaware corporation with its principal place of business in Illinois.

7.  Radio License Holding V, LLC, a Delaware corporation, is the owner and licensee of the radio broadcast license for WZZN-FM.  Radio License Holding V, LLC is a wholly-owned subsidiary of Chicago FM Radio Assets, LLC.

8.  Citadel Broadcasting Company, a Nevada Corporation, is a separate and distinct wholly-owned subsidiary of Citadel. Citadel Broadcasting Company has no ownership interest in Chicago FM Radio Assets, LLC., and Citadel Broadcasting Company has no operational control over or relating to WZZN-FM.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 25th day of March, 2008.

Jacquelyn J. Orr
General Counsel & VP

**EXHIBIT 2**

```
                                                                      1
         83oncapa
  1      UNITED STATES DISTRICT COURT
  1      SOUTHERN DISTRICT OF NEW YORK
  2      ------------------------------x
  2
  3      CAPSTAR RADIO OPERATING
  3      COMPANY, a DELAWARE
  4      CORPORATION,
  4
  5                      Plaintiff,          New York, N.Y.
  5
  6                v.                        08 Civ. 2976 (LAK)
  6
  7      ANTHONY CAMPBELL, LOUIS
  7      CARPINO, ADAM GROSS, JOSE LUIS
  8      TORRES, CITADEL BROADCASTING
  8      CORPORATION, a Nevada
  9      Corporation and JOHN DOES 1-10
  9
 10                   Defendants.
 10
 11      ------------------------------x
 11
 12                                         March 24, 2008
 12                                         2:30 p.m.
 13
 13      Before:
 14
 14                      HON. LEWIS A. KAPLAN,
 15
 15                                         District Judge
 16
 16                      APPEARANCES
 17
 17      SEYFARTH SHAW
 18           Attorneys  for Plaintiff
 18      BY:  L. LYNNETTE SARNO
 19           GLORIA GALANT
 20
 20      DEBEVOISE & PLIMPTON
 21           Attorneys for Defendant
 21      BY:  JEREMY FEIGELSON
 22           TRICIA BOZYK SHERNO
 23
 24
 25
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

2

83oncapa

```
 1              (Case called)
 2              THE COURT:  All right, Ms. Sarno.
 3              MS. SARNO:  Good afternoon, your Honor.
 4         We represent Capstar Radio Operating Company.
 5              THE COURT:  Use the lectern, please.
 6              MS. SARNO:  Sure.
 7         Good afternoon again.
 8              As mentioned, we represent Capstar Radio Operating
 9    Company, and for ease purposes because Capstar is a subsidiary
10    of ClearChannel communications, I'll refer to them as
11    ClearChannel.
12              Your Honor we are here this afternoon at the request
13    of a temporary restraining order on these individual defendants
14    Mr. Campbell, Mr. Carpino, Mr. Gross and Mr. Torres, as well as
15    Citadel with regard to unfair competition that they have
16    engaged in, in the mere 17 days since they left ClearChannel.
17    In the short time we have learned many things which leads us to
18    believe that they have engaged in a concerted --
19              THE COURT:  Let's start with whether I have
20    jurisdiction.
21              MS. SARNO:  Sure, your Honor.
22              I understand that one of the issues that was raised
23    was -- and we just received Citadel's papers now, but we
24    certainly believe there is diversity jurisdiction.  Capstar and
25    its parent company ClearChannel is a Delaware corporation with
```

3

83oncapa
```
 1    its principal place of business in Texas.
 2              In addition to that issue, because of the information
 3    that we keep learning as time goes, we also believe that we
 4    have a Computer Fraud and Abuse Act action.
 5              THE COURT:  I'm sorry.
 6              MS. SARNO:  What has happened since we've brought this
 7    action as well is that we continue to gain information that
 8    leads us to believe that we will also have a Computer Fraud and
 9    Abuse Act action, that we will be able to amend this claim.
10              THE COURT:  But jurisdiction is determined as of the
11    moment of the filing of the complaint.  Right?
12              MS. SARNO:  Yes, your Honor.
13              THE COURT:  So as of the moment of the filing of the
14    complaint, did I have any jurisdiction?
15              MS. SARNO:  We did not know.  It was our understanding
16    that Citadel was a Nevada corporation incorporated in Nevada.
17              THE COURT:  I understand that's what you thought.  Is
18    there any dispute over the fact as of now that they are in fact
19    a Delaware corporation?
20              MS. SARNO:  The only information that I have is what
21    was given to me today.  So we have been unable to confirm that.
22    But I certainly would expect that --
23              THE COURT:  Did you look at their 10-K before you
24    filed the lawsuit?
25              MS. SARNO:  I believe we did.  We must have gotten it
```
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

4

83oncapa
```
 1   mixed up with another entity.
 2          THE COURT:  You think there is another publicly held
 3   company with registered securities that's got another 10-K that
 4   is also called Citadel?
 5          MS. SARNO:  To be honest, your Honor, I don't know.
 6   But it is my understanding that we did check on their
 7   jurisdictional issues.
 8          THE COURT:  Go ahead.
 9          MS. SARNO:  Notwithstanding that issue, your Honor,
10   though, we certainly believe that, given the facts that have
11   been established, we would be able to amend our claim to
12   include a Computer Fraud and Abuse Act action because of the
13   fact that we have direct evidence that documentary files of
14   ClearChannel have been tampered with and basically plagiarized,
15   which would certainly show that they have engaged in
16   misappropriation of our trade secrets through the use of the
17   computer.
18          THE COURT:  You certainly don't expect me to grant you
19   a temporary retraining order on the basis of a complaint you
20   haven't filed, right?
21          MS. SARNO:  I understand that, your Honor.
22          THE COURT:  Let's focus on what's before me.
23          MS. SARNO:  Sure.
24          What is before you, your Honor, is the blatant
25   conspiracy between the parties in this action.  What we have
```

5

83oncapa
1    since learned in these few days since they have left is that,
2    as is mentioned in defendant's papers, from what I understand,
3    a former local sales manager of ClearChannel joined Citadel at
4    the end of February, which is exactly when his noncompete
5    agreement with ClearChannel ended.  Since then, actually within
6    days of that, four of our salespeople joined Citadel.  They
7    resigned from two different radio stations en masse and joined
8    a competing station of Citadel, WABC.
9         From what we understand, they have the exact same
10   roles at the Citadel station as they had at the ClearChannel
11   station.
12        THE COURT:  They are basically entry-level salesmen,
13   right?
14        MS. SARNO:  Yes, your Honor.
15        THE COURT:  So let's not get carried away with this.
16   That's what they are.
17        MS. SARNO:  Your Honor, we concede that.  That is not
18   what we think is an issue here.  What we think is an issue is
19   they have actually taken our confidential and trade information
20   and used it for their own use.
21        THE COURT:  Specifically what?  Where is the evidence
22   of it?
23        MS. SARNO:  Sure, your Honor.  I am happy to go
24   through that.
25        Specifically, we have clients who have said to us,
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

6
83oncapa
1    directly to our employees that are mentioned in our
2    declarations that these four salespeople have contacted them.
3            THE COURT:  Is it not the case that anybody can find
4    out who advertises on your stations by turning on the radio?
5            MS. SARNO:  We recognize that, your Honor.
6            That in and of itself is not what we are concerned
7    about.  What we are concerned about is the confidential
8    information that they gained in order make those contacts.  For
9    example, all of our client information, and I understand the
10   identities in and of themselves may be public, but there is a
11   lot of background information in connection with those clients.
12   For example, in our software which is called Radio Fusion --
13           THE COURT:  Is it true that Radio Fusion is a
14   third-party package that anybody can go buy?
15           MS. SARNO:  Yes.  It is not the software that we are
16   concerned about.  It's the information that's kept within the
17   software.  In that software is our pricing information, our
18   scheduling information.  That pricing is regularly updated
19   depending upon the market.
20           THE COURT:  What's the evidence that anybody either
21   took or used your internal pricing information?
22           MS. SARNO:  We know that they contacted them and
23   certainly used it for their solicitation.
24           THE COURT:  How do you know that?  Where is the
25   evidence of that?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

7

83oncapa

    1              MS. SARNO:  We know that they contacted them, and we
    2    think through discovery we will be able to find that.
    3              What we do have --
    4              THE COURT:  Do you have an affidavit here that says, I
    5    saw the defendant take the internal information and use it in
    6    pitching client X; or I'm client X, defendant No. 3 pitched me,
    7    and in the course of pitching me he used information about the
    8    prices I paid to ClearChannel, which he could only have found
    9    out because it was from ClearChannel because it was their
   10    internal information?  Is there anything like that in the
   11    record.
   12              MS. SARNO:  No, your Honor.
   13              THE COURT:  All you've got is you've got four guys who
   14    you say pitched accounts, the existence of which they knew of,
   15    and the existence of which as your accounts is knowable to
   16    probably 7 million people in the New York City area who listen
   17    to the radio, right?
   18              MS. SARNO:  Your Honor, what we think is the most
   19    egregious thing that's happened, and actually was the impetus
   20    for our filing was last Wednesday we received an e-mail from a
   21    client with a PowerPoint presentation that was attached to it
   22    that had what we have referred to in our papers as the
   23    Ask-the-Expert presentation.
   24              That is where we have seen direct evidence that
   25    Citadel has used our proprietary information.  Ask the Expert,
                         SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300

8

83oncapa
```
 1   it is a program that several of our stations developed.  In
 2   fact, the gentleman who developed it at ClearChannel is one of
 3   the declarants, Bernhard Weiss.  He developed that over a year
 4   ago.
 5           On Wednesday evening we received an e-mail from one of
 6   our clients saying to us, gee, this looks awfully familiar.
 7   What it was is that it was ClearChannel's PowerPoint
 8   presentation, but with a Citadel station on it.  In fact, some
 9   of the pictures on the cover were exactly the same.  The text
10   was the same.
11           THE COURT:  Is a copy of it in your papers?
12           MS. SARNO:  Your Honor, we have it available for you
13   in camera.  Because it is proprietary we wanted to keep it
14   confidential, but we do have copies for everyone here.
15           THE COURT:  This might be a good time to hand them
16   out.
17           MS. SARNO:  Your Honor, what you will see is one
18   presentation from Z100, which is a ClearChannel station, and
19   another presentation from WPLJ, which is a Citadel station.
20           THE COURT:  You are going too fast.
21           MS. SARNO:  Sure.
22           THE COURT:  We are going to mark this Plaintiff's
23   Exhibit AA for identification.
24           You are telling me this is two different documents, is
25   that right?
```

9

83oncapa

```
 1              MS. SARNO:  Yes.  It's two different documents.  You
 2    can see they are very similar.  The Z100 --
 3              THE COURT:  Ma'am, you talk far faster than I listen.
 4              MS. SARNO:  I'm sorry, your Honor.  My apologies.
 5              THE COURT:  Z100 belongs to whom?
 6              MS. SARNO:  ClearChannel.
 7              THE COURT:  I see.  So I only had one of them in front
 8    of me when you said I had two.
 9              MS. SARNO:  The Light Touch lasers.
10              THE COURT:  Yes.
11              MS. SARNO:  That is the other one.
12              THE COURT:  We will mark that Plaintiff's Exhibit AB?
13              MS. SARNO:  OK.
14              THE COURT:  AA, the one that says Z100, that's
15    ClearChannel?
16              MS. SARNO:  Yes.
17              THE COURT:  All right.  And AB?
18              MS. SARNO:  That is Citadel.
19              THE COURT:  All right.  Go ahead.  Why should I be
20    upset about this?
21              MS. SARNO:  Your Honor, the Ask the Expert program,
22    just to give you a little bit of background, is a sales program
23    of ClearChannel.
24              What they do is they allow the people within specific
25    industries to be expert for that station.  For example, this is
```

10

83oncapa
```
 1    the dental assistant expert for that station.  They go through
 2    this whole advertising program as to the DJs, you know, these
 3    people and so forth.
 4            This Ask the Expert PowerPoint that you see here was
 5    developed by a ClearChannel sales manager, Bernhard Weiss, as
 6    mentioned in his declaration, about a year ago.
 7            Last Wednesday, we received what you see as AB, 1AB,
 8    which is a PowerPoint from WPLJ radio, which is a Citadel
 9    station.  From the very beginning, your Honor, it is obvious
10    that one is taken from the other.  On the first page alone, the
11    pictures on the top are the exact same pictures.
12            THE COURT:  Are those pictures trade secrets?
13            MS. SARNO:  No, your Honor.  I am just saying that
14    that is probably what called it to the client's attention, but
15    if you look further, you will see how much more similar it is.
16    The second page is called "Marketing Strategy" on the Z100
17    proposal.  It's also called "Marketing Strategy" on the PLJ
18    proposal.  The text of it, notwithstanding the difference in
19    font, is exactly the same.
20            THE COURT:  The theory of protection is what?
21            MS. SARNO:  Your Honor, this is a sales program that
22    is used exclusively by the account executives of ClearChannel.
23    This is how they pitch to their clients on how you can become
24    well known in the industry as the expert of our station.
25            THE COURT:  Let me ask you this.  When you pitch to
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

11

83oncapa
```
 1    the client, does the client who receives the pitch sign a
 2    confidentiality agreement?
 3             MS. SARNO:  I don't know.
 4             THE COURT:  So, in the absence of evidence that that's
 5    the case, then you are publicly performing this pitch all over
 6    the place in circumstances in which the entire audience, to
 7    wit, all of the prospective customers to whom you are making
 8    this pitch, are free to tell anybody, let me tell you how
 9    ClearChannel just pitched my business here, right?
10             MS. SARNO:  Yes, your Honor.
11             But that doesn't allow Citadel to take the program
12    with it and take it as their own.
13             THE COURT:  Why not?
14             MS. SARNO:  It was a proprietary sales method of
15    theirs.
16             THE COURT:  What does "proprietary" mean in this
17    context?
18             MS. SARNO:  It was a manner in which they attracted
19    sales clients, and it was exclusive to their stations.  They
20    are allowed to take this method of -- I am not following your
21    Honor.
22             THE COURT:  You are speaking in totally bottom-line
23    conclusions.  I am asking you to explain what is proprietary
24    about it, and you tell me that it is proprietary and
25    exclusively theirs.  Frankly, that is not legal analysis.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

12

83oncapa
1   That's rhetoric.
2           Sometimes things are proprietary because they are
3   trade secrets.  Sometimes they are proprietary because they are
4   copyrighted.  Sometimes they are proprietary in a specialized
5   sense because they're trademarked.  Sometimes they are
6   proprietary because they are patented.
7           We are not talking about patents here.  We are not
8   talking about trademarks here.  When I inquired about
9   copyright, I drew a blank from you in the sense that you
10  weren't asserting that.
11          So, it must come down to trade secrets.  Now, if the
12  theory of protection is trade secrets, and you are making this
13  pitch available without restriction to anybody who is a
14  prospective customer, then what is the basis for calling any of
15  it proprietary?
16          MS. SARNO:  Your Honor, within the presentation is not
17  only the way in which the -- within the presentation is the way
18  the advertisement is actually going to be done, the methodology
19  of it, the streaming media of it, the use of key words, the
20  e-mail data.
21          Certainly what they are intending to do by showing
22  this particular PowerPoint, not necessarily the -- even if the
23  PowerPoint itself is public, the fact that they intend to use
24  this means of advertising, that is proprietary.
25          THE COURT:  Why?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

13
83oncapa

 1          MS. SARNO:  Because they are going to use our method
 2    of sales for their station.
 3          THE COURT:  So what?
 4          MS. SARNO:  That would certainly fall under unfair
 5    competition.
 6          THE COURT:  Suppose you were a car dealer, and at the
 7    end of every August, you got your dealership owner to go on
 8    television with a silly hat saying, "Come on down, greatest
 9    deals in history.  Get here by Labor Day and you are going to
10    get a fabulous deal.  We'll match any price."
11          Well, that's the way he intends to sell cars.
12          Do you mean to tell me that if another dealer
13    somewhere else decided to do the same thing, that person
14    couldn't lawfully do it because somebody else was doing it?
15          I don't think so.
16          MS. SARNO:  Your Honor, I agree with you with regard
17    to that.  That means of sales is certainly far beyond what is
18    going on here.
19          Here we have an entire sales program that was
20    developed that shows how they are going to do banner ads, how
21    they are going to do streaming media, how they are going to do
22    these things, and they would not have had knowledge of that had
23    they not taken them from ClearChannel.
24          THE COURT:  I don't mean to be rude, I really don't.
25    But the question "so what?" has not yet gone out of my mind.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

14

83oncapa

1              This is a perfectly obvious way to sell radio
2      advertising.  It is hard to imagine doing these things in other
3      ways.
4              I don't see the big deal.  I don't see a trade secret
5      because it is not confidential.  I don't see a patent.  I don't
6      see a copyright.  I don't see any of that.
7              So if you have an argument at all, it's some kind of a
8      fiduciary duty argument.  It is hard for me to see that the law
9      of fiduciary duty extends so far as to prevent people from
10     doing what is really plain vanilla in the industry.
11             MS. SARNO:  Your Honor, we would certainly not think
12     this particular program is plain vanilla in the industry.  I
13     understand that selling radio ads to different stations and
14     using your usual sales pitch may fall under that.  However,
15     this is a specific program that has done very well.  The fact
16     that they are now going to use it for their stations dilutes
17     the market of this particular program that has done quite well
18     for ClearChannel.
19             THE COURT:  There is a word for that.  The word is
20     competition.
21             MS. SARNO:  But, your Honor, in this particular case
22     we believe it is unfair competition because they have taken the
23     information from ClearChannel and used it for their own
24     purposes.  Certainly the fact that we discovered this
25     information nearly seven business days since they left is
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

15
```
     83oncapa
 1   evidence that this is -- they left ClearChannel.
 2             THE COURT:  What if they rewrote page 2 of the
 3   exhibit?
 4             MS. SARNO:  Your Honor, I believe and we believe that
 5   it's the idea behind the PowerPoint that --
 6             THE COURT:  Tell me what the idea is.  What is the
 7   idea?
 8             MS. SARNO:  The idea is what they do is they reach out
 9   to salespeople and they have an entire program of you click on
10   the website, there's different aspects to it, but this is one
11   aspect.  You click on the website.  It is called Ask the
12   Expert.
13             For example, on Lite FM it's one of the banners that
14   you can click.  It says, plastic surgery, dentistry, and then
15   you click on that and it has different endorsements and
16   different information on this particular --
17             THE COURT:  OK.  I will go with you so far.
18             There are people who have bought this from you, right?
19             MS. SARNO:  Yes.
20             THE COURT:  So if I turn on the radio and listen long
21   enough, I am going to hear an Ask the Expert bit, right?
22             MS. SARNO:  Yes.
23             THE COURT:  Some guy is going to come on and say, I'm
24   a chiropractor, and I have got this fabulous way of
25   manipulating somebody's vertebrae and so forth.  And if I am a
```

16

83oncapa

1    competing ad salesman, it doesn't take much to figure out that
2    if I am hearing that often that is a good way to sell
3    advertising, right?  Am I not right?
4              MS. SARNO:  Yes, your Honor.
5              THE COURT:  So what's the problem?
6              MS. SARNO:  The problem is that they have taken the
7    exact methods of ClearChannel and used it for their own.  I
8    understand that maybe the concept is the same, but what they
9    have actually done here is taken everything that they've
10   learned from ClearChannel and taken it over to Citadel.
11             Just to give you some more background, your Honor, two
12   of the defendants, Mr. Gross and Mr. Campbell, attended
13   ClearChannel training less than three business days from the
14   day they resigned.
15             We certainly think that what they have done is they
16   have been taking all of the methods and all of the information
17   that they gained from ClearChannel and brought it over to
18   Citadel.  Whether it was by design, we can't make that call,
19   but certainly it's suspicious.  We certainly think it would
20   give us a likelihood of success on the merits because what had
21   happened, just to give you a time line, is Jonathan Mason left
22   ClearChannel in November of 2007.  He had a noncompete
23   agreement and a nonsolicitation agreement that just expired at
24   the end of February 2008.
25             Immediately thereafter, the week afterwards, we get
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

83oncapa
```
 1   notices of resignation from these four people.  Two of those
 2   people attended our training process called Solution Based
 3   Selling the Wednesday before they resigned.
 4              They have now taken all of that information and
 5   brought it over to Citadel.  Certainly in that time frame they
 6   gained so much information about ClearChannel products,
 7   ClearChannel --
 8              THE COURT:  What did they gain?  Is there any showing
 9   here in the record?
10              MS. SARNO:  They gained all of the training that they
11   received from ClearChannel University, your Honor.
12              THE COURT:  Listen, the last time I looked,
13   ClearChannel University was not in the Ivy League.  To tell me
14   ClearChannel University, it is just more advertising hype.
15   It's meaningless.  It is an employee training program.
16              What were they trained on?  What is the information
17   that's so sensitive?
18              MS. SARNO:  Within that program, your Honor, they
19   learned ClearChannel's sales techniques, ClearChannel tips --
20              THE COURT:  What specific techniques did they learn,
21   and what's the evidence that they are trade secrets?  What is
22   the evidence, for example, that they are not exactly the same
23   as the sales techniques that Citadel was using before they ever
24   went to Citadel?
25              MS. SARNO:  Your Honor, we would not know what
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

18
83oncapa
```
 1    Citadel's sales techniques are, but certainly these are
 2    techniques that have taken years and an extensive amount of
 3    resources to develop.
 4              THE COURT:  Where is the evidence of that?
 5              MS. SARNO:  We have the declaration from the
 6    salesperson, and we don't have it here, but the actual booklets
 7    and the training programs are quite extensive.
 8              THE COURT:  If I had in here XYZ Chevrolet, they could
 9    make exactly the same arguments at this level of generality.
10    They would tell me that our car salesmen have got all this
11    wonderful training that we have developed over our 60 years in
12    business, and wowee, it's fabulous.  At the end of the day it
13    may be nothing more than what each and every one of us who has
14    ever bought a car knows for having been through the process.
15    This is all generalities.
16              MS. SARNO:  Your Honor, what the solution based
17    selling includes are client resources, where exactly they
18    should go within the company to get certain information.  They
19    have --
20              THE COURT:  Where within ClearChannel?
21              MS. SARNO:  Yes, where within ClearChannel.
22              THE COURT:  You think that's extremely valuable to
23    Citadel, do you?
24              MS. SARNO:  Sure.
25              THE COURT:  Why?
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

19

83oncapa

```
 1              MS. SARNO:  The information that they now have they
 2     know where --
 3              THE COURT:  You are telling me that it is very
 4     important for Citadel to show where within ClearChannel they
 5     should go to find something out if they were selling ads for
 6     ClearChannel?
 7              MS. SARNO:  Yes, your Honor.  They had access to that
 8     while they were there.
 9              THE COURT:  So what?
10              They probably knew where the men's room was too, but I
11     don't think that would be too valuable to Citadel in most
12     circumstances.
13              MS. SARNO:  Your Honor, the information that they
14     gained during the time that they were there is certainly
15     important, could certainly be important to Citadel.
16              In addition to just that information, they also had
17     all the access to the different ClearChannel products, all the
18     different proposals into the future that they planned on
19     creating.
20              Within that Radio Fusion, your Honor -- I don't want
21     to lose sight of what was in that client information that they
22     had.  We understand that the client lists in and of themselves
23     are readily available.  If I turn on the radio it is available.
24     But it is the information about those clients which is what was
25     proprietary.  In the Radio Fusion, which is a third-party
```

83oncapa
1    program provided by Viero, in there was the company's pricing,
2    scheduling, history of sales.
3              THE COURT:  Is there any evidence they walked out of
4    there with a piece of paper or a CD or a magnetic medium that
5    has any proprietary information on it?
6              MS. SARNO:  Not at this time, but certainly that may
7    be developed.
8              THE COURT:  You think they could remember all this
9    stuff if they ever looked at it?
10             MS. SARNO:  Certainly the names of the people could be
11   remembered, but not the information in there because that
12   information is quite detailed.  It shows the pricing points, it
13   shows differences in pricing points.
14             THE COURT:  All right.  Don't you think that if they
15   were selling ads to an account against ClearChannel and
16   ClearChannel was offering the account a better deal that the
17   account would say, "Hey, I am being offered the following by
18   ClearChannel.  You are going to have to beat that"?
19             Don't you think that's likely?
20             MS. SARNO:  Not necessarily, your Honor.  I mean, even
21   if that were the case, certainly, it would be a different sales
22   pitch if I were to know that ahead of time and wouldn't have to
23   get into that negotiation.  Certainly it could lead to better
24   pricing for them.
25             THE COURT:  But you have no evidence that any of them
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

21
83oncapa
1    has that information, right?
2             MS. SARNO:  Well, they had access to it at that time,
3    your Honor.
4             THE COURT:  Right.  There was a time when I had access
5    to the entire contents of the Harvard University libraries, but
6    I can't repeat them to you.
7             MS. SARNO:  Your Honor, but these particular people
8    had focused on particular clients.  They focused on particular
9    industries, and each of them were different.  Certainly they
10   can remember that information with regard to the ones that they
11   dealt with closely.
12            THE COURT:  When you say "remember that information,"
13   you mean specifically what?
14            MS. SARNO:  For example, the history of a client's
15   sales within that radio station, the pricing and the change of
16   pricing, the specific information about who to contact there
17   and how to pierce the company.  I understand that in the radio
18   industry it can be very difficult to pierce client contacts.
19            THE COURT:  Anything else?
20            MS. SARNO:  Your Honor, just to touch on it as well,
21   certainly the scope and duration of this agreement is very
22   narrow and should be enforced.  180 days within a small
23   industry of radio, within the industry of radio and television
24   in the New York area is very reasonable.
25            THE COURT:  The law in New York is that those
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

83oncapa

 1  agreements, correct me if I am wrong, are utterly unenforceable
 2  except to the extent necessary to protect trade secrets.
 3          Isn't that essentially right?
 4          MS. SARNO:  Absolutely, your Honor.
 5          THE COURT:  Where are the trade secrets?
 6          MS. SARNO:  Again, we believe the trade secrets are
 7  within the advertising techniques and programs that they not
 8  only have been aware of but have already used for the benefit
 9  of Citadel.  The information within Radio Fusion that is kept
10  about each particular client and each client that they dealt
11  with we certainly believe is proprietary to ClearChannel, and
12  the fact that they have reached out to them has shown malice on
13  their part that they are already engaging in such
14  misappropriation and unfair competition.
15          THE COURT:  The argument proves more than a little too
16  much.  It proves they would like to continue supporting their
17  families or eating.  And it proves that they know that these
18  are accounts, which anybody else in New York who turns on a
19  radio knows, right?
20          MS. SARNO:  Your Honor, it is not the fact that they
21  know the accounts, but the information about the facts that
22  we're concerned about.
23          THE COURT:  But you don't know that.  You are guessing
24  as to that.  OK.  Thank you very much.
25          MS. SARNO:  Thank you, your Honor.

23

83oncapa

```
 1              THE COURT:  Mr. Feigelson.
 2              MR. FEIGELSON:  Good afternoon, your Honor.  Jeremy
 3    Feigelson from Debevoise & Plimpton.  We represent the
 4    individual defendants as well as Citadel, with me is my
 5    colleague Tricia Bozyk Sherno.
 6              THE COURT:  What about this Ask the Experts bit?
 7              MR. FEIGELSON:  Let's go right there, Judge.
 8              First of all, you have in the record, we submitted
 9    this afternoon some declarations from each of the four
10    individual defendants disclaiming any knowledge of the
11    PowerPoint presentation that we have just seen for the first
12    time and how, if it made its way into Citadel's hands and it
13    was utilized in any way to create the Citadel version of that
14    PowerPoint, these four individuals know nothing about it.  That
15    is now a matter of record, Judge.  So it provides no basis for
16    any injunction against them.
17              We have had this case, your Honor, since late Friday
18    afternoon.  Over the holiday weekend we have been able to learn
19    a lot of facts, but not all the facts.  I cannot, sitting here
20    today, give your Honor a good explanation of the degree to
21    which the slides are similar and what role anyone within the
22    Citadel organization may have played.  That is something
23    obviously that we will look into.
24              But I want to emphasize, your Honor, that the program
25    itself, Ask the Expert, as your Honor suggested in the colloquy
```
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

83oncapa

```
 1    with Ms. Sarno, there is really nothing special or confidential
 2    or proprietary about it.
 3          THE COURT:  It is not dissimilar to Car Talk in a
 4    segment called "Stump the Chumps."
 5          MR. FEIGELSON:  I am a fan of that show, your Honor,
 6    so I would not disagree.  I was going to direct the court to
 7    the Campbell declaration, which is Exhibit 5 in the declaration
 8    package that we handed up to your Honor earlier.
 9          If the Court looks at Exhibit E to the Campbell
10    declaration, you will see there are two Internet promotions for
11    radio sales programs called Ask the Expert which appear to be
12    essentially identical.  These are from two other radio station
13    companies, Sinclair and Entercom, which have nothing to do with
14    either Citadel or ClearChannel.
15          This is a concept, your Honor, that has been out there
16    in the radio industry for --
17          THE COURT:  For a million years.
18          MR. FEIGELSON:  -- years and years.
19          While the similarity between the couple of the slides
20    and the PowerPoint is a matter of curiosity, Judge, I think
21    it's fair to say that it is of no legal consequence,
22    particularly since the program itself does not embody any kind
23    of a protectable concept.  It's what everybody in the business
24    does.  It is how everybody sells.
25          If the Court has other questions about Ask the Expert,
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

83oncapa

1   I would be pleased to try to answer them.  Otherwise I do want
2   to touch on jurisdiction.
3             THE COURT:  I am afraid of asking the expert.
4             MR. FEIGELSON:  Jurisdiction, your Honor, is quite a
5   serious issue.  Citadel's incorporation is a matter of public
6   record.  The 10-K that is in the exhibit package that we handed
7   up, that we submitted to chambers earlier today, Exhibit 9 to
8   the Feigelson declaration, is the cover page from Citadel's
9   10-K, that, of course, is a publicly available document, your
10  Honor.  We have pulled it down from Citadel's website.  It is
11  there for the world to see, including ClearChannel and its
12  counsel.  It is a complete answer to the assertion that there
13  is diversity jurisdiction here.
14            To be clear, your Honor, the complaint only asserts
15  one ground for federal jurisdiction.  That is diversity.
16  Diversity, of course, requires complete diversity.
17            You will see in the caption that Capstar asserts that
18  it is a Delaware corporation.  We now know that Citadel
19  Broadcasting also is a Delaware corporation.  That means, your
20  Honor, that wherever this case belongs, if it belongs anywhere,
21  it does not belong in federal court.
22            THE COURT:  Not necessarily, because if I thought it
23  appropriate, I could permit Citadel to be dropped as a party,
24  right?
25            MR. FEIGELSON:  You could, your Honor.  We are
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

83oncapa

```
 1   certainly aware of that possibility.  That's why in our papers
 2   we did go to on to address the merits.  I will go into those
 3   issues now.
 4           Our position, your Honor, is that certainly there is
 5   no basis in today's record for a TRO.  There will never be a
 6   basis, even after the record is developed, but certainly not
 7   today.
 8           Today, after two days of investigation that we have
 9   been able to document very thoroughly in our papers, Judge,
10   there is absolutely nothing proprietary or confidential that is
11   at issue in this business dispute.
12           This is a dispute about front-line radio ad salesmen,
13   as your Honor noted.  It is not about people with access to
14   high-level corporate information.  It is not about the secret
15   formula for Coke.
16           We are talking about a handful of categories of
17   information.  Each of them is shown very comprehensively in our
18   papers, Judge, based on just two days of investigation, to be
19   matters of public record.  Customer identities, not only your
20   Honor, are they available to any listeners of the radio, but
21   again, pointing to the Campbell declaration, if the Court looks
22   at Exhibit B to the Campbell declaration, this is a report from
23   a subscription based web service called Media Monitors.  What
24   this shows, your Honor, is, with a couple of clicks of a mouse,
25   any salesmen in this industry can call up an extremely detailed
```

27

83oncapa

1   station-by-station, day-by-day, day part-by-day part report of
2   exactly who is advertising on what radio stations.
3            It is a report that your Honor sees in the record here
4   was actually called up by Mr. Campbell, one of the individual
5   defendants, using his Citadel-issued log-on ID.  He's able to
6   call up all the detail for WKTU, which is the station he used
7   to sell for at ClearChannel.
8            Anyone can do that who has access to Media Monitors.
9   It is a totally standard industry tool, and it is the way that
10  salesmen using this public information fairly go after the
11  competition regardless of whether they used to work at the
12  competing company or not.  There is an enormous amount of
13  detail available out there that doesn't even require turning on
14  the radio.
15           As far as customer contact information, it is also a
16  matter of record that it is extremely easy to obtain.  We are
17  talking about salesmen who are targeting primarily small and
18  mid-sized businesses in the New York area, car dealerships,
19  restaurants, doctors.  It does not take a lot of work, your
20  Honor, to find out who at one of these businesses is the right
21  contact person to make an advertising decision.  It is in
22  Mr. Campbell's declaration, again undisputed, that all it takes
23  is typically a couple of clicks of a mouse maybe a phone call
24  or two and you've got the right person.  It is as simple as
25  that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

83oncapa

1          The contact information, to the extent it is not
2    already publicly available by looking on a business' website,
3    is very easily re-created by anyone without special knowledge
4    or information.
5          The other categories of information that are at issue
6    here, Judge, I think are the software, the training, and the
7    specific materials.  The software I think it's very clear is
8    not proprietary at all.  It is described explicitly in the
9    papers that ClearChannel submitted as proprietary software.  It
10   is just not.  Every software system that's been described is
11   publicly available for purchase by any radio station company.
12         I think it is also clear from the colloquy we just
13   heard that there is no evidence that these individuals had
14   taken any information from those systems, and their
15   declarations confirm that.  Those are now in the record, too.
16         The training is generic training.  How do you sell ads
17   on radio?  Again, this is not rocket science, your Honor.  As
18   for specific materials, what we have been able to learn and
19   what the declarations confirm is that these individuals took
20   their contacts lists because those are public information.
21   They provided client contact information for clients whose
22   identity as customers of the ClearChannel station is already
23   well known.  In a couple of cases people seemed to have taken
24   some presentation materials with them, which they have now
25   promised that they will return and which they have not

83oncapa
```
 1   consulted or used any way in the few days that they have been
 2   working for WABC.
 3           THE COURT:  What about the question of whether they
 4   ought to be permitted to contact accounts that were either
 5   handed to them at ClearChannel or that they developed beginning
 6   while they were at ClearChannel.
 7           MR. FEIGELSON:  I think ClearChannel's own views on
 8   that are quite important, your Honor.  One of the things we've
 9   suggested in our papers is that we agree with ClearChannel that
10   there ought to be expedited discovery.  One of the major topics
11   we would propose to pursue in expedited discovery is how
12   ClearChannel looks at this very issue, because two of the
13   individual defendants, your Honor, have stated in their
14   declarations that when they came to ClearChannel, they were
15   encouraged or even specifically directed to pursue clients from
16   former radio station companies where they used to work.
17           This is how the business functions, your Honor.  It is
18   how ClearChannel functions, too.  So should they be allowed to?
19   I think they should certainly be allowed to do at Citadel what
20   ClearChannel encouraged them to do when they were at
21   ClearChannel.
22           THE COURT:  I'm chuckling because this is deja vu all
23   over for me.  I will explain why later.
24           MR. FEIGELSON:  In any event, your Honor, should they
25   be allowed to -- again it goes back to the question of is there
```

83oncapa
1   anything confidential or proprietary here.  Anyone could come
2   to a sales job like this, your Honor; and, equipped with the
3   same tools that any of these four individual defendants have,
4   could quickly reconstruct the same client profiles and customer
5   contact information for all the clients of a ClearChannel
6   station.
7        So it is fair competition, your Honor, and there is no
8   reason why these individuals should be forbidden to engage in
9   it.
10       It is also important to note, your Honor, that some of
11  the clients contacts we are talking about here are contacts
12  that these gentlemen brought with them from previous
13  employment.  Certainly, it would be odd to suggest that
14  ClearChannel acquires a proprietary interest in a customer
15  relationship the individual had already developed while working
16  at another employer.
17       THE COURT:  This is just like the Wall Street rating
18  cases when the brokers go from one house to another.  Every
19  firm on Wall Street has the papers on both sides of the issue
20  in the word processor ready to go depending on whether they are
21  rating or being rated.
22       MR. FEIGELSON:  Well, your Honor, the fact that all
23  these categories of information that the plaintiffs have put in
24  issue are clearly matters of public information and common
25  sense, that is really the thread that pulls you through all of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

31
83oncapa

 1   the legal theories that have been thrown up in the plaintiff's
 2   papers.
 3          All of those legal theories, including the proposition
 4   that the noncompete should be enforced, they all require an
 5   evidentiary showing of actual trade secrets and confidential
 6   information.
 7          I think it's very clear that there's been no showing.
 8   In fact, with our submission today, your Honor, the record
 9   tilts very heavily in the opposite direction.
10          We would be pleased to engage in expedited discovery.
11   We have included in our submission a proposed order and some
12   initial discovery requests.
13          We are ready to be back here in a matter of weeks
14   after quick document productions and quick depositions on both
15   sides to show your Honor on the basis of a full record exactly
16   why this case as absolutely no merit.
17          THE COURT:  Is there any reason why I shouldn't
18   consolidate the preliminary injunction motion with the trial on
19   the merits under Rule 65(a)(2)?
20          MR. FEIGELSON:  Your Honor, that is a question that
21   obviously I need to consult with my client on before answering
22   definitively, but my snap reaction is it sounds like a
23   reasonable idea.
24          THE COURT:  Thank you.
25          Ms. Sarno?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

32

83oncapa

```
 1              MS. SARNO:  Your Honor, just to address a few of the
 2    point that were raised by defendant, we are well aware of Media
 3    Monitors.  It was an Internet program that is available to
 4    everyone and is certainly known to all account executives.
 5              What we are talking about is what is available on the
 6    information that is within Radio Fusion.  Radio Fusion,
 7    although it is provided by Viero, has been particularly
 8    tailored for ClearChannel.  In that is specific historical
 9    purchase information, product information, benefits
10    information, pricing, scheduling, and sponsorship information.
11              This is all information that was kept about the
12    clients that these four individuals worked with.  These four
13    individuals developed goodwill, and for the most part, with the
14    exception ever a few of them, were developed at ClearChannel
15    and were prior clients of ClearChannel long before they were
16    there.  They now have this information to take with them.
17              With regard to the allegation that these gentlemen
18    were encouraged to solicit clients from their former employers,
19    I am aware of one of them, and, yes, he was encouraged because
20    there was no noncompete agreement.  It is my understanding one
21    of the gentleman came from another radio station, and there was
22    no --
23              THE COURT:  That ultimately doesn't matter if you are
24    right on the law, right?
25              If in fact it is actionable under New York law on the
```

                         SOUTHERN DISTRICT REPORTERS, P.C.
                                  (212) 805-0300

83oncapa
```
 1    theory of unfair competition to compete with a former employer
 2    for a customer to whom the changing employee was introduced
 3    while at the former employer, then the absence of a noncompete
 4    doesn't matter, right?
 5              MS. SARNO:  Yes, your Honor.  But in this particular
 6    situation, they took the goodwill and they took the client, the
 7    confidential client information with them and they are now
 8    using it.  They have admitted that they have contacted --
 9              THE COURT:  Don't you think that when these guys you
10    hired and encouraged to go after their former accounts came to
11    you that they knew what the business history and the
12    relationship between their former employer and the clients you
13    urged then to go after was?  They couldn't have avoided knowing
14    that if your theory holds water.
15              MS. SARNO:  That is true.  But without a contractual
16    agreement restricting them or a nonsolicitation or
17    noncompete --
18              THE COURT:  If your unfair competition theory is
19    right, the noncompete doesn't matter, does it?
20              MS. SARNO:  I understand where you are going, your
21    Honor, but certainly that goes to the ones that they brought
22    with them.  From my understanding, they're putting those aside,
23    almost all of the clients that they worked with.
24              THE COURT:  It doesn't go to the ones they brought
25    with them.  It goes to what your client's practice is.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

83oncapa

 1          Let us posit for the sake of discussion that it is
 2   unfair competition for an employee to move from employer A to
 3   employer B and then to solicit employer A's clients because he
 4   knows things about employer A's clients that he learned while
 5   working for employer A.
 6          That's your premise, right?
 7          MS. SARNO:  Yes.
 8          THE COURT:  Let's assume that to be true.
 9          If your practice is, notwithstanding that principle,
10   to take somebody who comes from employer A and goes to work for
11   you to solicit the accounts he served while employed by
12   employer A, then you are regularly encouraging and engaging in
13   unfair competition, right?
14          MS. SARNO:  If the circumstances are the same.  The
15   reason why I say that is I also, in addressing your Honor, the
16   radio station -- for example, I believe it was Mr. Carpino that
17   came from a different radio station that brought over some
18   clients and he contacted them.  It is my understanding with
19   regard to him he came from a station that was not in the same
20   market as ours.
21          That is the situation where he was encouraged to
22   solicit.  What we are most concerned about are the clients.
23          THE COURT:  How many thousands of stations does
24   ClearChannel have?  11,000 or 12,000.
25          MS. SARNO:  12,000.

83oncapa
```
 1            THE COURT:  Do you think you could identify more than
 2   about 11 markets in the United States that you are not in?
 3            MS. SARNO:  Your Honor, I am talking about the station
 4   that they went to and the station from which they came.  For
 5   example, all four of these went to WABC.  WABC and WKTU and
 6   Lite FM are within the same market.  That certainly is
 7   different from all the different markets that ClearChannel as a
 8   whole belongs to.  What we are comparing is what station they
 9   come from and where they went.
10            THE COURT:  OK.
11            MS. SARNO:  Certainly, your Honor, we believe that
12   information that they gained and the goodwill that they
13   developed with these particular client contacts are proper
14   protectable interests of the company.
15            Thank you.
16            THE COURT:  OK.  I have the same question to you on
17   the 65(a)(2) consolidation that I asked Mr. Feigelson.
18            MS. SARNO:  Your Honor, I as well would have to
19   consult with my client.  But it certainly seems like an
20   expedited way to address the issue.
21            THE COURT:  Let's talk about scheduling.
22            What do you have in mind?  I could try this case in
23   April sometime.
24            MS. SARNO:  Your Honor, I understand that, if I may
25   from here, I have not even had a chance to take a look at
```

36

83oncapa
1   defendant's proposed schedule.
2           THE COURT:  I frankly wasn't focused on that either.
3   What about setting this down for April 23.  Then if it takes
4   more than a day, I think I can continue past that.  This is
5   unlikely to take more than two, two and a half days, right?
6           MS. SARNO:  I don't think so, your Honor.
7           THE COURT:  OK.  Let's say 9:30 on April 23, at least
8   the preliminary injunction hearing and, unless you can persuade
9   me otherwise, trial on the merits.
10          There is no jury demand, right?
11          MS. SARNO:  No, your Honor.
12          THE COURT:  Mr. Feigelson, there's not going to be a
13  jury demand, right?
14          MR. FEIGELSON:  Not from our side, your Honor.
15          THE COURT:  So 9:30 on the 23rd.
16          Expedited discovery you have agreed on.  It is
17  perfectly OK with me.  I am not going to grant a temporary
18  restraining order.
19          First of all, I'm by no means persuaded that there is
20  a substantial threat of irreparable injury.  There's been a lot
21  of talk of generalities, but I don't see any hard facts.
22          That goes also to the issue of likelihood of success
23  on the merits.  With respect to that point, there's the
24  additional problem that it appears, at least on the present
25  state of the matter that diversity is incomplete, at least as
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

```
     83oncapa
 1   it respects Citadel, and maybe more broadly there will be no
 2   jurisdiction.  We will see what the future holds on that.  But
 3   I just don't see any reason for a temporary restraining order
 4   here.
 5            Now, if the plaintiff wants to press for a preliminary
 6   injunction, you can file more papers and I'll see whether I get
 7   to it before April 23, but no temporary restraining order.
 8            Let's get to the rest of the schedule.
 9            MR. FEIGELSON:  Your Honor, if it is acceptable to the
10   Court, Exhibit 2 to my declaration is a proposed scheduling and
11   confidentiality order which lays out some dates.  We did not
12   have a chance to consult with plaintiff's counsel on this ahead
13   of today's hearing, but it is there for everyone to look at
14   now.
15            THE COURT:  Ms. Sarno, what is your comment on that.
16            MS. SARNO:  Your Honor, we could certainly expedite
17   our service of document requests.  However, we would ask that
18   it be until Wednesday as opposed to tomorrow, 10:00 a.m. on
19   3/26.
20            THE COURT:  Fine.
21            Document requests to be served by March 26.
22            Document production to be finished by -- what do you
23   want to do on that.  A week from today?
24            MS. SARNO:  A week from today.
25            THE COURT:  OK.
```

38

83oncapa

```
 1              March 31, completion of document requests.
 2              Given that we have the hearing on the 23rd, do you
 3    want to go beyond April 7 on depositions?
 4              MS. SARNO:  Yes, please.
 5              THE COURT:  How much further?
 6              MS. SARNO:  A week thereafter.
 7              THE COURT:  OK.  Depositions and all other discovery
 8    to be completed by April 14.
 9              Exchange premarked exhibits, exhibit lists, and
10    witness lists by April 21.  We will be ready to go on the 23rd.
11              Anything else that we need to do?
12              MR. FEIGELSON:  Your Honor, our proposed order
13    included some confidentiality provisions.  I don't want to
14    impose on my adversary to try to agree on those on the spot.
15    Perhaps we should submit an order that embodies --
16              THE COURT:  Submit a pretty standard confidentiality
17    order and I will sign it.
18              MR. FEIGELSON:  Thank you, your Honor.
19              THE COURT:  Is there something else?
20              Let's go off the record for a minute.
21              (Discussion off the record)
22              THE COURT:  OK.  If you have problems on discovery,
23    you will let me know.  Thank you, folks.
24              (Adjourned)
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**EXHIBIT 3**

**Sean Nash**

| | |
|---|---|
| **From:** | Benton, Susan |
| **Sent:** | Friday, March 21, 2008 1:35 PM |
| **To:** | Nash, Sean; Frazer, Jason |
| **Subject:** | Fw: TRO HEARING |

Please truy to get the pleadings. I will be back in the office shortly.

----- Original Message -----
From: Jackie Orr <jackie.orr@citcomm.com>
To: JYu@seyfarth.com <JYu@seyfarth.com>; LSarno@seyfarth.com <LSarno@seyfarth.com>;
Ggalant@seyfarth.com <Ggalant@seyfarth.com>
Cc: Benton, Susan; Steve Borneman <steve.borneman@citcomm.com>
Sent: Fri Mar 21 14:19:59 2008
Subject: TRO HEARING

As you and your firm are well aware of, I am the general counsel for Citadel.  Despite it being publicly
available that I am and your specifically being aware of this through your firms involvement in the
Chicago TRO matter--- for some reason your firm still fails to intentionally notify me of any
emergency matters involving Citadel.


Our GM just received notice of this hearing.  If it has not occurred yet or is in process, please call me
at 215-369-5450.  We have not received copies of any papers and object to your proceeding ex parte
in this matter.


I left you a VM and would appreciate a call as soon as possible.


Thank you.




Jacquelyn J. Orr

General Counsel & Vice President

Citadel Broadcasting Corporation

142 West 57th Street, 11th Floor

New York, New York  10019

Ph:   (212) 887-1666

1

Fax: (212) 887-1675

The information contained in this communication is confidential, may be subject to the attorney-client privilege, attorney work-product, may constitute inside information, and is intended only for the use of the addressee. It is the property of Citadel Broadcasting Corporation. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return e-mail or by e-mail to rthompson@citcomm.com and destroy this communication and all copies thereof, including all attachments.