**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMFM BROADCASTING, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 08-CV-1519 |
| | ) |
| CHICAGO FM RADIO ASSETS, LLC, | ) Hon. James B. Zagel |
| incorrectly captioned as | ) |
| CITADEL BROADCASTING CORPORATION | ) Magistrate Judge Morton Denlow |
| and REBECCA OSOWIEC | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' PRE-HEARING MEMORANDUM
IN OPPOSITION TO PLAINTIFF'S MOTION FOR TRO**

Defendants Chicago FM Radio Assets, LLC ("Chicago FM") (owner of WZZN-FM) and Rebecca Osowiec ("Osowiec") (collectively, the "Defendants"), submit this pre-hearing memorandum of law in opposition to Plaintiff's motion for temporary restraining order ("TRO"). The hearing is scheduled for April 7, 2008 at 2:15 p.m.

## INTRODUCTION

The evidence at today's hearing will show that this is not a proper case for a temporary restraining order, for the simple reason that Clear Channel cannot carry its burden of showing that any trade secrets or confidential information are truly at stake. Instead the evidence will show that in radio advertising sales, clients routinely air commercials on competing stations simultaneously, and the details of each competing company's sales efforts are as public as can be:

- Anyone in Chicago can learn the identity of Clear Channel's advertising clients just by turning on the radio.

- Through online subscription services, anyone in the radio business can learn the details of their competitors' advertising efforts in great detail – including exactly who is advertising on which competing stations, on what days and at what times, and with what creative approaches.

- The identities of client contact persons likewise are public or easily obtained from public information.

- The allegedly proprietary software products employed by Clear Channel are in fact third-party products used widely in the industry. To the extent that the versions used at Clear Channel include specific financial information, that is of no use to Osowiec at WZZN and she will not rely on it.

- The record also will show that Osowiec took nothing with her when she left Clear Channel; that she deleted no information from Clear Channel computers; and that she can and will do her job for WZZN without relying in any way on trade secrets or confidential information of Clear Channel.

Clear Channel's effort to enforce its sweeping noncompete form thus not only comes too late to justify emergency relief – it is flatly inconsistent with Illinois law, which allows enforcement of restrictive covenants only to protect exclusive long-standing near permanent customer relationships and true trade secrets or confidential information. The evidence will show that Clear Channel's conclusory assertions of exclusive customer relationships and trade secret and confidential information have no basis in fact. This simple conclusion leaves Clear Channel unable to carry its legal burden on any of its claims and unable to satisfy the demanding test for preliminary relief. Through the drastic and extraordinary measure of a TRO that keeps Osowiec from working her trade at all, Clear Channel is seeking to avoid fair competition. The TRO accordingly should be vacated.

## ARGUMENT

### I.    Legal Standard.

To obtain a TRO, Plaintiff must show the following elements: (1) some likelihood of success on the merits; (2) an absence of an adequate remedy at law; (3) irreparable injury if the injunction is not issued; and, if these are established: (4) that the balance of harms favors Plaintiff; and (5) the effect that either granting or denying the injunction will have on the public interest. Ferrell v. U.S. Dept. of Housing and Urban Dev., 186 F.3d 805, 811 (7th Cir. 1999). Moreover, the Court may balance these factors using a "sliding scale" where "the greater the moving party's likelihood of prevailing on the merits, the less strongly it must show that the

balance of harms weighs in its favor." <u>Ferrell</u>, 186 F.3d at 811. "Conclusion, opinion or allegations on information and belief are not sufficient to support a claim for injunctive relief." <u>Heerey v. Berke</u>, 179 Ill. App. 3d 927, 939, 534 N.E.2d 1277, 1284 (1st Dist. 1989).

## II.     Plaintiff Cannot Establish That It Has a Clear Right Needing Immediate Protection and the Balance of Harms Clearly Weighs Against Granting Injunctive Relief.

The timing of Plaintiff's moving papers belies any "immediate right" in need of protection. WZZN hired Osowiec in December 2007, and by its own admission, Plaintiff had knowledge of that hire as early as January 17, 2008, two full months before its "emergency" filing. Plaintiff did not file this action until March 14, 2008, more than three months after Osowiec's last day of employment on December 3, 2007 and at least one month after it sent it a letter to Defendants on February 15, 2008.

Plaintiff has effectively "slept on its rights" and may not now ask this Court for the extraordinary and drastic remedy of a TRO.[1] It is hornbook law that "a party wishing to invoke a court's equitable power must have acted with diligence." <u>In re: County Collector</u>, 285 Ill. App. 3d 518, 519, 674 N.E.2d 123, 124 (1st Dist. 1996) (internal citations omitted). Plaintiff, who has not acted with diligence in pursuing this claim, should not be granted injunctive relief. See <u>Cintas v. Perry</u>, No 03 C 8404, 2004 Wl 2032124 (N.D. Ill. Aug. 20, 2004)[2] (concluding that plaintiff, who failed to act until after defendant began working for a competitor, could not establish that injunctive relief was necessary).

The balance of hardships clearly favors Defendants. The Court must consider both "the possibility of irreparable harm to the plaintiff's legal rights pending the outcome of the trial if the preliminary injunction does not issue [and] the potential irreparable harm to the defendant's rights if it does." <u>Carbonic Fire Extinguishers, Inc. v. Heath</u>, 190 Ill. App. 3d 948, 951, 547 N.E.2d 675, 676 (2d Dist. 1989). Osowiec has worked for WZZN for almost four

---

[1] This is consistent with Clear Channel's history of failing to enforce its non-competes. There are numerous employees who had access to the same information as Osowiec, who signed the same agreement as Osowiec and against whom Plaintiff sought no contract enforcement or relief whatsoever: for example, Carla Ross left Clear Channel sales position in August 2006 to accept the same position at WILV "Love FM;" Staci Diamond left her sales position with Clear Channel's WNUA in April 2007 to accept a similar position at WTMX; Kate Roadhouse left her sales position at WLIT in December 2006 to become an Account Executive at ESPN Radio; and Jessica Evans left WLIT in the last few months to become an Account Executive at WTMX. All of this would come out in written discovery and depositions. There is no basis for emergency relief. The matter should simply proceed to discovery and hearing on the motion for preliminary injunction.

months.  Removing her from her position at this point (which the *ex parte* TRO has done) has substantially hindered her ability to make a living, as her salary at WZZN is based on 100% commission.  A TRO is an emergency remedy used to *preserve* the status quo until a hearing can be held on a preliminary injunction.  <u>Passon v. T C R, Inc.</u>, 242 Ill. App. 3d 259, 264, 608 N.E.2d 1346, 1350 (2d Dist. 1993).  The issuance of the *ex parte* TRO in this case *changed* the status quo between the parties.  Prior to the entry of the *ex parte* TRO, the status quo was Osowiec working for three months at WZZN.  Any allegedly misappropriated confidential information was stale and useless well before the TRO action was brought. (See Section IV below).  The existing TRO causes considerable financial harm to Osowiec, and does nothing to protect any legitimate interest of Plaintiff.  This is simply an effort by Clear Channel – one of the largest radio station owners in the country – to restrain competition in this marketplace.  Plaintiff will suffer no harm by the dissolution of the *ex parte* TRO; Osowiec will suffer greatly if the TRO is not dissolved.

### III.    Plaintiff Cannot Demonstrate Any Likelihood of Success on The Merits.

In injunction proceedings involving post-employment restrictive covenants, the primary focus is on whether the covenant is enforceable, which is a question of law.  <u>Millard Maintenance Serv. Co. v. Bernero</u>, 207 Ill. App. 3d 736, 744, 566 N.E.2d 379, 383 (1st Dist. 1990).  In Illinois, restrictive covenants are disfavored in the law and closely scrutinized because they are repugnant to the public policy encouraging an open and competitive marketplace.  See <u>Bishop v. Lakeland Animal Hosp.</u>, 268 Ill. App. 3d 114, 117, 644 N.E.2d 33, 35 (2d Dist. 1994). This is especially true in the case of covenants not to compete, which Illinois courts have held to be restraints on trade.  *See* <u>Office Mates 5, North Shore, Inc. v. Hazen</u>, 234 Ill.App.3d 557, 568, 599 N.E.2d 1072, 1080 (1st Dist. 1992).

A restrictive covenant is not enforceable unless it is reasonable in geographical and temporal scope and is necessary to protect a legitimate interest of the employer.  <u>Eichmann v. Nat'l Hosp. and Health Care Servs., Inc.</u>, 308 Ill. App. 3d 337, 345-46, 719 N.E.2d 1141, 1148 (1st Dist. 1999).  Illinois courts have recognized only two situations in which an employer has a legitimate business interest sufficient to justify the enforcement of a restrictive covenant:  (1) where, "by the nature of the business, the customer relationship is near permanent and, but for

---

[2] All unpublished cases cited in this Memorandum are attached hereto.

her association with plaintiff, defendant would never have had contact with the clients in question;" and (2) where the former employee "acquired confidential information through his employment and subsequently attempted to use it for his own benefit." <u>Office Mates 5</u>, 234 Ill. App. 3d at 569 (internal citations omitted); <u>Capsonic Group v. Swick</u>, 181 Ill. App. 3d 988, 993, 537 N.E.2d 1378, 1382 (2d Dist. 1989). Plaintiff cannot satisfy the foregoing standards.

### A. Plaintiff's Allegations of Protectible Interest Are Not Sufficient to Support a Non-Compete.

Wholly ignoring the realities of the radio industry, Clear Channel, through Earl Jones and Ken Denton, attempts to claim both near-permanent customer relationships and confidential information. Jones merely states, in pure conclusory fashion with no underlying facts, that it has "near-permanent relationships with it customers" and that it has "confidential information concerning its customers." (Jones Decl. ¶3). Such conclusions cannot support injunctive relief. Denton's declaration is also largely conclusory:

> "Because of its vast presence in radio, television, and outdoor advertising, Clear Channel's confidential information and other proprietary information is unique and sets it apart from other competitors in the marketplace."

(Denton Decl. ¶2). Later in paragraph 8 of his declaration (and also in Nancy O'Brien's Declaration at ¶2), Denton lists "valuable information" about customers, including:

- personal and professional contact information;
- the client's target consumer;
- previous year sales in campaign or account;
- advertising and marketing schedules;
- event sponsorships;
- buying preferences; and
- sales demographics.

*All* such information is readily available to competitors from public or subscription sources, specifically the telephone directory, the internet site for the customers, directly from the customers, and most easily by accessing data from various third party

subscription services such as X-Ray or Media Monitors to which both Citadel and Clear Channel subscribe.[3]

Media Monitors monitors all of the top-rated radio stations in major markets, including Chicago. Advertising commercial sports are tracked each hour, 365 days per year, by advertiser, station, spot content, time length and frequency, and client spots on competing stations. From these reports, a station can identify, *inter alia,* all advertisers in the market, the frequency of their radio ads, which advertisers are and are not buying which stations, the specific demographics targeted by the advertisers and the buying preferences of each advertiser. (Benton Decl. ¶4, Ex. D)

X-Ray is a report generated for subscribers by Miller, Kaplan, Avase & Co., LLP. The X-Ray report "provides subscribers with an advertiser-by-advertiser look at market spending. Sales management and account executives are empowered with the ability to query and export results by agency, advertiser, and product code." (Benton Decl. ¶4, Ex. E). Advertisers' radio expenditures can be viewed monthly. Id. Advertisers who spend little or nothing on a particular station and who have the greatest potential revenue benefit for a station are identified by another X-Ray service, X-Ray Advantage, by relevant demographic area and format. Advertisers' contact information and suggested proposal amounts are also supplied by X-Ray Advantage. Id.

Denton also asserts that "Clear Channel's confidential and proprietary information currently includes proprietary software systems called Radio Fusion and Best Rate, and until November 2007, Tapscan." (Denton Decl. ¶3). Tapscan was replaced by Radio Fusion at WLIT just days before Osowiec resigned from Clear Channel (Compl. ¶13); Osowiec used Tapscan, and not Radio Fusion, at WLIT prior to her resignation. WZZN uses Tapscan, and has done so for a number of years. Tapscan, like Radio Fusion, is used by radio stations to "demonstrate the value of their audience to advertisers, streamline their sale processes and program their stations more effectively." (Benton Decl. ¶2, Ex. B).

Best Rate and Radio Fusion are integrated revenue management solutions products provided by Lan International. Lan International is a wholly owned subsidiary of Clear Channel. (Benton Decl. Ex. A.). A number of radio companies subscribe to this same software.

---

[3] Plaintiff's conclusory and factually baseless allegations should be tested in written discovery before they are

Id. WZZN does not subscribe to Radio Fusion or Best Rate, although it could certainly choose to do so.

Both Radio Fusion and Best Rate are software programs designed to assist the Lan International customer (in this case Clear Channel) to efficiently manage revenue. The Radio Fusion and Best Rate programs are tailored for each Lan International customer with customer-specific data, and have value for that customer only.

The Lan International website highlights the ever-changing nature of the data provided to the Lan customer through Radio Fusion and Best Rate: "VIERO RMS revenue management (T&B) schedules and reports spots in **real time**, helping you capture and **transform last minute avails from lost opportunities into high-powered revenue generators**." Radio Fusion works with continually updated data "**reflecting up-to-the minute inventories and demand reflective pricing**." Radio Fusion interacts with Best Rate, providing "ratings information, **up-to date pricing** and **real-time inventory** from your VIERO BEST RATE rate and yield management, ensuring maximum value for your inventory." "You enhance visibility, streamline workflow and expedite the sales process." (Benton Decl. ¶2 Ex. A). "The VIERO BEST RATE and yield management helps you manage station inventories quickly and effectively. … VIERO BEST RATE rate and yield management **measures the daily demand on inventory**, and adjusts rates with a single objective; to maximize revenue … . VIERO BEST RATE rate and yield management searches its datamart for **nightly download**s from the VIERO ® revenue management solution. It then uses this data to generate current demand prices for unsold available inventory. These prices are maintained in a portion of the VIERO BEST RATE rate and yield management program referred to as a rate card. Rate cards display recommended spot pricing based on inventory usage, **calculated daily** and seasonal demand, and availability for a given station." Id. (Emphasis added). Pricing information contained in Radio Fusion and Best Rate is "demand driven" and ever-changing. One day's data has no value the next day, much less months later. Because cost and pricing information changes frequently or turns stale and obsolete, it is not confidential. See, e.g., Applied Indus. Materials Corp. v. Brantjes, 891 F. Supp. 432, 437-38 (N.D. Ill. 1994) (finding that old or stale "pricing information" lacks current economic value and is no longer useful).

---

allowed to form the basis for injunctive relief.

### B.    Plaintiff Does Not Have a "Protectible Interest" in its Customers.

Plaintiff does not enjoy "near permanent" relationships with its customers. Illinois courts have recognized a legitimate business interest where "the customer relationships are near-permanent and but for the employee's association with the employer, the employee would not have had contact with the customers." Outsource Int'l, Inc. v. Barton, 192 F3d 662, 666 (7th Cir. 1999) (quoting Lawrence and Allen, Inc. v. Cambridge Human Resources Group, Inc., 292 Ill. App. 3d 131, 685 N.E.2d 434, 443 (Ill. App. 2d Dist. 1997)).

At issue in this case is the sale of advertising space on radio stations, a demographic-driven, non-unique product. Plaintiff's customers include just about any and every type of business in the Chicagoland market. Generally, the "near-permanency test turns in large degree on the nature of the business involved, and certain businesses are just more amenable to success under it." Outsource Int'l, 192 F.3d at 667 (internal citations omitted). A business engaged in "ordinary sales" generally will not enjoy near-permanent relationships with its customers. Id. Thus, "a near-permanent relationship is generally absent where the nature of the plaintiff's business does not engender customer loyalty by providing a unique product or personal service and customers utilize many suppliers simultaneously to meet their needs. Office Mates 5, North Shore, Inc. v. Hazen, 234 Ill. App. 3d 557, 572, 599 N.E.2d 1072, 1082 (Ill. App. 1st Dist. 1992). Consistent with these principles, the court in Office Mates 5 noted:

> The fact pattern typifying these latter cases (i.e., non near-permanent) is the existence of a highly-competitive industry in which customers, through cross-purchasing, satisfy their buying needs. Plaintiffs in these businesses rely heavily on their sales force, who utilize basic sales techniques such as cold calls to make sales. The identities of customers or clients are known by all in the industry.

Office Mates 5, 599 N.E.2d at 1082.

This case is prototypical of those cases which found no near permanent relationships in sales. Most significantly, advertisers run spots on multiple stations daily as is easily determined through Media Monitors and X-Ray. They choose stations based upon target demographics and audience reach, not based on long-term relationships with particular sales personnel at a station. Salespeople at radio stations utilize basic sales techniques, including cold calls, to make sales. The identities of customers are known by listeners and competitors; they are

identified in radio broadcasts, on websites, the stations live internet streams, and by third party services such as Media Monitors and X-Ray.

The hearing testimony will also establish that contacts for local advertisers are easily available in the phone book or online; cold calls for local sales are common. Accordingly, because the customers are easily ascertainable and buy spots from multiple stations simultaneously, Plaintiff cannot establish that it enjoys "near-permanent" relationships with its customers subject to protection through a non-compete.

Specifically, the three customers identified by Plaintiff are not long standing customers unique to Plaintiff; two have histories of buying spots on WZZN, Broadway in Chicago and Paramount Theater. The advertising patterns of each are available on Media Monitors. Contact is a simple phone call away. National Hair Growth is certainly not a long-standing customer of WLIT – it bought only one schedule in 2007 (based on information available through Media Monitors). It bought nothing from WLIT either before or after that schedule. Plaintiff's relationships with these customers are in no way protectible by restraining a competitor's, and former employee's, activities through a non-compete. Office Mates 5, 599 N.E.2d at 1082.

### C. Plaintiff Has No Legitimate Protectible Interest in Alleged Confidential Information.

Plaintiff's only remaining avenue for establishing a protectible interest is by showing that Plaintiff provided Osowiec with access to confidential and proprietary information. See Springfield Rare Coin Galleries, Inc. v. Mileham, 250 Ill. App. 3d 922, 930, 620 N.E.2d 479, 485 (4th Dist. 1993); Outsource Int'l, 192 F.3d at 668. Plaintiff has not made and cannot make such a showing. The information alleged by Plaintiff's to be proprietary is, in fact, largely available through third party services throughout the radio industry.

Information that is generally available to other employees and known in the trade or that can be easily duplicated by reference to telephone directories or industry publications is not confidential. Springfield Rare Coin, 250 Ill. App. 3d at 930-31. Here, Plaintiff's alleges that it maintains proprietary software containing pricing information. But in fact, the software programs, Tapscan, Radio Fusion and Best Rate, are third-party software packages that are available to any radio station by subscription. WZZN-FM also uses Tapscan. Tapscan, like

Radio Fusion, is a scheduling program that maximizes revenue per spot and streamlines the sales process. Best Rate is an ever-changing "rate card" for WLIT.

In fact, there is no secret to a radio station's "pricing strategy." WLIT gets its "rate card" from Best Rate. WZZN has an entirely different "rate card." A station's primary revenue stream comes from selling on-air spots to advertisers. The goal is to maximize the price per spot. The price a station is able to charge for a spot is typically correlated both to the number of listeners during any particular day part and the demographics of the listener. For example, WLIT's primary listener is age 25-54, 60% women and 40% men. WZZN, on the other hand, targets a listener between the ages of 35-64, 50% men and 50% women. WLIT reaches more listeners than WZZN as measured by Arbitron. Because WLIT has a higher Arbitron rating, i.e. more listeners, it can charge more for a spot. Cost per spot is also determined by the particular station's availability of spots; *i.e.* the fewer spots available, the higher the costs for the remaining spots. As seen in Best Rate, "avails" or spot availability changes daily, and spot pricing changes accordingly. WLIT's "rate card" simply provides no value to competitors, including WZZN.

Moreover, Plaintiff's pricing information is available from a number of sources. Customers share competitor pricing in their attempt to get the lowest price for a spot. Pricing is available for large advertisers through X-Ray Advantage. One can come close to determining how much an advertiser is paying another station for a spot by analyzing Tapscan information, which provides the cost per Arbitron rating point for every station in any given schedule. Radio Fusion and Best Rate are programs unique to WLIT and Clear Channel; Lan International tailored its software programs using Clear Channel data. Not only did Osowiec not take any information from either program, the information would have no value to WZZN if she did. Because Radio Fusion and Best Rate have no value to competitors, these third-party programs do not constitute a protectible interest for Plaintiff sufficient to support a non-compete under Illinois law. Unisource worldwide, Inc. v. Carrara, 244 F. Supp. 2d 977, 987 (C.D. Ill. 2003) (finding that information concerning Unisource's profit margins, costs, and markups is not valuable enough to competitors to constitute confidential information).

> **D.    Plaintiff Fails to Present Any Facts to Support a Breach of the Confidentiality Provision of the Agreement and Thus Fails to Demonstrate Any Likelihood of Success on the Merits of That Claim.**

Moreover, there is absolutely no evidence in Plaintiff's moving papers that Osowiec attempted to use any of Plaintiff's purported confidential information for her own or WZZN's benefit.  Here, Plaintiff's would-be "smoking gun" evidence is simply an allegation based "upon information and belief" that Osowiec copied "customer lists and bid rate information," and an allegation that three of its customers' account revenues decreased from 2007 to 2008. (Compl. ¶¶ 34, 37). What Plaintiff fails to inform the Court, and what the hearing testimony will show, is that ad sales are down by approximately 15% *industry-wide* for that period.

Plaintiff cites no evidence even suggesting that Osowiec attempted to use any of Plaintiff's purported confidential information for her own or WZZN-FM's benefit.  Tellingly, Plaintiff's papers try to "finesse" this hole in their argument by referring only to vague generalities and failing to cite one specific instance of disclosed confidential information.[4]  The hearing testimony will show that Osowiec has not taken, used or disclosed any information belonging to Plaintiff, confidential or otherwise.[5]  Thus Plaintiff failed to demonstrate any likelihood of success on the merits of its breach of contract claim.

     E.     **The Covenant Not to Compete is Overbroad and Constitutes an Unlawful Activity Restraint.  Plaintiff Thus Fails to Demonstrate Any Likelihood of Success in Enforcing the Non-Compete.**

Even, assuming *arguendo*, that Plaintiff could establish a protectible interest, the noncompete provision of the Agreement – which prohibits Osowiec from working in the radio industry for six months - is unenforceable as overbroad. Plaintiff's non-compete agreement prohibits Osowiec from working in any capacity with any radio station (see Compl. at ¶23) for 180 days.  As drafted, the "covenant not to compete" would prohibit Osowiec from working for WZZN-FM as a janitor or deliveryman.  Such a provision is so broad as to be void and unenforceable under Illinois law.  Telxon Corp. v. Hoffman, 720 F. Supp. 657, 665 (1989) (non-compete held unenforceable as a matter of law because "[a]s written, the agreement would prevent [defendant] from working as a competitor as a janitor"); see also Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc., ___ Ill. App. 3d ___, 879 N.E.2d 512, 526 (Ill. App. 1st Dist. 2007) (finding that activity restrictions in non-compete provision invalid because

---

[4] Again, written and oral discovery are needed before injunctive relief is granted.
[5] Because Plaintiff cannot show that Osowiec took any confidential information and used it for her own benefit, its conversion claim (Compl. Count III) will fail as well.

"a blanket bar on all activities for competitors … is excessive in light of the limited areas in which [defendant's] knowledge would be competitively useful."), citing Lawrence and Allen, Inc. v. Cambridge Human Resource Group, 292 Ill. App. 3d 131, 685 N.E.2d 434, 443 (Ill App. 2d Dist. 1997) (finding that activity restrictions contained in covenant not to compete should be narrowly tailored to protect only against activities that threaten employer's interest); Telxon Corp. v. Hoffman, 720 F. Supp. 657, 665 (1989) (non-compete held unenforceable as a matter of law because "[a]s written, the agreement would prevent [defendant] from working for a competitor as a janitor").

### IV.    Plaintiff Has Demonstrated No Likelihood of Success on the Merits of Its Trade Secrets Claim.

For many of the same reasons listed above, namely that the alleged information is not confidential, Plaintiff cannot show a likelihood of success on its Trade Secrets Act claim. The Act defines a trade secret as: "Information… that is (1) sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality. 765 ILCS 1065/2(d). Information that is generally known or understood within an industry, even if not known to the public at large, does not qualify as a trade secret. Learning Curve Toys, Inc. v. Playwood Toys, Inc. 342 F.3d 714, 722 (7th Cir. 2003). Likewise, where information can be readily duplicated without considerable time, effort or expense, it is not a trade secret. Hamer Holding Group v. Elmore, 202 Ill.App.3d 994, 1011-12, 560 N.E.2d 907 (1st Dist. 1990)

Here, Plaintiff alleges that Osowiec had knowledge of its "confidential" pricing information and identity of customers (Compl. ¶34). Knowledge of a supplier's pricing policies, without showing that the value of the formula lies in the fact that it is not generally known by others and could not be acquired through general skills and knowledge, is not a trade secret. Central Specialties Co. v. Schaefer, 318 F. Supp. 855, 859 (N.D. Ill. 1970). As noted supra, pricing for advertisement space is generally known throughout the industry. Certainly there is no Clear Channel or WLIT "formula" at issue.[6] The identity of customers and the purchase price

---

[6] Ken Denton generally states that "Best Rate employs an algorithm to create a pricing system used by Clear Channel to sell advertising to its clients on the various radio stations it owns." (Denton Decl. ¶4). To the extent that Plaintiff claims that this algorithm is a formula, that formula is proprietary to Lan International and not Plaintiff. And certainly Plaintiff cannot claim that Osowiec had access to the algorithm.

for spots can be derived from information available to virtually every radio station. Additionally, as noted above, Plaintiff has come forth with nothing more than speculation that Osowiec took any information, much less trade secret or confidential information. Thus Plaintiff cannot succeed on its Trade Secrets Act Claim.

## V. Plaintiff Has No Likelihood Of Success On The Merits Of Its Computer Fraud And Abuse Act Claim.

Plaintiff's Computer Fraud and Abuse Act claim is simply not actionable. Defendants adopt their arguments in their briefs in support of the motion to dismiss as if incorporated herein. But even if Plaintiff had stated a cognizable claim under the CFAA, it has not demonstrated any likelihood of success on the merits. Osowiec did not delete any emails on the day of her resignation. She never logged on to her computer on that day. Plaintiff should have evidence in its records confirming these facts. Plaintiff produced the affidavit of Emily Ruffner, who stated that she conducted an exit interview with Osowiec the day of her resignation and that Osowiec deleted e-mail on the day of her departure. (Ruffner Decl at ¶ 12-13). But Ruffner did not conduct Osowiec's benefits exit interview; Michael Smiley did. Plaintiff fails to explain how Ruffner, as a Human Resources Manager, had any personal knowledge regarding these alleged deletions by Osowiec. Speculation alone cannot support this claim for injunctive relief. Discovery is needed before these baseless statements are used to support injunctive relief.

## VI. Plaintiff Will Not Suffer Irreparable Injury: It Has An Adequate Remedy At Law.

Plaintiff alleges that because Osowiec is working at WZZN, the revenues for the three identified clients have decreased. (Denton Decl. ¶12). Revenue decline is calculable. If Plaintiff proves that Osowiec is accountable for the revenue, its relief is damages, an adequate remedy at law. At earlier hearings in this matter, Plaintiff, through counsel, argued that Osowiec, through Best Rate, would have an unfair competitive advantage against WLIT in the future if the non-compete was not enforced. Because the Best Rate "rate card," according to Lan International, a Clear Channel company, contains ever-changing "up to the minute data" impacting and modifying pricing for WLIT spots, it is impossible to understand the basis for this contention of unfair competition. Plaintiff simply cannot identify any confidential data or exclusive customer relationships it seeks to protect by enforcing the unlawfully overbroad non-compete. Rather, based on the facts at issue here (and not "information and belief" speculation)

Plaintiff is asking this Court to restrain competition for advertisers in the Chicago Radio Market. The Court should not allow such a restraint to continue to be imposed. If Plaintiff is truly harmed, it has an adequate remedy at law.

**VII.     The Public Interest Would Be Harmed Because Issuance of a TRO Would Operate As An Improper Restraint on Trade.**

The public interest would be harmed if the *ex parte* TRO is allowed to continue. The TRO currently in effect effectively imposes an unlawfully overbroad non-compete on the Defendants. In Illinois, restrictive covenants are disfavored in the law and closely scrutinized because they are repugnant to the public policy encouraging an open and competitive marketplace. See Bishop v. Lakeland Animal Hosp., 268 Ill. App. 3d 114, 117, 644 N.E.2d 33, 35 (2d Dist. 1994). This is especially true in the case of covenants not to compete, which Illinois courts have held to be restraints on trade. *See* Office Mates 5, North Shore, Inc. v. Hazen, 234 Ill.App.3d 557, 568, 599 N.E.2d 1072, 1080 (1st Dist. 1992). The restraint urged by Plaintiff here should not be allowed to stand, as it is an unlawful restraint on trade.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants respectfully request that the *ex parte* TRO be dissolved.

<div style="margin-left:50%">

Respectfully submitted,

CHICAGO FM RADIO ASSETS, LLC and
REBECCA OSOWIEC


By:     /s/Susan M. Benton
One of the Attorneys for Defendants

</div>

Susan M. Benton
Sean Nash
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600
sbenton@winston.com
snash@winston.com

## CERTIFICATE OF SERVICE

The undersigned, one of the attorneys for Defendants, hereby certifies that a true and correct copy of the foregoing DEFENDANTS' PRE-HEARING MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TRO was served via electronic filing on April 7, 2008 to:

Christopher Garcia
Yvette A. Heintzelman
Justin K. Beyer
Seyfarth Shaw LLP
131 South Dearborn Street
Suite 2400
Chicago, Illinois 60603


            /s/ Sean Nash
            Sean Nash

CHI:2071197.3

Not Reported in F.Supp.2d                                                                        Page 1
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**⊞**

**Cintas** Corp. v. Perry
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
**CINTAS** CORPORATION, a Washington corpora-
tion, Plaintiff,
v.
Daniel A. PERRY, Defendant.
**No. 03 C 8404.**

Aug. 20, 2004.

Richard John Nogal, Goldstine, Skrodzki, Russian,
Nemec & Hoff, Ltd., Burr Ridge, IL, for Plaintiff.
Steven Thomas Catlett, Brent Daniel Knight, Jones
Day, Chicago, IL, for Defendant.

*REPORT AND RECOMMENDATION*

BROWN, Magistrate J.
**\*1** Plaintiff **Cintas** Corporation ("**Cintas**") filed a
Motion for Preliminary Injunction, seeking, *inter
alia,* to enjoin Defendant Daniel Perry ("Perry"), a
former employee, from competing with **Cintas** for
a period of two years. (Pl.'s Mot. at 15.) [Dkt 5.]
The District Judge referred **Cintas**' motion to this
court to conduct necessary proceedings and submit
a report and recommendation. [Dkt 9 .] For the fol-
lowing reasons, this court respectfully recommends
that **Cintas**' Motion for Preliminary Injunction be
DENIED.

PROCEDURAL BACKGROUND

On November 6, 2003, **Cintas** filed a complaint
against Perry in the Circuit Court of Cook County,
Illinois (Case No. 03 CH 18621) claiming that
Perry breached an employment agreement by enter-
ing into employment with Aramark Uniform and
Career Apparel, Inc. ("Aramark") within twenty-
four months of resigning from **Cintas**, and by soli-
citing former customers of **Cintas** for the benefit of

Aramark. (Notice of Removal, Ex. A, Compl. ¶ 28.)
[Dkt 1.] In its complaint, **Cintas** sought both in-
junctive relief and monetary damages. (*Id.* at
10-11.)

On November 21, 2003, Perry removed the action
to federal court based on diversity of citizenship.
(Notice of Removal ¶ 4.) On December 12, 2003,
**Cintas** filed its Motion for Preliminary Injunction,
claiming that Perry materially breached the Agree-
ment when he joined Aramark and asking the court:
(A) to enjoin Perry from competing with **Cintas** for
a period of two years following the entry of the in-
junction; FN1 (B) to enjoin Perry from soliciting,
hiring or attempting to hire any **Cintas** client, em-
ployee or candidate whose identity or qualifications
Perry learned while employed by **Cintas**; (C) to en-
join Perry from disclosing to any other person or
entity, or misappropriating for his own use or bene-
fit, any trade secrets or other confidential or propri-
etary information of **Cintas**; (D) to enjoin Perry
from calling on or soliciting any **Cintas** customers
or prospects for a period of two years following the
entry of the injunction; FN2 (E) to enjoin Perry
from doing business with or performing any ser-
vices or selling any goods that Perry obtained in
breach of his duties of **Cintas**; (F) to direct an ac-
counting to determine the proceeds derived by
Perry as a result of his misappropriations of trade
secrets and other Confidential Materials and In-
formation of **Cintas**; FN3 and (G) to grant any oth-
er relief as the court deems just and proper. (Pl.'s
Mot. at 15-16.) FN4

> FN1. During the course of the hearings,
> **Cintas** changed its position regarding the
> date on which the two year period should
> begin to run, presumably in light of Ohio
> law. (Tr. 167-68.) **Cintas** now claims that
> Perry should be enjoined for two years
> from the date on which he left **Cintas**
> (October 27, 2003), as opposed to the date
> on which an injunction is entered. (Pl.'s
> Post-Hr'g Br. at 3 n. 2.)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

FN2. *See* previous footnote.

FN3. Based on its post-hearing brief, it appears that **Cintas** has dropped its request for an accounting. (Pl.'s Post-Hr'g Br. at 3.) In addition, **Cintas'** counsel stated at the hearing that **Cintas** is *not* alleging that Perry misappropriated its trade secrets. (Tr. 442.) *See also* Pl.'s Reply Br. at 3.

FN4. Contemporaneously with its motion for preliminary injunction, **Cintas** filed a motion for limited expedited discovery. [Dkt 4.] That motion was granted by the District Judge on December 22, 2003. [Dkt 6.]

On January 26, 2004, Perry filed his Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction, claiming that **Cintas'** motion should be denied because **Cintas** cannot establish irreparable harm, an inadequate remedy at law or a likelihood of success on the merits. (Def.'s Opp'n Mem. at 6-14.) [Dkt 8.]

The District Judge referred **Cintas'** motion to this court to conduct a preliminary injunction hearing and to submit a report and recommendation. Both parties filed pre-hearing briefs [dkt 15, 16], and a three-day preliminary injunction hearing was held on April 27, June 21 and June 22. [Dkt 21, 26, 27.] FN5 In addition, the parties submitted deposition testimony of five witnesses.FN6 **Cintas** submitted a post-hearing brief in support of its motion [dkt 34], Perry filed a response [dkt 36], and **Cintas** filed a reply brief [dkt 37]. Based on the evidence adduced at the hearing and the written submissions of the parties, this court respectfully recommends that **Cintas'** motion be denied.

FN5. The hearing scheduled for April 28, 2004 was rescheduled (by agreement of the parties) to June 21, 2004, in light of certain developments pertaining to Omar Harris, another Aramark employee. (April 28, 2004 Order.) [Dkt 22.] References to the

transcript of the hearings are cited herein as "Tr. __."

FN6. The parties submitted designated portions of the deposition testimony of Richard Bryant, Harold McCadd, Ileana Salazar, Omar Harris and John Salveson. (Tr. 522-28.)

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Factual background

1. *Perry's employment at* **Cintas**

**\*2 Cintas** is a Washington corporation and has its headquarters and principal place of business in Ohio. (Compl. ¶ 1; Answer ¶ 1.) **Cintas** is engaged in the business of renting, selling, processing and delivering corporate identity uniforms and related products. (Answer ¶ 1.) According to **Cintas**, it operates in 46 states within the U.S., including Illinois, as well as Canada and Mexico. (Compl.¶ 1.)

On or about January 14, 1993, **Cintas** hired Perry as a Sales Representative in its Bedford Park, Illinois facility. (Answer ¶¶ 3, 11.) Perry was subsequently promoted to Sales Manager and then to Director of Sales Training & Development for the North Central Group of **Cintas**. (*Id.*) During that time, Perry was based in **Cintas'** offices in metropolitan Chicago. (*Id.* ¶ 3.)

In or around October 2000, Perry was promoted to National Account Manager ("NAM").(*Id.* ¶ 11.)As a condition of his continued employment with **Cintas**, Perry signed an employment agreement dated October 10, 2000 (the "Agreement'). (Compl., Ex. A, Agreement; Tr. 338-39.) Paragraph 1 of the Agreement provides in part:
As a leader in the highly-competitive Industries [previously defined term], Employer has developed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and implemented confidential strategies and programs, which include expansion and acquisition plans, market research, sales systems, marketing programs, product development strategies, budgets pricing strategies, identity and requirements of customers and prospects, methods of operating, service systems, computer passwords, other trade secrets and confidential information regarding customers, prospects and employees of Employer or of its customers and other information not known to the public (collectively "Confidential Materials and Information"), giving Employer an advantage over competitors not aware of such Confidential Materials and Information.

(Agreement ¶ 1.)

Paragraph 3 sets forth Perry's acknowledgements and covenants:

(a) Confidential Materials and Information. In performing duties for Employer, Employee regularly will be exposed to and work with Employer's Confidential Materials and Information. Employee acknowledges that such Confidential Materials and Information are critical to Employer's success and that Employer has invested substantial money in developing Employer's Confidential Materials and Information. While Employee is employed by Employer, and after such employment ends for any reason, Employee will not reproduce, publish, disclose, use, reveal, show, or otherwise communicate to any person or entity any Confidential Materials and Information of Employer unless specifically assigned or directed by Employer to do so. The covenant in this Subparagraph (a) has no temporal, geographical or territorial restriction or limitation, and it applies wherever Employee may be located.

(b) Non-Solicitation of Employees. While Employee is employed by Employer, and for twenty-four (24) months after such employment ends for any reason, Employee, acting either directly or indirectly, or through any other person, firm or corporation, will not induce or attempt to induce or influence any employee of Employer to terminate employment with Employer when Employer desires to

retain that person's services. The covenant in this Subparagraph (b) has no geographical or territorial restriction or limitation, and it applies wherever Employee may be located.

**\*3** (c) Covenant Against Unfair Competition. While Employee is employed by Employer, and for twenty-four (24) months after such employment ends for any reason, Employee will not, either directly or indirectly, (i) be employed in a managerial or professional position by, consult for, engage in any Industries business for, or have any ownership interest in any of Employer's competitors named in the attached Appendix A, which will be updated periodically by Employer issuing to Employee a revised and dated list including names of new significant competitors or successors to any previously-listed competitors, or (ii) call on, solicit or communicate with any of Employer's customers or prospects for the purpose of obtaining any Industries business other than for the benefit of Employer....

(d) Return of Confidential Materials and Information. Employee agrees that whenever Employee's employment with Employer ends for any reason, all documents containing or referring to Employer's Confidential Materials and Information as may be in Employee's possession, or over which Employee may have control, will be delivered by Employee to Employer immediately, with no request being required.

(e) Irreparable harm. Employee agrees that a breach of any covenant in this Paragraph 3 will cause Employer irreparable injury and damage for which Employer has no adequate remedy, and Employee further agrees that if Employer claims a breach of any such covenant, Employer will be entitled to seek an immediate restraining order and injunction to prevent, pending or following arbitration under Paragraph 5 below, such violation or continued violation, without Employer having to prove damages, and if Employee has violated any covenant in this Paragraph 3, Employee will pay all litigation costs and expenses and Employer's reasonable attorney fees necessarily incurred in the litigation, in addition to any other remedies to which Employer may be entitled at law or equity. If Employer sues

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Employee for an alleged breach of covenant(s) in this Paragraph 3 and the court rules that Employee has not violated such covenant(s), Employer will pay all litigation costs and expenses and Employee's reasonable attorney's fees necessarily incurred in the litigation.

(*Id.* ¶ 3). [FN7]

> [FN7.] Subparagraph 3(a) is referred to herein as the "Non-Disclosure Covenant;" subparagraph 3(b) is referred to as the "Non-Solicitation Covenant;" and subparagraph 3(c) is referred to as the "Covenant Not to Compete."

It appears from subparagraph 3(e) of the Agreement that **Cintas** can only seek an injunction against Perry "pending or following arbitration" under Paragraph 5 of the Agreement. However, Paragraph 5 only applies to Employees' claims against **Cintas**, not **Cintas'** claims against Employees. In any event, neither party is seeking to compel arbitration.

One of thirty-two competitors listed on Appendix A of the Agreement is "Aramark." (Agreement, App. A; Answer ¶ 7.) According to **Cintas**, Aramark is its largest competitor in the business of renting, selling, processing and delivering corporate identity uniforms and related products throughout the U.S., including Illinois. (Compl. ¶ 7; Tr. 315-16, 340.)

Paragraph 4 of the Agreement provides that the Agreement shall be interpreted, governed and enforced according to the Federal Arbitration Act and the law of the State of Ohio. (Agreement ¶ 4.) Paragraph 6 permits a court to modify any portion of the Agreement if it is held to be invalid or unenforceable in any respect. (*Id.* ¶ 6.)

**\*4** As a NAM, Perry was charged with building intimate relationships with large corporations and selling national accounts (Tr. 114, 320), which **Cintas** defines as accounts with an "initial spend" of at least $250,000, usually at multiple locations (Tr. 321). Perry was responsible for national accounts headquartered in Illinois and Indiana. (Tr.

322.) In an effort to service those accounts, however, Perry would often travel to other states where those customers were operating, including California, Texas and New Jersey. (Tr. 323.) In the course of his job duties, Perry would contact the accounts in his region and prepare pricing proposals. (Tr. 110-13, 324.) During his employment with **Cintas**, Perry obtained Confidential Materials and Information, as that term is defined in the Agreement. (Tr. 110.) Perry had access to information regarding customers and prospects in his region, such as pricing information, cost of goods, contact information and historical data. (Tr. 110-11; Answer ¶ 15.) Perry also had access to **Cintas'** marketing plans, strategies and policies for servicing national accounts. (Answer ¶ 13.) As a NAM, Perry received special training, had access to certain restricted computer databases and attended national meetings and seminars where he received confidential strategy and marketing information. (*Id.* ¶¶ 14, 16; Tr. 360-63.) NAMs are at the highest levels of **Cintas'** security clearance. (Tr. 360.)

### 2. *Perry's move to Aramark*

In 2003, Perry provided his resume and an unsigned copy of a **Cintas'** employment agreement to Salveson & Stetson Group, Inc. ("SSG"), an executive search firm. (Tr. 33, 559-60; Pl.'s Ex. 151, Perry's Resume and Blank **Cintas** Employment Agreement.) In May 2003, Perry had a telephone conversation with Doug Battista, the Director of Human Resources for Aramark's Western Region, regarding employment opportunities at Aramark. (Tr. 22-24.) During that conversation, Perry told Mr. Battista about the Covenant Not to Compete. (Tr. 25.) In the summer and fall of 2003, Perry visited Aramark's corporate offices in California on three occasions. (Tr. 26-27, 30-33, 38, 49.)

On October 14, 2003, Perry signed an offer letter from Aramark for the position of Vice President of Field Sales for the Western Division. (Tr. 24, 42-43; Def.'s Ex. 7, Aramark Offer Letter.) The offer letter stated that, as a condition of Aramark's of-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

fer of employment, Perry could not violate any non-disclosure, confidentiality or non-solicitation provisions of any employment agreement to which he was a party while employed at **Cintas**. (Def.'s Ex. 7, Aramark Offer Letter at 3-4.) Upon beginning employment with Aramark, Perry also was required to confirm that he did not bring any property or information belonging to any former employer, that he would not use and would protect from disclosure any confidential or proprietary information of any former employer and that he would comply with any covenants not to solicit employees of any former employers. (Def.'s Ex. 9, Aramark's Proprietary Information Obligations Checklist; Def.'s Ex. 25, New Employee Guidelines document.)

**\*5** On October 20, 2003, Perry advised Martin Rogman, the Director of National Accounts, that he was voluntarily resigning from **Cintas**. (Answer ¶ 20; Tr. 42, 312.) Perry's last day of employment with **Cintas** was October 27, 2003. (Answer ¶ 20; Tr. 41.) On October 28, 2003, Perry started working for Aramark in California. (Tr. 16, 41.) [FN8]

> [FN8]. According to **Cintas**, it did not learn that Perry had accepted employment with Aramark until November 3, 2003. (Compl.¶ 22.)

3. *Perry's employment at Aramark*

Perry testified that, as an employee of Aramark's regional field sales division, Perry does not have any contact with any accounts valued over $250,000. (Tr. 552-53.) As Vice President of Field Sales for the Western Division, the geographic range of Perry's responsibilities is centered in California, but also includes Washington, Oregon, Arizona, Utah, Colorado, Texas, Oklahoma, and portions of Arkansas, Louisiana and Mississippi. (Tr. 24, 63-64.) Aramark's Western Region does not include Illinois, Indiana or Wisconsin. (Tr. 63-64.) In his position, Perry is primarily responsible for training and developing field sales personnel in the Western Region. (Tr. 58.) According to Perry, his job responsibilities do not include contacting customers (Tr. 552), calling on prospective customers (*id.*), or soliciting prospective employees (Tr. 554). As Vice President of Field Sales, Perry's customer contact is limited to "incidental contact" with customers while evaluating his regional field sales personnel. (Tr. 24, 552.) Perry testified that, in his first eight months at Aramark, he had incidental contact with about nine or ten customers in order to evaluate a salesperson's job performance. (Tr. 557-58.) Perry played no role in identifying those customers. (*Id.*)

### Standard for Preliminary Injunction

A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Boucher v. School Bd. of the Sch. Dist. of Greenfield,* 134 F.3d 821, 823 (7th Cir.1998) (quotations omitted). Accordingly, to prevail on a motion for preliminary injunction, **Cintas** must demonstrate that (1) its case has a likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. *Foodcomm Intl. v. Barry,* 328 F.3d 300, 303 (7th Cir.2003) (citing *Promatek Indus., Ltd. v. Equitrac Corp.,* 300 F.3d 808, 811 (7th Cir.2002)). If those three conditions are met, the court must balance the harm to **Cintas** if the injunction is not issued against the harm to Perry if it is issued. *Id.* (citing *Storck v. Farley Candy Co.,* 14 F.3d 311, 314 (7th Cir.1994)). That balancing involves a sliding scale analysis: the greater **Cintas'** chances of success on the merits, the less strong a showing it must make that the balance of the harm is in its favor. *Id.* In addition, the court must take into account the public interest at risk if injunctive relief is granted or denied.*Promatek Indus.,* 300 F.3d at 811;*see also Baskin-Robbins Inc. v. Patel,* 264 F.Supp.2d 607, 609 (N.D.Ill.2003).

1. *Likelihood of Success on the Merits*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*6** The likelihood of success on the merits often serves as a threshold requirement for entitlement to preliminary relief. *Outsource Intl., Inc., v. Barton, 192 F.3d 662, 666 (7th Cir.1999).* The Seventh Circuit has stated that the threshold for that showing is low and that the plaintiff need only demonstrate a "better than negligible chance of succeeding."*Cooper v. Salazar, 196 F.3d 809, 813 (7th Cir.1999)* (quoting *Boucher, 134 F.3d at 824*)). Perry argues that the "better than negligible" standard has not, in fact, been applied, and quotes a decision from the Southern District of Indiana stating that "[w]here the balance of harms does not heavily favor the moving party, ... the moving party must show at least a 'reasonable likelihood' of success on the merits."*Eco Mfg. LLC v. Honeywell Intl., Inc., 295 F.Supp.2d 854, 865 n. 4 (S.D.Ind.2003)* (citing *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1084 (7th Cir.1988)*). It is not necessary to resolve that issue because, even considering the evidence under the "better than negligible" standard, **Cintas** has not demonstrated that it is likely to succeed on the merits of its breach of contract claims.

**Cintas** claims that Perry breached the Agreement in four ways: (1) by soliciting **Cintas'** customers for the benefit of Aramark; (2) by recruiting **Cintas'** employees; (3) by disclosing **Cintas'** Confidential Materials Information; and (4) by working for Aramark within twenty-four months of leaving **Cintas.**FN9(Compl. ¶ 28; Pl.'s Post-Hr'g Br. at 11.) Based on the choice-of-law provision in the Agreement, **Cintas'** claims are governed by Ohio law.FN10In order to prove a breach of contract claim under Ohio law, a plaintiff must show the existence of a valid contract, performance by the plaintiff, breach by the defendant and damage or loss to the plaintiff.*Allied Erecting & Dismantling Co., Inc. v. Uneco Realty Co., 146 Ohio App.3d 136, 765 N.E.2d 420, 424, 425 (Ohio Ct.App.2001).*

FN9. In its complaint, **Cintas** only alleged that Perry violated the Agreement by

working for Aramark and soliciting **Cintas'** customers. (Compl.¶ 28.) **Cintas** did not assert its additional theories (that Perry improperly recruited **Cintas'** employees and disclosed **Cintas'** confidential information) until after the hearing.

FN10. A district court sitting in diversity must apply the substantive law suggested by the conflict rules of the forum state.*Medline Indus., Inc. v. Grubb, 670 F.Supp. 831, 834 (N.D.Ill.1987)* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)*). Because Illinois courts enforce contractual choice of law provisions and the Agreement provides that Ohio law controls its interpretation and enforcement, Ohio law governs **Cintas'** claim that Perry breached the Agreement. *Id.* (citing *Sarnoff v. American Home Prods. Corp., 798 F.2d 1075, 1080 (7th Cir.1986)*). The parties agree that Ohio law governs **Cintas'** claims, at least for purposes of deciding the present motion. (Pl.'s Mot. at 8; Def.'s Pre-Hr'g Br. at 1.)

**A.** *Cintas has not proven that Perry solicited Cintas' customers for the benefit of Aramark.*

Pursuant to Subparagraph 3(c)(ii) of the Covenant Not to Compete, Perry cannot directly or indirectly "call on, solicit or communicate with any of [**Cintas'**] customers or prospects for the purpose of obtaining any Industries business other than for the benefit of [**Cintas**]" while employed at **Cintas** and for two years after leaving **Cintas.** (Agreement ¶ 3(c)(ii).) **Cintas'** allegation that Perry violated that provision of the Agreement was made "upon information and belief." (Compl.¶ 28.) At the hearing, **Cintas** failed to offer any evidence to sustain that allegation. Although **Cintas** made several attempts, it was unable to show that Perry solicited a **Cintas** customer or prospect or that **Cintas** lost a customer or prospect based on Perry's actions.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**Cintas** presented evidence that by July 2003, Perry had discussed his possible move to Aramark with J.R. Ohmen of Archer Daniels Midland ("ADM"), one of his former **Cintas** accounts. (Pl.'s Ex. 90, July 21, 2003 E-mail from J.R. Ohmen to Perry; Tr. 121, 461-62, 499-500, 546-48.) Perry testified that Mr. Ohmen was married to a college friend of Perry, and that by the summer of 2003, Mr. Ohmen was a financial analyst at ADM and no longer associated with the business relationship between ADM and **Cintas**. (Tr. 547.) More importantly, in August 2003, through Perry's negotiation, ADM "transitioned" from a "voluntary" contract to a "mandatory" contract with **Cintas** until at least 2006, and possibly longer. (Tr. 121-122, 499-500; 548-49.) A "mandatory" contract is more favorable to **Cintas** because it means that ADM is contractually obligated to purchase its uniform and supply needs from **Cintas** until at least 2006. (Tr. 121-122, 499-500.) Perry signed that mandatory contract on behalf of **Cintas** in August 2003. (Tr. 501.) ADM remains a **Cintas** customer today. (Tr. 499-500.) That fact rebuts any suggestion that Perry attempted to lure ADM to Aramark.[FN11]

> [FN11.] **Cintas** apparently suggested that Perry, on behalf of Aramark, had also contacted Nancy Carlson of ADM. (Def.'s Opp'n Mem., Ex. 2, Jan. 21, 2004 E-mail from Martin Rogman to Gregory L. Sugar). However, Ms. Carlson subsequently signed a declaration stating that she has had no contact with Perry since he became affiliated with Aramark. (Def.'s Opp'n Mem., Ex. 3, Declaration of Nancy Carlson.) **Cintas** did not present any evidence at the hearing that Perry contacted Ms. Carlson to solicit ADM for Aramark.

**\*7** **Cintas** also presented evidence that Perry accompanied Richard Bryant, an Account Manager with Aramark, on a sales call to a company that had a contract with **Cintas**. (Bryant Dep. at 5, 10-11, 14, 42.) However, Mr. Bryant testified that, although Perry went on a "ride-along" with him in December 2003, Perry had no prior knowledge of the customers that Mr. Bryant was scheduled to visit that day and that, as soon as Perry learned that the customer ("Tru-Circle") was a **Cintas** account, Perry informed Mr. Bryant of his covenant not to compete with **Cintas**. (Id. at 10-12, 42-44,765 N.E.2d 420.) Mr. Bryant further testified that Perry stayed in the car while Mr. Bryant met with the Tru-Circle representatives. (Id. at 11-12, 44, 765 N.E.2d 420.) Mr. Bryant had worked on getting the Tru-Circle business for three years and had personally visited Tru-Circle three times prior to the day with Perry. (Id. at 41, 765 N.E.2d 420.) When asked if Perry instructed him on how to sell to Tru-Circle, Mr. Bryant responded: "Absolutely not." (Id. at 107, 765 N.E.2d 420.) Although Perry assisted Mr. Bryant in installing the Aramark mats in the facility later that day, Mr. Bryant had prepared the contract and believed that the deal was "in place." (Id. at 14, 44, 46-51, 56, 107, 765 N.E.2d 420.)

Perry admitted that in the summer of 2003, he told representatives of two **Cintas** customers, Tom Wright of Supply Force and Carol Gauer of Abbott Laboratories, about his possible employment with Aramark. (Tr. 124-25.) Perry testified that since joining Aramark, he has had no contact with anyone from Supply Force or Abbott Laboratories (Tr. 122-23), and **Cintas** presented no evidence to the contrary. There is no evidence that Perry "solicited" those customers for Aramark or that **Cintas** has lost either of those accounts as a result of Perry's actions.

Based on the current record, there is simply no evidence to support **Cintas**' claim that Perry violated the Agreement by soliciting **Cintas**' customers or prospective customers.

**B.** **Cintas** **has not proven that Perry solicited** **Cintas** **employees to join Aramark.**

**Cintas** was equally unsuccessful in showing that Perry violated the Non-Solicitation Covenant,

which prohibits Perry from inducing or attempting to induce or influence **Cintas** employees to terminate their employment with **Cintas**. (Agreement ¶ 3(b).) Although **Cintas** presented evidence that Perry interviewed Tanya Knox in December 2003 (McCadd Dep. at 21, 27-28), the evidence established that, at the time of the interview, Ms. Knox was not working for **Cintas**; she had terminated her employment a month earlier. (*Id.* at 59, 765 N.E.2d 420.) Even **Cintas** concedes that, at the time of the interview, Ms. Knox was a "former" **Cintas** employee. (Pl.'s Post-Hr'g Br. at 11.) As written, subparagraph 3(b) does not prohibit Perry from soliciting former employees of **Cintas**. (Agreement ¶ 3(b).) Furthermore, although Ms. Knox was given a verbal offer to come work for Aramark, that offer was later revoked apparently because of her own non-competition agreement with **Cintas**. (McCadd Dep. at 21-22, 60.)

**\*8** **Cintas** also claimed that Perry contacted Harold McCadd, while Mr. McCadd was working as a Sales Manager for **Cintas**, and "encouraged McCadd to accept employment with Aramark."(Pl.'s Post-Hr'g Br. at 11.) That allegation is not supported by the evidence. According to Mr. McCadd, in a September 2003 telephone conversation, Perry asked Mr. McCadd if he was "considering an opportunity with Aramark." (McCadd Dep. at 13-15.) Mr. McCadd testified: "I think I responded yes, I am, and if I've heard correctly you have accepted a position with Aramark, congratulations. And that's really the exchange."(*Id.* at 14-15, 765 N.E.2d 420) There is no indication from Mr. McCadd's testimony that Perry "encouraged" him to accept a position with Aramark during that conversation or on any other occasion, let alone that Perry "induced" Mr. McCadd to join Aramark.

**Cintas** also argued that Perry violated the Agreement in October or November 2003 when he spoke to Mr. McCadd at a management operation meeting regarding employment opportunities at Aramark. (Pl .'s Post-Hr'g Br. at 11.) At the time of that conversation, however, Mr. McCadd had already

resigned from **Cintas** and accepted an offer to join Aramark. (McCadd Dep. at 11-12.) There is nothing in the Agreement that prohibits Perry from discussing employment opportunities with Aramark employees who are former **Cintas** employees.

In light of the foregoing, **Cintas**' claim that Perry breached the Agreement by soliciting **Cintas**' employees is unsupported by the record.

C. *Cintas has not proven that Perry used Cintas' confidential information.*

The Non-Disclosure Covenant prohibits Perry from using or disclosing **Cintas**' Confidential Materials and Information, as that term is defined in Paragraph 1 of the Agreement, unless specifically directed to do so by **Cintas**. (Agreement ¶ 3(a).) That provision has no temporal or geographical limitations. (*Id.*) In its post-hearing brief, **Cintas** asserts that Perry has "already actually used on several occasions during his employment with Aramark certain confidential information that he took from **Cintas**" (Pl.'s Post-Hr'g Br. at 10), referring to a "productivity tenure report" (Pl.'s Ex. 183, Productivity Tenure Report) and the two computer disks that Perry gave to his executive assistant at Aramark, Ileana Salazar.

The productivity tenure report is an Excel spreadsheet, reflecting account managers and their backgrounds (*e.g.,* if they were from outside or within the industry or "fresh off the street," and internal promotions). (Salazar Dep. at 27-28, 31-32.) According to Perry, he found the **Cintas** productivity tenure report in the drawer of a desk in Aramark's Seattle office in November or December 2003. (Tr. 217-18.) He gave it to Ms. Salazar because he thought it might be useful to explain the format of a report that he was trying to get her to prepare. (Tr. 218.) However, Ms. Salazar testified that when Perry gave her the report, it was in an old, white, three-ring binder, which she saw about a week after Perry started at Aramark. (Salazar Dep. at 28-29, 52, 69.) [FN12] When Ms. Salazar asked Perry

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

whether any of the information contained in the binder was copyrighted, Perry advised her that everything in the binder, including the report, was his own work. (*Id.* at 52, 67, 765 N.E.2d 420.)

FN12. Perry began at Aramark on October 28, 2003. (Tr.16.)

**\*9** In light of Ms. Salazar's testimony, the court is skeptical that Perry simply found the report in Aramark's Seattle office. However, it is undisputed that when Perry gave the report to Ms. Salazar, he asked her to use the template of the report, not the contents. (*Id* . at 28-29, 31, 765 N.E.2d 420.) She used it as "a visual of exactly what he was asking for."(*Id.* at 31, 765 N.E.2d 420.) Ms. Salazar has not given a copy of the report to anyone else at Aramark. (*Id.* at 83, 765 N.E.2d 420.)

With respect to the two computer disks (which contained documents that Perry prepared while at **Cintas**), Perry testified that he found the disks in his house in Chicago when he was preparing to move to California. Specifically, Perry testified that he was going through a storage closet in his basement and found the disks in the bottom of a box. (Tr. 226; Pl.'s Exs. 181A, 182, Disks and hard copy print-outs of disks' contents.) When he found the disks, Perry saw the word "tenure" on them and "thought that [they] might help [Ms. Salazar] create the spreadsheet that [she was] having so much trouble trying to format."(Tr. 226; Pl.'s Ex. 181A, Disk and hard copy print-out of disk's contents.) Ms. Salazar confirmed that Perry gave her the disks to assist her in preparing the productivity tenure report. (Salazar Dep. at 56.) Ms. Salazar further testified that she only opened one of the disks, which was labeled "Productivity," and that on that disk she found a file named "Tenure. XLS," which was an exact duplicate of the hard copy of the productivity tenure report. (*Id.* at 57-58, 78, 765 N.E.2d 420.) That was the only document on the "Productivity" disk that Ms. Salazar opened. (*Id.* at 60, 765 N.E.2d 420.) Ms. Salazar explained that, from the report on the disk, she was able to copy the formulas, which are mathematical equations

embedded within the Excel program that were not available from the hard copy of the report. (*Id.* at 58, 80-81, 765 N.E.2d 420.) Ms. Salazar did not use any of the cell contents (the actual data); she used only the formulas. (*Id.* at 81, 83, 765 N.E.2d 420.) According to Perry, he never looked at the contents of those disks after he found them in his home. (Tr. 231.)

It appears that the information contained on the computer disks was several years old. (Pl.'s Exs. 181A, 182, Disks and hard copy print-outs of disks' contents.) Even though the hard copy print-outs of the disk contents were not admitted into evidence (based on Perry's counsel's objection), they were offered into evidence by **Cintas**, presumably because **Cintas** believed the print-outs were favorable to its position. (Tr. 232-33.) Based on the content of those print-outs, it appears that the information contained on the disks dates anywhere from 1995 through 1999 (Pl.'s Exs. 181A, 182, Disks and hard copy print-outs of disks' contents), which is consistent with Perry's testimony that the disks had been in the box for "quite a long time." (Tr. 227). Parenthetically, Ms. Salazar testified that she has never been able to create the productivity tenure report, which has been frustrating for her. (Salazar Dep. at 28, 56.)

**\*10 Cintas** conceded that neither the format nor the concept of a productivity tenure report is proprietary information. (Tr. 514.) **Cintas** has never argued that the formulas embedded within the Excel spreadsheet constitute Confidential Materials or Information. Although, pursuant to subparagraph (3)(d) of the Agreement, Perry should have returned the report and computer disks to **Cintas** after he realized that he had them, this court is not convinced that Perry's actions violated the Non-Disclosure Covenant. **Cintas'** confidential information (the content of the report, rather than its format) was not used, and there is no suggestion that Ms. Salazar had any interest in or use for the confidential information, as opposed to the format. Additionally, **Cintas** has failed to explain how the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

facts described above caused damage or loss to its business, which is another requisite element of a breach of contract claim. *Allied Erecting & Dismantling, 765 N.E.2d at 424.*[FN13] Presumably, **Cintas'** business information from ten or even five years ago that might be contained on the disks is outdated and would be of limited usefulness to a competitor. In fact, other than generally stating that the report and disks contained "confidential and proprietary information," **Cintas** has not explained how any of the information contained therein would give Aramark an unfair competitive advantage. The court is not persuaded that **Cintas** could prove it suffered any damages as a result of Perry's actions.

> FN13. To the extent **Cintas** relies on its inevitable disclosure argument to demonstrate that an injury should be presumed, the merits of that argument are discussed below.

An additional **Cintas** document, a NAM Performance Ranking Report (Def.'s Ex. 11, DAP 35) was produced by Perry in discovery. (Tr. 391-92.) It shows the ranked performance of **Cintas'** NAMs through July 2003. (*Id.*) It is confidential and in effect reveals the emphasis **Cintas** puts on certain areas. (Tr. 392.) Perry testified that he has not given that document to anyone at Aramark, and has not used it in any way in his job at Aramark, because he does not deal with national accounts. (Tr. 545.) Perry testified that he kept the document (which shows that Perry was the top ranked NAM) for "bragging." (Tr. 546; Def.'s Ex. 11, DAP 35, NAM Performance Ranking Report.) **Cintas** did not provide any evidence that Perry has, in fact, used or disclosed that confidential document since leaving **Cintas**. Ms. Salazar testified that she had never seen that document. (Salazar Dep. at 76.)

Finally, in a last ditch effort to show that Perry violated the Non-Disclosure Covenant, **Cintas** claims that, in August 2003, Perry downloaded a blank employment agreement from **Cintas'** restricted-access and confidential intranet database and sent it to SSG, the executive search firm with which he was

working. (Pl.'s Post-Hr'g Br. at 11; Pl.'s Ex. 151, Perry's Resume and Blank **Cintas** Employment Agreement.) **Cintas** conceded that Perry would have the right to disseminate a *signed* version of his employment agreement. (Tr. 579.) Rather, **Cintas** takes issue with Perry sending SSG a blank copy of a **Cintas'** employment agreement, which he obtained from **Cintas'** computer system. However, **Cintas** fails to explain why an unsigned employment agreement is confidential, while its executed counterpart is not. One would expect an employee, before negotiating new employment agreement, to provide the executive search firm with information about any restrictions on his future employment. Other than the "confidential" stamp that was placed on the blank employment agreement for purposes of this litigation, there is no indication on the document itself that it was deemed confidential by **Cintas**. (Pl.'s Ex. 151, Blank **Cintas** Employment Agreement.) Although **Cintas** concludes that the blank employment agreement constitutes "Confidential Material and Information" (Pl.'s Post-Hr'g Br. at 11), it fails to explain how the information contained in that document gives **Cintas** an "advantage over competitors" (*see* Agreement ¶ 1) when that same information is found in an executed employment agreement that admittedly can be made public.[FN14] This court finds no merit in **Cintas'** argument that Perry breached the Non-Disclosure Covenant when he sent SSG a blank copy of a **Cintas'** employment agreement.

> FN14. Although **Cintas'** counsel indicated at the hearing that there were "several material differences" between the employment agreement signed by Perry and the blank employment agreement he downloaded and sent to SSG (Tr. 571), **Cintas** never explained the nature of those discrepancies or argued that the discrepancies were what made the unsigned agreement confidential.

D. *The portion of the Agreement that prohibits Perry from working for Aramark within two years*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case: 1:08-cv-01519 Document 27-2 Filed 04/07/2008 Page 11 of 20 Page 11

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

*of leaving* **Cintas** *is unenforceable.*

**\*11** As its final allegation, **Cintas** claims that Perry breached the Agreement when he began working for Aramark within two years of leaving **Cintas**. It is undisputed that Perry began working for Aramark, one of the competitors listed on Appendix A, immediately after he terminated his employment with **Cintas**. By working for Aramark, Perry breached the Covenant Not to Compete. However, in order to succeed on a breach of contract claim, **Cintas** must also show that the Covenant Not to Compete is valid and enforceable under Ohio law. *See Biomedical Innovations, Inc. v. McLaughlin,* 103 Ohio App.3d 122, 658 N.E.2d 1084, 1087-88 (Ohio Ct.App.1995) ("As the alleged breach related to the noncompetition portion of the agreement, appellant is required to show that the noncompetition agreement was valid.").

Ohio courts generally look upon non-competition agreements with some skepticism and have cautiously considered and carefully scrutinized them. *Lake Land Empl. Group of Akron, LLC v. Columber,* 101 Ohio St.3d 242, 804 N.E.2d 27, 30 (Ohio 2004) (citing *Covenants Not to Compete,* 36 Akron L.Rev. 49, 50 (2002)). A covenant not to compete is an agreement in the restraint of trade, is therefore disfavored in the law, and must be construed strictly. *Single Source Packaging, LLC v. Cain,* No.2003-CA-14, 2003 WL 22064129 at *6 (Ohio Ct.App. Sept.5, 2003) (Fain, J.) (citations omitted); *see also Robert W. Clark, M.D., Inc. v. Mount Carmel Health,* 124 Ohio App.3d 308, 706 N.E.2d 336, 340 (Ohio Ct.App.1997). Modern economic realities, however, do not justify a strict prohibition on non-competition agreements between employer and employee in an at-will relationship. *Lake Land,* 804 N.E.2d at 30. Accordingly, the Ohio Supreme Court "has long recognized the validity of agreements that restrict competition by an ex-employee if they contain reasonable geographical and temporal restrictions." [FN15] *Id.* (citing *Briggs v. Butler,* 140 Ohio St. 499, 45 N.E.2d 757 (Ohio 1942)); *see also Robert W. Clark,* 706 N.E.2d

at 340 (stating that "restrictive covenants are not *per se* unenforceable and if reasonable may be enforced by injunctive relief").

> FN15. Although not addressed by the parties, the Covenant Not to Compete must also be supported by adequate consideration. The Ohio Supreme Court recently held that consideration exists to support a non-competition agreement when, in exchange for the assent of an at-will employee to a proffered non-competition agreement, the employer continues an at-will employment relationship that could legally be terminated without cause. *Lake Land,* 804 N.E.2d at 32. Here, under the terms of the Agreement, Perry was an at-will employee who had no express contractual expectation of, or legal entitlement to, continued employment. He continued working for **Cintas** for over three years after he signed the Agreement. Thus, under Ohio law, the Covenant Not to Compete was supported by adequate consideration.

In *Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 325 N.E.2d 544 (Ohio 1975), the Ohio Supreme Court established the test of reasonableness for non-competition agreements. Specifically, the court stated:

A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public.

*Id.* at 547. An employer seeking to enforce a restrictive covenant must establish, by clear and convincing evidence, each of those three elements. *Neff Motivation, Inc. v. Lagrou,* No. 01-CA-1560, 2002 WL 1251832 at *6 (Ohio Ct.App. June 7, 2002) (Grady, J.) (citation omitted). The *Raimonde* court articulated a number of other relevant factors that comprise "reasonableness" in the context of covenants not to compete: **\*12** [t]he absence or presence

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

of limitations as to time and space [;] ... whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.

*325 N.E.2d at 547* (quotation omitted). In determining whether the restrictions of a covenant are reasonable, each case is to be decided on its own facts and tested by the totality of the circumstances. *Id.* (citation omitted). In this case, it is unlikely that **Cintas** will be able to prove, by clear and convincing evidence, that the Covenant Not to Compete is reasonable under the *Raimonde* test.

i. *No Greater than Necessary for the Protection of the Employer's Legitimate Business Interests*

Under the first prong of the *Raimonde* test, courts look to whether the restrictive covenant is greater than necessary for the protection of the employer's legitimate business interests. **Cintas** claims that it has a legitimate business interest in and ascertainable right to protect its Confidential Materials and Information, confidential competitive data, information regarding its customers and potential customers as well as its customer, consultant and employee relationships. (Compl.¶¶ 19, 29.) **Cintas** further argues that a breach of the restrictions contained in the Agreement "poses a substantial risk to **Cintas**' relationship with its customers, particularly its national accounts, since said relationships were developed and cultivated over time and at great expense to **Cintas**."(*Id.* ¶ 19, *325 N.E.2d 544.*) Based

on those statements, **Cintas** seems primarily concerned with its Confidential Materials or Information, including its customer information, as well as its customer and employee relationships. However, in light of the evidence produced at the hearing, the Covenant Not to Compete is much greater than necessary to protect those business interests.

Subparagraph 3(c)(i) of the Covenant Not to Compete restricts Perry from "be [ing] employed in a managerial or professional position by, consult[ing] for, engag[ing] in any Industries business for, or hav[ing] any ownership interest in any of Employer's competitors named in the attached Appendix A, *which will be updated periodically by Employer issuing to Employee a revised and dated list including names of new significant competitors or successors to any previously-listed competitors,....*" (Agreement ¶ 3(c)) (emphasis added). In other words, **Cintas** claims a unilateral right to revise Appendix A, after Perry signed the Agreement, to include any companies that it deems a competitor-a right it apparently exercises frequently. Mr. Rogman testified at the hearing: "[**Cintas**] takes great pains to try and incorporate all the competitors. Sometimes the names change or a new player enters the market ... and I believe that they're all listed to the best of our company's ability...." (Tr. 340.) Based on that fact, it appears that the Covenant Not to Compete seeks to eliminate *all* competition, not merely competition that is unfair to **Cintas**. *See Raimonde,* 325 N.E.2d at 547.

**\*13** In addition, the phrase "managerial or professional position" is undefined and potentially subject to broad interpretation. (Agreement ¶ 3.) That phrase is, in fact, read by **Cintas** as including positions outside of the sales context, the only area in which Perry worked while at **Cintas**. Mr. Rogman testified that the Agreement would prohibit Perry from being employed even in Aramark's human relations department. (Tr. 497-98.)

Furthermore, Appendix A is not specifically limited to the "identity uniform" aspects of the companies listed. For example, Aramark also has a food ser-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

vices division and a facilities management division. (Tr. 58-59.) As written, the Agreement arguably would preclude Perry from being employed by or consulting for any of those divisions.[FN16]

FN16. As drafted, the prohibition in Sub-paragraph 3(c) on employment by or consulting for the companies in Appendix A is not limited to activities relating to **Cintas'** "Industries," as defined in Paragraph 1 of the Agreement. *In addition to* those prohibitions, the employee is also prohibited from engaging in "Industries business for" any of the companies listed on Appendix A. (Agreement ¶ 3(c).)

Although Ohio courts do not consider any particular geographic restriction to be *per se* unreasonable, they will not uphold restrictions that expand beyond what is necessary to protect an employer's legitimate business interests. *See, e.g., Professional Investigations & Consulting Agency, Inc. v. Kingsland,* 69 Ohio App.3d 753, 591 N.E.2d 1265, 1269 (Ohio Ct.App.1990)* (finding a non-competition clause with no geographic restrictions unduly restrictive); *National Interstate Ins. Co. v. Perro,* 934 F.Supp. 883, 891 (N.D.Ohio 1996)* (finding that "the non-competition provision is greater than is required for the protection of [the plaintiff] ... because it purports to restrict employment with a company in which [the defendant] would work outside of his original exclusive six-state territory"); *Lexis-Nexis v. Beer,* 41 F.Supp.2d 950, 957 (D.Minn.1999)* (applying Ohio law) (stating that, "given the inherently territorial nature of [the former employee's] customer contacts, the almost worldwide application of the noncompete agreement makes its geographic scope unreasonably broad"). In this case, the geographical restriction, which basically prohibits Perry from working in any managerial or professional position, in any department, of any location, of any company that **Cintas** deems a competitor, is unreasonably broad in light of **Cintas'** asserted business interests. In his position at Aramark, Perry has little or no contact with current or pro-

spective customers. (Tr. 552-53.) Furthermore, Perry's territory at Aramark does not include Illinois, Indiana or Wisconsin. (Tr. 63-64.) Thus, **Cintas** has not demonstrated that its customer information and customers relationships would be impacted by Perry's employment at Aramark.

**Cintas** relies on *Neff Motivation* in support of its position that the Covenant Not to Compete is reasonable. (Pl.'s Mot. at 10-11 .) However, the decision in *Neff Motivation* actually supports a finding that the covenant in this case is unreasonably broad. In *Neff Motivation,* the defendant, a former sales representative, organized his own company in his former sales territory for purposes of selling merchandise similar to that of the plaintiff, NMI 2002 WL 1251832 at *1. The trial court entered a permanent injunction prohibiting the defendant, for a period of close to two years, from selling NMI's most recent products to customers to which the defendant had sold NMI products since January 1, 2001 and to other customers in the same counties.*Id.* at *2. In affirming the trial court's decision, the Ohio Court of Appeals focused on the narrow scope of the injunction and particularly noted that it did not prohibit the defendant "from competing with NMI outright." *Id.* at *6. Clearly, the Ohio Court of Appeals was skeptical of such broad restrictions on employees. Here, the scope of the Covenant Not to Compete, which effectively prohibits Perry from working in any managerial or professional capacity for any identity uniform business in *any* sales territory, regardless of whether Perry sold any **Cintas'** accounts in that territory or not, is not narrowly tailored.

***14** In its post-hearing briefs, **Cintas** argued *for the first time* that, if the Covenant Not to Compete is found to be unreasonably broad, the court "should modify the covenant as it sees fit, and enforce it as modified to protect **Cintas'** interests."(Pl.'s Post-Hr'g Br. at 8.) *See also* Pl.'s Reply Br. at 9. **Cintas** is correct that, under Ohio law, courts "are empowered to" modify or amend unreasonable employment agreements to the extent necessary to pro-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

tect an employer's legitimate interests. *See Rai-monde,* 325 N.E.2d at 547. However, **Cintas** did not suggest a draft modification, let alone present *any* evidence as to how the Covenant Not to Compete should be modified in this case, and whether, if so modified, it would result in an injunction against Perry's current employment. Based on the current record and the fact that this case is at the preliminary-injunction stage, this court finds that modifying the Covenant Not to Compete at this juncture would be inappropriate, if not impossible.

ii. *Undue Hardship*

Under the second element of the *Raimonde* test, a covenant not to compete must not impose undue hardship on the employee. A determination that a covenant is unduly harsh requires a much greater standard than determining whether the covenant is merely unfair. *Robert W. Clark,* 706 N.E.2d at 342. "The *Raimonde* test requires more than just *some* hardship."*Id.* (quoting *Williams v. Hobbs,* 9 Ohio App.3d 331, 460 N.E.2d 287, 293 (Ohio Ct.App.1983) (emphasis added)). Further, "[u]ndue hardship cannot be determined on a post hoc basis, but rather by the terms of the agreement at the time it was entered into."*Id.* (quotation omitted).

According to Perry, the granting of a preliminary injunction "would throw [him] into unemployment, and out of the industry in which he has worked for the vast majority of his professional career, cutting off his family's primary means of support."(Def.'s Opp'n Mem. at 2.) Ohio courts have considered the employee's ability to earn a livelihood in determining whether there would be undue hardship. In *Ro-gers v. Runfola & Assocs., Inc.,* 57 Ohio St.3d 5, 565 N.E.2d 540, 544 (Ohio 1991), for example, the Ohio Supreme Court found that a covenant which prohibited the defendants from engaging in court reporting or public stenography in Franklin County for a period of two years, and from soliciting or di-verting any of the plaintiff's clients for a lifetime, was unreasonable and created an undue hardship on the defendants. In so deciding, the court noted that

court reporting was a "unique profession" and that the defendants' testimony indicated that "court re-porting [was] the only profession in which they have become proficient."*Id.* The court in *Rogers* ul-timately decided to modify the covenant so that the employees were only prohibited from working as stenographers or court reporters and from soliciting the employer's clients in the city of Columbus for one year. *Id.*

In contrast, the court in *Brentlinger Enters. v. Cur-ran,* 141 Ohio App.3d 640, 752 N.E.2d 994, 1004 (Ohio Ct.App.2001) (affirming denial of injunctive relief on other grounds) found that the restrictive covenant, which prevented the defendant from working in his area of speciality, the sale of European automobiles, and in the area in which he lived, would not be unduly prohibitive. Specific-ally, the court noted that the defendant's experience in selling automobiles "would be transferable to the sale of other types of cars" and the defendant could "continue working in the automobile sales field, even in types of foreign automobiles sales."*Id.* The court also found significant that the defendant was "restricted only from working in a very small geo-graphical area eliminating only a small percentage of his possible employers."*Id. See also Parma Intl. Inc. v. Herman,* No. 54243, 1989 WL 12928 at *1, 4 (Ohio Ct.App. Feb. 16, 1989) (Dyke, J.) (upholding a covenant not to compete that prohib-ited an employee from engaging in any business similar to that conducted by the employer in geo-graphical areas in which the employer conducted business during the last two years).

**\*15** This case falls somewhere between *Rogers* and *Brentlinger.*If the covenant is enforced, Perry is es-sentially prohibited, for a period of two years, from being employed in any managerial or professional capacity by, or consulting for, any company that is also in the identify uniform business. Unlike court reporting, however, sales is not a "unique profes-sion." There are a variety of other industries in which Perry could use his managerial or sales skills and not violate the covenant. On the other hand,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 15

Perry has been employed in the identity uniform business for eleven of the fourteen years of his professional career. According to Perry, even assuming that the Agreement could be modified to allow employment in other Aramark divisions, Aramark cannot provide him comparable employment and salary should he be prohibited from working in the Uniform Services division. (Tr. 57-58.) Furthermore, unlike the covenants in *Brentlinger* and *Parma* or the modified covenant in *Rogers,* the Covenant Not to Compete is not limited to a particular county or to a very small geographical area, or even to geographical areas in which **Cintas** has conducted business in the last two years. Rather, the Covenant Not to Compete limits Perry from working for any division of any company that **Cintas** deems a competitor anywhere in the world. According to Mr. Rogman, **Cintas** attempts to include every "new player" in the identity uniform industry on Appendix A. (Tr. 340.) That does not eliminate a small percentage of possible employers in the uniform industry; rather, by **Cintas'** own assertions, it eliminates *all* possible employers in the identity uniform industry. Based on that expansive definition, this court finds that the covenant is unduly harsh.[FN17]

FN17. Because this court finds that the Covenant Not to Compete is unreasonably broad and imposes an undue burden on Perry, there is no need to address whether enforcement of the Covenant Not to Compete would harm the public.

For all of the reasons set forth above, this court finds that **Cintas'** chances of succeeding on the merits of its breach of contract claims are not "better than negligible." Based on that finding, this court recommends that **Cintas'** Motion for Preliminary Injunction be denied.

## 2. *Irreparable Harm*

The finding of irreparable harm to the plaintiff if the injunction is denied is also a threshold requirement for granting a preliminary

*Foodcomm Intl.,* 328 F.3d at 304. In an effort to establish irreparable harm, **Cintas** first relies on Paragraph 3(e) of the Agreement, which states that "a breach of any covenant in this Paragraph 3 will cause Employer irreparable injury and damage for which Employer has no adequate remedy."(Pl.'s Mot. at 13.)[FN19]While having some persuasive value, that provision is not conclusive in the determination of ongoing irreparable harm. *See Baskin-Robbins Inc.,* 264 F.Supp.2d at 611.

FN18. In support of its irreparable harm argument, **Cintas** cites a few Illinois and Ohio cases. (Pl.'s Mot. at 13 (citing *Central Water Works Supply, Inc. v. Fisher,* 240 Ill.App.3d 952, 181 Ill.Dec. 545, 608 N.E.2d 618, 623 (Ill.App. 4th Dist.1993)); Pl.'s Pre-Hr'g Br. at 1 (citing *Kaeser v. Adamson,* Case No. 773, 1982 WL 5602 at *8 (Ohio Ct.App. Dec.14, 1982) (Milligan, J.))). While Ohio law is relevant in determining a likelihood of success on the merits (*e.g.,* whether the covenant is enforceable), neither Ohio nor Illinois law applies when determining whether **Cintas** has established irreparable harm. "The propriety of the issuance of a preliminary injunction ... is to be determined by the rules and decisions of federal courts."*General Elec. Co. v. American Wholesale Co.,* 235 F.2d 606, 608 (7th Cir.1956); *see also Outsource,* 192 F.3d at 673-74 (Posner, J. dissenting) ("As a detail, I note that the court assumes that state rather than federal law governs the standard for the grant or denial of a preliminary injunction. Not so; it is federal law."); *Budget Rent A Car Corp. v. Harvey Kidd Automotive,* 249 F.Supp.2d 1048, 1050 (N.D.Ill.2003) (stating that "whether [the plaintiff] has established irreparable harm is not governed by Illinois law and its presumptions, but rather by federal law").

FN19. In its Motion, **Cintas** refers to Para-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

graph 5 in support of its argument, although the Paragraph which addresses inadequate remedy is Subparagraph 3(e).

Next, **Cintas** asserts that irreparable injury should be "presumed" when "the protectible interest at stake is imperiled by a defendant's conduct."(Pl.'s Post-Hr'g Br. at 12) (citing *Pepsico, Inc. v. Redmond,* No. 94 C 6838, 1996 WL 3965 at *29 (N.D.Ill. Jan.2, 1996)* (Lindberg, J.)). Specifically, **Cintas** claims that, "[g]iven the similarities in the nature and scope of Perry's sales positions with **Cintas** and his present position with Aramark, there is a great threat of harm to **Cintas'** business resulting from Perry's inevitable use or disclosure of **Cintas'** Confidential Materials and Information in his Aramark employment."(*Id.* at 9-10.)That argument is based on the so-called "inevitable disclosure" doctrine.[FN20]

> FN20. Although this report and recommendation addresses **Cintas'** inevitable disclosure argument under the section relating to irreparable harm, it is unclear from **Cintas'** filings where **Cintas** believes that its inevitable disclosure argument fits into the preliminary injunction analysis. In its post-hearing brief, **Cintas** presents the argument in support of its likelihood of success on the merits as well as in its effort to establish irreparable harm. (Pl.'s Post-Hr'g Br. at 9.) Where the argument fits into the preliminary injunction analysis is potentially significant for purposes of determining what law should apply. *See* footnote 18. However, as discussed below, **Cintas'** inevitable disclosure argument is without merit under federal or Ohio law.

**\*16** *Pepsico, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir.1995), is a leading case on the inevitable disclosure doctrine. In *Pepsico,* the plaintiff sought a preliminary injunction against one of its former executives and his new employer, Quaker Oats, to prevent the former employee from divulging trade secrets and confidential information in his new pos-

ition and from assuming any duties relating to beverage pricing, marketing and distribution of sports and new age beverages. *Id.* at 1263, 1264.The district court granted the injunction requested by the plaintiff. *Id.* at 1263.In affirming the district court's decision, the Seventh Circuit applied the Illinois Trade Secret Act and stated that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets."*Id.* at 1269 (citations omitted).

**Cintas** also cites *Procter & Gamble Co. v. Stoneham,* 140 Ohio App.3d 260, 747 N.E.2d 268 (Ohio Ct.App.2000), in support of its inevitable disclosure argument. In *Procter & Gamble,* a senior level manager who was primarily responsible for the international marketing of the plaintiff's hair products had accepted a similar position with the plaintiff's competitor. *Id.* at 265, 747 N.E.2d 268. The plaintiff sued its former employee for breach of contract and misappropriation of trade secrets. The Court of Appeals of Ohio reversed the trial court's decision to dismiss the trade secret claim. The court criticized the trial court's finding that actual harm was required in order to grant the plaintiff injunctive relief because an Ohio statute expressly authorizes an injunction upon a showing of misappropriation of trade secrets, eliminating the need for demonstrating the ordinary equitable requirements.*Id.* at 273-74, 278.In explaining the inevitable disclosure doctrine, the court stated:
[A] threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment.

*Id.* at 279.The court ultimately held that the plaintiff presented clear and convincing evidence that its former employee either had already used

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

some of its trade secrets or was substantially likely to use its trade secrets to benefit his new employer. *Id.* at 280.

*Branson Ultrasonics Corp. v. Stratman,* 921 F.Supp. 909 (D.Conn.1996), the other case upon which **Cintas** relies, is quite similar to *Proctor & Gamble.*In *Branson,* the defendant had been one of the leaders of the team responsible for developing the plaintiff's new line of ultrasonics joining equipment, in which the plaintiff had invested millions of dollars. *Id.* at 912.Although the defendant's new job was in metal welding, not plastic welding, the plaintiff's product was suitable for both. *Id.* The court found that the "high degree of similarity between [his] former and current employment" made it likely that the former employer's trade secrets and confidential information would be used and disclosed. *Id.* at 913.

**\*17** In this case, however, **Cintas** has stated that it is *not* alleging that Perry misappropriated its trade secrets. *See* Pl.'s Reply Br. at 3 ("**Cintas** has not asserted a claim of trade secret misappropriation."). In fact, **Cintas** conceded at the hearing that it has not uncovered any evidence to support such a claim. (Tr. 444.) Also, **Cintas** has not made any effort to establish that the information it claims Perry will "inevitably disclose" constitutes a trade secret. Given those facts, it is questionable whether the inevitable disclosure doctrine is even applicable in this case.[FN21]

> FN21. Although two courts from this District have applied the inevitable disclosure doctrine outside of the trade secret context, those cases were factually similar to *Pepsico* in that they involved fierce competitors and highly sensitive marketing information. *See Kempner Mobile Elecs., Inc. v. Southwestern Bell Mobile Sys.,* No. 02 C 5403, 2003 WL 1057929 at \*22 (N.D.Ill. March 10, 2003) (Schenkier, M.J.) ("While we have found no case that discusses the application of [the inevitable disclosure] doctrine in the specific context of a non-

compete case that involves confidential (and not trade secret) information, we see no reason, in principle, that it should not apply in assessing both the interest to be protected and the reasonableness of the restraints imposed."); *YCA, LLC v. Berry,* No. 03 C 3116, 2004 WL 1093385 at \*15 (N.D.Ill. May 7, 2004) (Leinenweber, J.) ("Although *Pepsico* involved misappropriation of trade secrets, not mere confidential information, its factual record heavily informs the present action.").

Assuming, *arguendo,* that the doctrine can be applied outside of the trade secret context, **Cintas** has failed to demonstrate that it should be applied to this case. First, the evidence has not established that Perry's position with Aramark is sufficiently comparable to his former position at **Cintas** that the disclosure of information would be inevitable. As a NAM, Perry was responsible for selling and managing national accounts, which by definition generate more than $250,000 in annual revenue, for customers and prospective customers headquartered in Illinois, Indiana and Wisconsin. In his position at Aramark, Perry does not deal with the same size accounts, he is not focused in the same region of the country and, most significantly, he does not sell to, target or solicit customers. Rather, Perry is primarily responsible for training and developing sales managers. (Tr. 58.) Thus, unlike the defendant in *Procter & Gamble,* who "directly targeted the very products he worked on when employed at P & G" (747 N.E.2d at 280), there is no evidence that Perry, in his new position at Aramark, will target or solicit the customers he serviced while at **Cintas** or even prospects in the same region.

Second, even if the positions were sufficiently similar, "the mere fact that a person assumed a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose ... trade secret information' so as to 'demonstrate irreparable injury.' " *Pepsico,* 54 F.3d at 1269 (quoting *AMP Inc. v. Fleischhacker,* 823 F.2d 1199, 1207

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

(7th Cir.1987)). In *Pepsico,* it was essentially undisputed that the marketing manager was in possession of important trade secrets that would be directly relevant to his new employment position. *Id.* at 1264, 1266.There is no such evidence in this case. Other than the productivity tenure report and the two computer disks discussed above, there is no evidence that Perry took or now possesses any confidential **Cintas** information, apart from what he might retain in his memory. When Perry worked out his employment arrangement with Aramark, it appears that special efforts were made to verify that Perry would not disclose confidential **Cintas** information. *See* Def.'s Ex. 7, Aramark Offer Letter; Def.'s Ex. 25, New Employee Guidelines. Perry has also made a point to inform his co-workers at Aramark about the restrictions placed on him by the Covenant Not to Compete. *See, e.g.,* Tr. 545. That he did so was confirmed by his co-workers. (Harris Dep. at 13-14, 99-100; McCadd Dep. at 15; Bryant Dep. at 8; Salazar Dep. at 63, 67-68.) Other than the information he provided to Ms. Salazar for the purpose of formatting a productivity tenure report, there is no evidence that Perry has made any disclosure of confidential **Cintas** information to anyone at Aramark. There is also no reason to suspect that Perry needs to use **Cintas**' proprietary information in order to fulfill his new responsibilities. In fact, Perry testified that he has no need to rely on, or disclose, **Cintas**' trade secrets or confidential information to perform his job at Aramark. (Tr. 550-57).

**\*18** Most significantly, **Cintas** has been unable to produce any evidence that, in the eight months that Perry has worked for Aramark, he has used any **Cintas**' confidential information for the benefit of Aramark. (Tr. 502, 510-11, 515.) It is hard to see how **Cintas** can claim that disclosure is "inevitable" when the only disclosure that has taken place in the better part of a year has been one spreadsheet (which was used for its non-proprietary format) and two computer disks with aged data. Rather, **Cintas**' belief that it needs an injunction to prevent Perry from revealing its confidential in-

formation appears based on mere speculation, which is insufficient to establish inevitable disclosure.

Because **Cintas** has failed to establish that it will suffer irreparable injury if an injunction is denied, **Cintas**' Motion for Preliminary Injunction should also be denied on this ground.

3. *Inadequate Remedy at Law*

To obtain a preliminary injunction, **Cintas** must also show that it has no adequate remedy at law. *Foodcomm Intl.,* 328 F.3d at 304 (citation omitted)."Inadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered."*Id.* (citation omitted).**Cintas** points again to the language of the Agreement (Paragraph 3(e)), claiming that "Perry himself even agreed that his breach of the [ ] Agreement would leave **Cintas** with an inadequate remedy at law."(Pl .'s Mot. at 14.) FN22However, as discussed above, while the provision in the Agreement may be persuasive, it is not conclusive in the determination of whether there is an inadequate remedy at law. *See Baskin-Robbins Inc.,* 264 F.Supp.2d at 611.

> FN22. As mentioned earlier, although **Cintas** referred to Paragraph 5 in its Motion to support this argument, the paragraph that actually applies is Subparagraph 3(e).

**Cintas** further argues that it "stands to lose considerable profits and customers by Aramark's hiring of Perry" and "[b]ecause it would be nearly impossible for **Cintas** to accurately calculate the damages sustained by Perry, **Cintas** is left with an inadequate remedy at law."(Pl.'s Mot. at 14.) **Cintas** has not presented *any* evidence that it has lost, or is at risk of losing, a single customer or that it has been unable to maintain a relationship with any customer due to Perry's actions or employment at Aramark. *See Medline Indus.,* 670 F.Supp. at 838 (denying

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

injunction because the employer failed to present any evidence that the employee diverted customers to the competitor company or that the employer suffered any loss of good will due to the employee's activities). In contrast, in *Foodcomm Intl.,* 328 F.3d at 304-05, the court found that the plaintiff had no adequate remedy at law because the plaintiff had suffered a complete loss of its relationship with one of its largest customers. That is not the case here.

**Cintas** also argues that "the loss of trade secrets and other confidential or proprietary information is not easily measurable in money damages."(Pl.'s Post-Hr'g Br. at 13) (citing *Computer Assocs. Intl., Inc. v. Bryan,* 784 F.Supp. 982, 986 (E.D.N.Y.1992)). Unlike the plaintiff in *Computer Assocs.,* however, **Cintas** is not alleging that Perry misappropriated its trade secrets. Nor has **Cintas** demonstrated that any confidential information has been "lost forever" due to Perry's actions. *See Computer Assocs.,* 784 F.Supp. at 986 (quotation omitted).

**\*19** Thus, **Cintas** has not demonstrated that it has an inadequate remedy at law, and its Motion for Preliminary Injunction should be denied on this basis as well.

4. *Balancing the Harms*

Because this court finds that **Cintas** has not made the required threshold showings, there is no need to balance the harms involved. *Kellas v. Lane,* 923 F.2d 492, 496 (7th Cir.1990); *cf. Cooper,* 196 F.3d at 817. However, because this is a report and recommendation, this court will discuss the evidence in terms of the sliding scale analysis. *Foodcomm Intl.,* 328 F.3d at 303. **Cintas** claims that its "strong showing of substantial likelihood of success on the merits of its claim for breach of the [Agreement] lessens the showing of irreparable harm that **Cintas** otherwise would be required to make."(Pl.'s Post-Hr'g Br. at 12.) However, for the reasons stated above, **Cintas** has not made a "strong showing" that is likely to succeed on the merits in this case.

In fact, **Cintas** has failed to demonstrate that Perry solicited its customers, recruited its employees or used its Confidential Materials and Information. The Covenant Not to Compete, which Perry admittedly has breached, is unreasonably broad under Ohio law.

**Cintas** also argues that:
[a]bsent the issuance of a preliminary injunction, **Cintas** stands to lose the benefit of the Confidential Materials and Information acquired and retained by Perry, as well as potential sales and profits. **Cintas** also will be forced to endure injury to its customers and employee relationships as a result of Perry's violations of the restrictive covenants in the [Agreement].

(*Id.* at 13.)However, as set forth above, **Cintas** has failed to demonstrate that Perry has acquired or retained any of its Confidential Materials and Information for an improper purpose or that any of its customer or employee relationships have been affected due to Perry's actions. Furthermore, **Cintas** has not shown that, in Perry's new position, it is "inevitable" that he will use or disclose **Cintas'** confidential information.

In *Medline Indus.,* 670 F.Supp. at 838, the court found that the balance of hardships favored denying injunctive relief because the restrictive covenant was overbroad, the record in the case was curiously lacking any evidence of damage, and the plaintiff chose to rely on speculation, conjecture and the mere possibility that the former employee used confidential information to harm the plaintiff. In this case, the scale is tipped in favor of Perry for many of the same reasons. The Covenant Not to Compete is unreasonably broad, **Cintas** has been unable to demonstrate that it has suffered any actual harm by Perry's actions, and **Cintas'** allegations of a "threat of harm" or "inevitable disclosure" are based on pure speculation. As a result, the balance of hardships weighs in favor of Perry, and **Cintas'** Motion for Preliminary Injunction should be denied.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5. *Attorneys' Fees*

Perry claims that, pursuant to the Agreement, he is entitled to the attorneys' fees that have been paid in defending this lawsuit. (Def.'s Resp. Pl.'s Post-Hr'g Br. at 15.) **Cintas** disagrees, arguing that "Perry's claim for attorney's fees is erroneous and un-timely."(Pl.'s Reply Br. at 15.) Subparagraph 3(e) of the Agreement states: "If Employer sues Employee for an alleged breach of covenant(s) in this Paragraph 3 and *the court rules that Employee has not violated such covenant(s),* Employer will pay all litigation costs and expenses and Employee's reasonable attorney's fees necessarily incurred in the litigation."(Agreement ¶ 3(e)) (emphasis added). That provision anticipates that attorneys' fees will be paid after a *final* judicial determination that an employee has not violated the Agreement. Because this matter is at the preliminary injunction stage, the decision on **Cintas'** motion is not a final determination on the merits. *See University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (stating that "it is generally inappropriate for a federal court at the pre-liminary-injunction stage to give a final judgment on the merits"); *see also Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 264 (7th Cir.1981) (stating that the purpose of a preliminary injunction is not to conclude the merits of the controversy, but merely to preserve the status quo until a more considered decision on the merits is possible). Therefore, Perry's request for attorneys' fees is premature.

CONCLUSION

**\*20** For the foregoing reasons, this court respectfully recommends that **Cintas'** Motion for Preliminary Injunction be denied. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed.R.Civ.P. 72(a). Failure to file objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this court in the report and recommendation. *Lorentzen v. Anderson Pest Control,* 64 F.3d 327, 330 (7th Cir.1995).

N.D.Ill.,2004.
Cintas Corp. v. Perry
Not Reported in F.Supp.2d, 2004 WL 2032124 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMFM BROADCASTING, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 08-CV-1519 |
| | ) |
| CHICAGO FM RADIO ASSETS, LLC, | ) Hon. James B. Zagel |
| incorrectly captioned as | ) |
| CITADEL BROADCASTING CORPORATION | ) Magistrate Judge Morton Denlow |
| and REBECCA OSOWIEC | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF SUSAN M. BENTON

1.      My name is Susan M. Benton.  I am one of the attorneys representing Defendants Rebecca Osowiec and Chicago FM Radio Assets, LLC in the above-captioned lawsuit.

2.      I personally accessed the Lan International website and Arbitron website via computer to gather information about Radio Fusion, Best Rate and Tapscan.  Attached as Exhibits A (Lan International) and B (Arbitron) are printouts about these software programs obtained from the Lan International and Aribtron websites.

3.      I requested information regarding Clear Channel's ownership of AMFM Broadcasting, Inc.  Attached as Exhibit C are copies of the SEC Form 8-K and news articles regarding the merger.

4.      I personally accessed websites for Media Monitors and the Miller Kaplan X-Ray report.  Attached Exhibits D (Media Monitors) and E (X-ray) are information from the websites describing the services and reports.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _6th ___th day of April, 2008.

CHI:2072590.2

Exhibit A

# EXHIBIT  A



**How to win the battle**
to maximize revenue.

Home       About Us       Solutions       Support

# About Us - Our Heritage

Our track record demonstrates our ability to deliver significant results at accelerated rates. Over a sustained period of several years, we've installed our solutions in an average of eight new markets each month. So we've had ample opportunity to hone our skills in business process evaluation, application development, site preparation, installation, training and customer support.

This is the story of a company whose very foundation is rooted in change.

## Fulfilling the need

In 1996 the massive consolidation trend sparked by cable deregulation was winding down. MSOs were turning their attention to integrating and retooling their infrastructure to handle an anticipated broadband boom. As a result, cable TV operators desperately needed traffic and billing software that could handle insertions across multiple networks and hundreds of headends.

LAN's product filled this need. With a single order line, cable operators could create and schedule spot placements across their enterprise, and apply one rate against them all. It also provided a unique vision into the future: dynamic scheduling of spots as far in advance as the operator desired. No other software offered this capability.

In the US cable market, these unparalleled advantages quickly generated more than just interest. Within six months, three major MSOs had signed on with LAN.

## Crossover potential realized

In striving to meet its customers' considerable needs, LAN soon found itself seeking additional operating capital. The broadcast segment, LAN found, was experiencing many of the same problems, and had many of the same needs, as cable. Thanks to the flexibility of its product, **LAN's leaders** determined that radio offered the highest potential for quickly generating the needed revenue.

Impressed with the advanced functionality and real potential for LAN's cable product to solve similar problems in radio, a major broadcaster commissioned a consulting firm to investigate the software provider. Eight weeks later, the broadcaster informed LAN that it not only wanted a radio-purposed version of LAN's cable TV product - it wanted to buy the company!

LAN's investors accepted the offer. But before the ink was dry on the purchase agreement, the buyer was purchased by another broadcasting company. Once again LAN was scrutinized, and the findings were positive.

And then the parent company was acquired by industry leader Clear Channel Communications.

## Implementation at record-breaking pace

Over the next several years, LAN undertook what was to become the industry's largest-ever traffic and billing software conversion project. With over 1,200 stations, its new parent presented LAN with unprecedented challenge - and an equally unique opportunity.

The two companies worked closely together to perfect both the software and the support. LAN soon became expert at large-scale implementation rollouts. At the same time, its people retained their passion for providing and managing a value-intensive customer/provider relationship experience.

Simultaneous to its efforts in converting the radio stations to its software, LAN produced and distributed new releases. The company added significant enhancements three to four times a year.

## What we've learned

This experience taught LAN to take a solutions-based, results oriented approach to software development. This perspective is formalized in the development process adopted by the company, Scrum, which makes it possible for LAN to produce a market-ready version of any of its products every 30 days.

Because its offerings are the result of listening to its customers and understanding the business processes they strive to implement, LAN's solutions hold the competitive advantage. Unlike many other high tech companies, LAN does not pursue technology simply for the sake of technology. Rather, its philosophy has always been to use technology as a tool for solving customer problems.

Because of LAN's inherently close ties to its constituency, its software solutions have benefited enormously from suggestions and requests from hands-on users. As the company continues to support existing Clear Channel radio users, it is now also making its impressive media revenue management experience available to the entire broadcast industry.



# How to win the **battle**
to maximize revenue.

Home     About Us     Solutions     Support

## About Us - Our Leaders



### Sharon Blankenship
**Founder / President / CEO**

With over 30 years in the broadcast and technology industries, Sharon Blankenship has established herself as a pioneer and visionary in the media world. Her achievements in quantifiable advertising and interactive marketing, which include consulting with former President Bill Clinton, have been detailedin news outlets across the country, and in many ways have set the standard for others to follow.

In 1996, Blankenship co-founded LAN International, a software development company serving radio and television stations. Under her leadership, the company has grown from a small technology startup to one of the broadcast industry's premier providers of revenue management solutions. Now a wholly owned subsidiary of Clear Channel Communications, LAN International has over 110 employees, with offices in California, Texas and Florida. Led by its flagship product Viero™, LAN's integrated suite of enterprise solutions are used by over 1,100 stations in 220 markets across the country, and provide the foundation for Clear Channel Radio's domestic traffic and billing systems. Having recently announced a



### Patti Roberts Haley
**Senior Vice President/Customer Operations**

Patti directs the activities of LAN Customer Relations, Training Services, Customer Support, and Field Implementation and Conversion Services. During her tenure with LAN, Patti directed the industry's largest-ever traffic and billing software conversion project. This involved converting nearly 1200 Clear Channel radio stations in 220 markets to LAN's inventory and revenue management solutions over a period of several years.

This considerable undertaking required major expansion of LAN's customer training center, and major development of its customer support services capabilities and web-based training program, all under Patti's direction. She joined LAN as Director of Training and Documentation.

Earlier management experience includes over 20 years with Cox Communications in various managerial positions within customer service, technical operations and advertising sales. There she planned and directed multiple hardware system and software conversions, along with many of the company's facility build-outs.



### Peter Richards
**Chief Financial Officer**

Peter's role as chief financia responsibility for the compa function. He joined LAN in 1 CFO. Prior experience inclu managing accounting and fi the marketing services and industries. In addition, he sp management and engineeri

Peter holds a degree in Eng University of Southern Calif Finance from Loyola Marym



How to win the **battle** to maximize revenue.

Home    About Us    Solutions    Support

# About Us - Our Customers

LAN International is proud to work with the following Broadcast Groups...

| | | |
|---|---|---|
| **Bicoastal Media** | **Forever Communications** | **Peak Broadcasting** |
| **BYU Broadcasting** | **GAP Broadcasting** | **Rincon Broadcasting** |
| **Capital Broadcasting** | **GAP West Broadcasting** | **Radio Fargo-Moorhead, Inc.** |
| **Clear Channel Radio** | **Great Eastern Radio** | **Three Eagles Communications** |
| **Coloff Media** | **Minnesota Valley Broadcasting** | **Urban Radio Broadcasting** |
| **Cumulus Broadcasting** | **Monticello Media** | **WEUP Radio** |
| **E. Arkansas Broadcasting** | **Neuhoff Communications** | |
| **El Dorado Broadcasting** | **NRG Media** | |

*Check back soon as we're always growing.*

**Leadership Council**

VIERO® solutions are designed based on a compilation of requests and comments from users and client executives. In addition, LAN development and product marketing teams draw from the considerable real-world experiences of the members of our user advisory boards and the VIERO Leadership Council.

The groups, comprised of representatives from customers' sales, business and traffic management, monitor development progress and provide valuable feedback throughout the process.

These groups actively and regularly evaluate product functionality and enhancements. In addition, members take a leadership role in providing support to other users.



By helping to define product requirements and set feature priorities, the VIERO advisory groups and Leadership Council ensure that users of VIERO solutions are not only involved, but are partners in the software development lifecycle.



"Single-screen er
the keyboard mo
along."

"The multi-thread
extremely fast; or
instantaneously."

"Reports are lots

"Multicolor highlic
capabilities, and I
number of empty
logs that much cl
managers will be
too!"

Home - About Us - Solutions - Support - News - Sitemap
Terms of Use | © 2006 LAN International
Info@lanint.com - 949-425-3322

**Stay informed and ahead...**
**click here sign up for LAN's free quarterly newsletter today!**



How to win the **battle**
to maximize revenue.

# The VIERO Advantage

### How it can work for you

VIERO revenue management solutions are some of the industry's **smartest, most powerful tools** for maximizing and managing revenue. Tools that give you visibility across the enterprise in real time, and far into the future. Tools that provide the **answers you need**, and then help your organization change direction on a dime.

VIERO solutions schedule and report spots in real time, helping you capture and transform last-minute avails from lost opportunities into **high-powered revenue generators**. Configurable, priority-based booking logic optimizes scheduling of higher-priority spots. In addition, the flexible electronic invoicing capabilities help improve your cash flow.

What's more, these tools also help you make the most of your precious resources. The VIERO solutions suite is replete with labor-saving features like automated order import, smartfill fields and remote order entry via the web. All are engineered specifically to save you **time, labor and money.**

Because of our intensely close, consultative relationships with those we serve, we can truly say that VIERO solutions are developed by media professionals for media professionals.

The VIERO suite is the **intelligent solution.**













**Stay informed and ahead…**
**click here sign up for LAN's free quarterly newsletter today!**



How to win the **battle**
to maximize revenue.

Home     About Us     Solutions     Support

## Solutions - Revenue Management



**Real-time**
**Revenue Management**
# Across the enterprise

VIERO RMS™ revenue management (T&B) schedules and reports spots in real time, helping you capture and transform last-minute avails from lost opportunities into high-powered revenue generators. You configure the priority-based booking logic through powerful order options to optimize scheduling of higher priority spots. In addition, the flexible electronic invoicing capabilities help improve cash flow.

**Featuring the patent pending VIERO BOOKING AGENT™ scheduler, providing the**

**industry's only fully automated, truly dynamic spot placement.**

Schedules spots automatically for you, guided by proprietary logic and your specified parameters defining spot placement priorities - you take maximum advantage of each and every spot's revenue-generating potential.

Constantly evaluates current inventory against new order entries, moving spots based on order line rules to optimize revenue.

Dynamically schedules literally millions of spots across hundreds of stations or networks 15 months or more into the future, for unprecedented visibility in reporting inventory.

Exclusive, dynamic booking engine provides real-time revenue tracking - you get up-to-the-second views of the effects changes have on revenue.

**Electronic invoicing capabilities improve cash flow**

Energize your cash flow; take another important step toward the paperless office .

Standard 4As file format.

Current EDI partners include SpotData, Katz Media and RadioInvoices.com.

Delivery methods such as FTP and secure email.

Robust reporting of electronic invoicing activities.

## Timely, configurable reporting

Virtually infinite number of standard and custom-configurable reports based on real time data, including revenue projections, AR, end-of-month and other revenue reports, spot sales comparisons, invalid copy group, verification reconciliation status, invoice journal and many more.

Easy export to Microsoft Excel, Adobe pdf and other widely used file formats.

## Labor-saving accounts receivables

A true accounting powerhouse that puts all information onscreen and at your fingertips.

View and work with all outstanding accounts, customer credit information, payment and adjustment entries, and complete transaction history.

Advanced tools to search, select and sort accounts receivable data the way you need it; windows can be customized for views and data entry.

## Enterprise-class security

Powerful yet flexible security features provide enhanced protection of critical market data.

Create and define roles that enable users to access specific tasks and modules.

Assign/unassign one or many roles to each user, based on user name.

Add new users, view and edit existing users, remove existing users, remove existing roles.

Home - About Us - Solutions - Support - News - Sitemap
Terms of Use | © 2006 LAN International
Info@lanint.com - 949-425-3322

**Stay informed and ahead...**
**click here sign up for LAN's free quarterly newsletter today!**



How to win the **battle** to maximize revenue.

Home        About Us        Solutions        Support

## Products - Strategic Account Management



**Manage accounts**
**Create, route and approve proposals electronically**
# Sales Process Automation

VIERO RADIO FUSION™ CRM and sales automation organizes, manages and transforms data into knowledge your sales force can use. When used in conjunction with the other tools of the VIERO® solutions suite, VIERO RADIO FUSION CRM and sales automation is the smart, powerful solution to your CRM needs.

Beginning with a lead, your account executives create an e-proposal reflecting up-to-the-minute inventories and demand-reflective pricing. After totally electronic review and approval, the proposal - calculated to optimize the profit potential of all your avails - becomes an order. With final management approval the order is injected directly into VIERO RMS™ revenue management (T&B). And that's truly just the beginning of what VIERO RADIO FUSION CRM and sales automation can do for you.

Prospect leads, manage contacts and maintain critical historical information on all of your accounts.

AE efficiencies - easily see the entire sales cycle from the first contact to emails, appointments, proposals and orders; all activity is tied to client records for easy reporting and personalized selling.

Integrates with Microsoft Exchange Server for Calendar, Contacts, Email, Tasks and Notes - navigation and layout utilize already-familiar concepts and techniques.

Proposal features ratings information, up-to-date pricing and real time inventory from VIERO BEST RATE® rate and yield management, ensuring maximum value for your inventory.

Paper is optional - VIERO RADIO FUSION CRM and sales automation transcends the standard, hard copy environment with its inherent inefficiencies like data entry errors and redundant work. You enhance visibility, streamline workflow and expedite the sales process.

Home - About Us - Solutions - Support - News - Sitemap
Terms of Use | © 2006 LAN International
Info@lanint.com - 949-425-3322

**Stay informed and ahead...**
**click here sign up for LAN's free quarterly newsletter today!**



**How to win the battle to maximize revenue.**

Home    About Us    Solutions    Support

## Solutions - Rate & Yield Management



**Real-time**
**Yield Management**
# Demand-driven Pricing

**With VIERO BEST RATE**
**rate and yield management you c**

The VIERO BEST RATE® rate and yield management helps you manage station inventories quickly and efficiently. It provides sales managers and account executives with the information they need to make better daily, weekly, monthly, quarterly and annual pricing decisions.

VIERO BEST RATE rate and yield management measures the daily demand on inventory, and adjusts rates with a single objective; to maximize revenue. Utilizing data gathered from across your enterprise, VIERO BEST RATE rate and yield management is your tool for identifying trends and developing simulations to predict budget, sales rates and inventory.

It is the first enterprise network pacing and pricing tool, saving countless hours of manual calculations as your sales force works toward maximizing sales revenues. Best of all, it integrates transparently with the VIERO solutions suite.

VIERO BEST RATE rate and yield management travels across your WAN, accessing, processing and packaging information for six distinct organizational levels (executive management, senior management, regional management, market management, station management, and account executives).

VIERO BEST RATE rate and yield management searches its datamart for nightly downloads from the VIERO® revenue management solution. It then uses this data to generate current demand prices for unsold available inventory. These prices are maintained in a portion of the VIERO BEST RATE rate and yield management program referred to as a rate card. Rate cards display recommended spot pricing based on inventory usage, calculated daily and seasonal demand, and availability for a given station.

Adjust rates in realistic ar demand

Identify and leverage poc and adjust rates accordin

Reduce risk of lost reveni lower where amount of ur

Generate real-time rate c

Reduce the number of bu

Improve revenue through management



How to win the **battle**
to maximize revenue.

# Support - Customer Training



**Comprehensive, hands-on,
Real world experiences**

Combining lecture, demonstration, practice and business application, LAN customer training services offer hands-on experience in our business solutions. Users explore the coursework in a practical business setting at our training facility at LAN headquarters in Aliso Viejo, California.

Students are evaluated through formal testing of their skills and knowledge. The results are analyzed and reported to you, along with any recommendations for additional study.

LAN International user training represents the culmination of years of user needs assessment, aggressive, ongoing curriculum development, and thoughtful formulation of effective and complete training materials and presentations. The training process begins even before conversion to our solutions. But it doesn't stop there. Online coursework is offered to your entire staff at no additional charge with every new version release.

At LAN, training is 24/7. your staff can refresh the customer training archive expertise and provides yc flexibility. For example, it of role reassignment with help you stay agile in your

Home - About Us - Solutions - Support - News - Sitemap
Terms of Use | © 2006 LAN International
Info@lanint.com - 949-425-3322

**Stay informed and ahead...
click here sign up for LAN's free quarterly newsletter today!**

# EXHIBIT B

**TAPSCAN®**
Local market radio ratings software suite

Radio salespeople know TAPSCAN as the software that makes it easy to tell their station's story and generate more revenue. The intuitive design is easy to use and master—if your sellers can use a mouse, they will be able to use TAPSCAN from their very first day on the job.

The TAPSCAN Suite may include TAPSCAN, TrafficLink®, RETAIL SPENDING POWER<sup>SM</sup>, MEDIAMASTER<sup>SM</sup> and pdfFactory®

Powered with exclusive Maximi$er®-level data, TAPSCAN gives you access to customized demos, geographies, dayparts and multibook averages. TAPSCAN gives you an edge by making almost every part of the sale easier, from the initial presentation all the way to the hand-off to traffic.

With TAPSCAN, you can:

- Demonstrate the sales potential of your audience with more than 80 categories of RETAIL SPENDING POWER qualitative information
- Show advertisers the number of listeners they can reach only through your station
- See what you—and your competition—can charge to hit a requested CPP
- Find out how many spots you need to run to reach a certain frequency, based on a demo and daypart
- Determine your reach and frequency by specific demo, daypart and spot level
- Demonstrate your power against newspapers, magazines, television, cable and outdoor
- Get proposals to clients faster with e-mail-friendly PDF output
- Streamline order approval and automate the transfer to your traffic system

**Data used in system:**
Arbitron Respondent-Level Radio Data, Arbitron Summary-Level Radio Data, Arbitron Black Radio Data, Arbitron Hispanic Radio Data, Eastlan Radio Data

Want more info? Contact your account manager now!

Maximi$er®, MEDIAMASTER<sup>SM</sup>, RETAIL SPENDING POWER<sup>SM</sup> and TrafficLink® are marks of Arbitron Inc.
TAPSCAN® is a registered mark of TAPSCAN Inc., used under license.
pdfFactory® is a registered mark of FinePrint Software, LLC.
Last updated: 2.21.08

Radio Stations | Ad Agencies | Television Services | Portable People Meters
Online Radio | National Radio | Out-of-Home Companies
Custom Research | International | Arbitron Home
Privacy Statement | Patents | Trademarks | Contact

© 2008 Arbitron Inc.  All Rights Reserved



❝ ❝ Arbitron is completely customer-focused. Everything we do is built around helping our clients achieve their goals, grow their businesses and maximize their return on investment. ❞ ❞

**– Steve Morris**
Chairman, President & CEO

Read more ▶

## WHAT WE DO

Arbitron Inc. (NYSE: ARB) is a media and marketing research firm serving the media—radio, television, cable, online radio and out-of-home—as well as advertisers and advertising agencies in the United States. Arbitron's core businesses are measuring network and local-market radio audiences across the United States; surveying the retail, media and product patterns of local-market consumers; and providing application software used for analyzing media audience and marketing information data. The company has developed the Portable People Meter™, a new technology for media and marketing research.

Through its Scarborough Research joint venture with The Nielsen Company, Arbitron provides additional media and marketing research services to the broadcast television, newspaper and online industries.

Arbitron's marketing and business units are supported by a world-renowned research and technology organization located in Columbia, Maryland. Its executive offices are located in New York City.

## INFORMATION SERVICES



- Local radio ratings in the United States

- Network and national radio audience measurement in the United States

- Online radio ratings in the United States

- Local market and regional qualitative consumer and media usage information in the United States

- Software services to help customers analyze and understand media and consumer data

## THE NEXT GENERATION



- The Portable People Meter (PPM™) is a portable, cell-phone-sized device that electronically tracks exposure to radio, broadcast television and cable media as consumers wear it throughout the day.

Portable People Meter™ and PPM™ are service marks of Arbitron Inc.
Last upated: 4.1.08

Radio Stations  |  Ad Agencies  |  Television Services  |  Portable People Meters
Online Radio  |  National Radio  |  Out-of-Home Companies
Custom Research  |  International  |  Arbitron Home
Privacy Statement  |  Patents  |  Trademarks  |  Contact

© 2008 Arbitron Inc.  All Rights Reserved

## SOFTWARE FOR RATINGS DATA

- TAPSCAN® Suite              Local market radio ratings software suite
- IRS<sup>SM</sup>            Sales management tool
- QUALITAP<sup>SM</sup>       Local market qualitative consumer information software
- MapMAKER Direct<sup>SM</sup>  Local direct sales prospecting software
- PD Advantage®              Audience analysis software for programmers
- Maximi$er®                 Local market radio ratings software
- Maximi$er® Plus            Local/regional market radio audience software
- Custom Coverage<sup>SM</sup>  Ratings software for non-Metro stations

Custom Coverage<sup>SM</sup>, MapMAKER Direct<sup>SM</sup>, Maximi$er®, Maximi$er® Plus, PD Advantage® and QUALITAP<sup>SM</sup> are marks of Arbitron Inc.
TAPSCAN® is a registered mark of TAPSCAN Inc., used under license.

Radio Stations | Ad Agencies | Television Services | Portable People Meters
Online Radio | National Radio | Out-of-Home Companies
Custom Research | International | Arbitron Home
Privacy Statement | Patents | Trademarks | Contact

© 2008 Arbitron Inc. All Rights Reserved

## QUALITATIVE CONSUMER AND MEDIA USAGE INFORMATION

*Radio stations and radio groups* use Arbitron's' Scarborough qualitative service to show the quality of their audience and get beyond selling with cost per point. *Advertising agencies and marketers* use Arbitron's Scarborough qualitative to target and reach consumers. *Cable TV system operators and cable TV networks* use Arbitron's local market qualitative services to demonstrate the value of their subscribers to both local and national advertisers. *Out-of-home and outdoor media* providers use Arbitron's qualitative services to show the real value of their inventory to marketers and advertisers.

Close Window

**SOFTWARE SERVICES**

*Radio stations and radio groups* use Arbitron's software services to demonstrate the value of their audience to advertisers, streamline their sales processes and program their stations more effectively. *Advertising agencies and marketers* use Arbitron's software to plan more effective radio buys and target consumers more precisely.

Close Window

**LOCAL RADIO RATINGS**

*Radio stations and radio groups* use Arbitron's local and regional radio ratings services to demonstrate the value of their audience to advertisers. *Advertising agencies and marketers* use Arbitron's radio ratings service to plan more effective radio buys and target consumers more precisely.

Close Window

## NETWORK AND NATIONAL RADIO
## AUDIENCE MEASUREMENT

*Radio networks* use Arbitron's RADAR® service to show the value of their audience by pairing listening estimates with commercial clearance data.
*Radio networks and radio syndicators* use Arbitron's Nationwide service to demonstrate the value of their audience on a market-by-market basis

RADAR® is a registered trademark of Arbitron Inc.

Close Window

**QUALITAP**SM
Local market qualitative consumer information software

QUALITAP makes it easy for you to plug into the power of qualitative data and sell based on your listeners' lifestyles. With the Instant Qualitative Profile feature, you can show how your audience contains the specific consumers an advertiser wants to reach.

**Data used in system:**
Arbitron Respondent-Level Radio, Scarborough Local Market, RetailDirect®, Qualitative Diary

Want more info? Contact your account manager now!

QUALITAP SM and RetailDirect®are marks of Arbitron Inc.

Radio Stations | Ad Agencies | Television Services | Portable People Meters
Online Radio | National Radio | Out-of-Home Companies
Custom Research | International | Arbitron Home
Privacy Statement | Patents | Trademarks | Contact

© 2008 Arbitron Inc. All Rights Reserved

**MAXIMI$ER®**
Respondent-Level Radio Ratings

Maximi$er ratings data help you give advertisers a more focused, in-depth profile of your audience and get past the limitations of standard market areas. With Maximi$er, you can focus your presentation on your prospects' needs with custom geographies, demographic groups or dayparts. In addition, Maximi$er socioeconomic information enables you to demonstrate the true power of your station and to sell on more than just the ranker.

- Local market radio ratings
- Coverage: Top 280+ markets in the U.S. and Puerto Rico
- Released: Quarterly in large markets, semiannually in smaller markets

Information coverage includes income, education, presence of children and household size information. Show your station's full delivery potential to advertisers with zip code information on where your listeners work, as well as where they live.

*This data set can be accessed with:*
Maximi$er, TAPSCAN®

See Ratings Data Release Dates

Want more info? Contact your account manager now!

Maximi$er® is a registered mark of Arbitron Inc.
TAPSCAN® is a registered mark of TAPSCAN Inc., used under license.

Radio Stations | Ad Agencies | Television Services | Portable People Meters
Online Radio | National Radio | Out-of-Home Companies
Custom Research | International | Arbitron Home
Privacy Statement | Patents | Trademarks | Contact

© 2008 Arbitron Inc. All Rights Reserved

**ARBITRON RATINGS DATA**

 Get a bird's-eye view of how the stations in your market are performing, using our Persons 12+, Monday-Sunday 6AM-Midnight, <u>AQH Share</u> rankers. These data may not be quoted or reproduced without the prior written permission of Arbitron.

To view ratings data, choose the market you want from the following list.

**Market**

Chicago

<u>Don't know your market name? Choose your market by state.</u>

**Need a basic course on Arbitron Ratings?**
Visit <u>www.ArbitronTraining.com</u> and take "Arbitron 101."

**Note:** Markets that are surveyed twice per year will only have the most recent two surveys of data available.

Copyright © 2008 Arbitron Inc. All rights reserved

**ARBITRON RATINGS DATA**
for Chicago

Return to market selection page

**AQH Share for Persons 12+, Mon-Sun 6AM-Mid**
*Click on any column heading to sort by that field—station, format or survey period.*

| Station | Format | WI07 | SP07 | SU07 | FA07 |
|---------|--------|------|------|------|------|
| WGN-AM | News Talk Information | 5.1 | 5.8 | 6.6 | 5.5 |
| WGCI-FM | Urban Contemporary | 5.4 | 5.1 | 4.5 | 5.0 |
| WBBM-AM | All News | 4.9 | 4.3 | 4.7 | 4.9 |
| WLIT-FM | Adult Contemporary | 2.5 | 2.8 | 2.3 | 4.2 |
| WOJO-FM | Mexican Regional | 4.1 | 3.6 | 4.6 | 4.2 |
| WNUA-FM | New AC (NAC)/Smooth Jazz | 4.0 | 3.8 | 4.2 | 4.0 |
| WLS-AM | News Talk Information | 3.3 | 3.6 | 2.7 | 3.5 |
| WVAZ-FM | Urban Adult Contemporary | 4.4 | 3.7 | 4.5 | 3.5 |
| WKSC-FM | Pop Contemporary Hit Radio | 3.3 | 3.6 | 3.5 | 3.4 |
| WBBM-FM | Rhythmic Contemporary Hit Radio | 3.2 | 2.9 | 3.2 | 3.1 |
| WPPN-FM | Spanish Adult Hits | 3.1 | 3.3 | 3.0 | 3.0 |
| WLEY-FM | Mexican Regional | 3.1 | 1.7 | 2.3 | 2.9 |
| WUSN-FM | Country | 3.1 | 3.7 | 3.1 | 2.8 |
| WDRV-FM | Classic Hits | 2.5 | 3.1 | 2.8 | 2.6 |
| WTMX-FM | Modern Adult Contemporary | 2.6 | 3.3 | 2.9 | 2.6 |
| WZZN-FM | Oldies | 3.0 | 2.9 | 2.8 | 2.3 |
| WJMK-FM | Adult Hits | 1.7 | 2.1 | 1.9 | 2.2 |
| WLUP-FM | Classic Rock | 1.9 | 2.1 | 1.9 | 2.1 |
| WPWX-FM | Urban Contemporary | 2.5 | 2.0 | 2.1 | 2.1 |
| WFMT-FM | Classical | 2.0 | 1.6 | 1.9 | 1.9 |
| WILV-FM | Rhythmic AC | 2.4 | 2.2 | 1.7 | 1.9 |
| WXRT-FM | Album Adult Alternative | 1.9 | 1.8 | 2.1 | 1.8 |
| WMVP-AM | All Sports | 1.5 | 1.3 | 1.3 | 1.7 |
| WGRB-AM | Contemporary Inspirational | 1.6 | 1.8 | 1.5 | 1.6 |
| WKQX-FM | Alternative | 1.3 | 1.5 | 1.5 | 1.6 |
| WSCR-AM | All Sports | 1.5 | 1.9 | 1.6 | 1.5 |
| WVIV-FM | Latino Urban | 2.0 | 1.9 | 1.8 | 1.5 |
| WCFS-FM | Adult Contemporary | * | * | * | 1.4 |
| WIND-AM | News Talk Information | 0.7 | 0.9 | 0.9 | 0.9 |
| WIIL-FM | Album Oriented Rock | 0.4 | 0.6 | 0.7 | 0.7 |
| WSRB-FM | Urban Adult Contemporary | 0.9 | 1.1 | 1.1 | 0.7 |
| WVON-AM | Talk/Personality | 0.7 | 0.5 | 0.6 | 0.7 |
| WCCQ-FM | Country | 0.5 | 0.6 | 0.4 | 0.5 |
| WERV-FM | Classic Hits | * | 0.5 | 0.5 | 0.5 |
| WRTO-AM | Spanish News/Talk | 0.6 | 0.4 | * | 0.5 |

| | | | | | |
|---|---|---|---|---|---|
| WRZA-FM | Adult Hits | * | 0.7 | 0.4 | 0.5 |
| WCPT-AM | Talk/Personality | 0.8 | 0.3 | 0.8 | 0.4 |
| WAIT-AM | Religious | 0.4 | * | * | * |
| WCKG-FM | Talk/Personality | 1.1 | 1.3 | 1.2 | * |
| WJKL-FM | Contemporary Christian | 0.8 | * | * | * |
| WNTD-AM | Spanish Contemporary | * | 0.4 | * | * |
| WXLC-FM | Hot Adult Contemporary | 0.4 | * | * | * |
| WZSR-FM | Adult Contemporary | 0.7 | 0.4 | * | * |

* Data are not available for this station/survey. This happens primarily in two-survey-per-year markets where data are released only in Spring and Fall.

What Is AQH Share?

Return to Market Selection Page

Copyright © 2008 Arbitron Inc. May not be quoted or reproduced without the prior written permission of Arbitron.

# EXHIBIT  C

*SEC Info*    Home    Search    My Interests    Help    Sign In    *Please **Sign In***

# Amfm Inc · 8-K · For 10/2/99 · EX-99.1

### Filed On 10/5/99 · SEC File 1-15145 · Accession Number 950134-99-8693

| Find | | in | this filing. | | Show docs searched and every "hit". |

Help...    *Wildcards:* **?** (any letter), ***** (many). *Logic:* for Docs: **&** (and), **|** (or); for Text: **|** (anywhere), **"(&)"** (near).

| *As Of* | *Filer* | *Filing* | *On/For/As Docs:Pgs* |
|---|---|---|---|
| 10/05/99 | Amfm Inc | 8-K{5,7} | 10/02/99    3:67 |

---

### Current Report · Form 8-K
### Filing Table of Contents

| *Document/Exhibit* | *Description* | *Pages* | *Size* |
|---|---|---|---|
| 1: 8-K | Current Report | 4 | 12K |
| 2: EX-2.1 | Agreement and Plan of Merger Dated October 2, 1999 | 60 | 339K |
| 3: EX-99.1 | **Press Release Dated October 4, 1999** | 3 | 21K |

---

### EX-99.1 · Press Release Dated October 4, 1999

| EX-99.1 | 1st Page of 3 | TOC | Top | Previous | Next | Bottom | Just 1st |

EXHIBIT 99.1

**$56 BILLION MERGER BETWEEN CLEAR CHANNEL COMMUNICATIONS AND AMFM INC. TO CREATE THE WORLD'S LARGEST OUT-OF-HOME MEDIA COMPANY**

SAN ANTONIO & DALLAS, Texas--(BUSINESS WIRE)--Oct. 4, 1999--Clear Channel Communications, Inc. (NYSE: CCU) and AMFM Inc. (NYSE: AFM) today announced that they have entered into a definitive merger agreement to create the world's largest out-of-home media entity. After anticipated divestitures required to gain regulatory approval, the combined company will have operations in 32 countries including approximately 830 radio stations and more than 425,000 outdoor displays as well as 19 television stations and significant equity interests in other leading radio broadcasting and outdoor advertising entities.

Pursuant to the Telecommunications Act of 1996 and other regulatory guidelines, it is expected that collectively Clear Channel and AMFM may divest approximately 125 radio stations to secure regulatory approval for the merger. The station sales resulting from the merger should serve the public interest by increasing the diversity and ownership of radio broadcasting properties.

The proposed merger-of-equals values AMFM at $23.5 billion, including the assumption of approximately $6.1 billion of AMFM debt. The combined entity will be called Clear Channel Communications. Lowry Mays will remain Chairman and CEO and Thomas O. Hicks, currently the Chairman and Chief Executive Officer of AMFM Inc., will serve as Vice Chairman of the combined entity. Mark Mays will continue to serve as Clear Channel's President and Chief Operating Officer, and Randall Mays as Executive Vice President and Chief Financial Officer. The Board of Directors of the new company will consist of the current eight members of the Clear Channel Board and five members of the AMFM Board to be designated by AMFM.

Lowry Mays said, *"This merger creates the world's pre-eminent out-of-home media enterprise focused on the fast-growing radio and outdoor advertising sectors. Over the past several years Clear Channel has successfully focused on the out-of-home opportunity because of its compelling fundamentals, driven by an increasingly mobile society that spends more time driving, listening to the radio and viewing outdoor displays. As a result of this growing trend and a recognition of the high degree of cost-effectiveness it makes possible, advertisers have increasingly relied on out-of-home media to reach consumers. By combining Clear Channel's broad portfolio of out-of-home assets with AMFM's leading portfolio of well-clustered, well-managed, highly rated and geographically diversified radio operations, including a significant major market presence, we will not only be the undisputed industry leader, but will have the financial, programming, management and distribution resources to best serve the needs of this exciting, growing, global marketplace."*

Tom Hicks said, "Clear Channel is the model of success in out-of-home media, and Lowry, Mark and Randall Mays have adeptly driven the company's growth through a combination of vision, superior operating results and financially astute, strategically sound acquisitions. These efforts have attracted a tremendous level of deserved respect from its partners, as well as from the advertising and financial communities. Combining the Clear Channel and AMFM assets will create significant operating and financial value through an entity with world-class operating management and local programming, content and branding spanning 32 countries. We are delighted to bring such an attractive transaction to our shareholders as it underscores our commitment to growth, our employees, our advertisers and the consumer marketplace which embraces out-of-home media for its local content, accessibility and low-cost, high-entertainment value. We are

Case 1:08-cv-01519    Document 27-3

even

| **EX-99.1** | **2nd Page of 3** | TOC | 1st | Previous | Next | Bottom | Just 2nd |

more delighted that as a stock-for-stock transaction, our shareholders will be able to participate fully in what we believe is the tremendous upside potential of the combined enterprise."

Under the terms of the agreement, AMFM shareholders will receive 0.94 shares of Clear Channel Communications Inc. common stock, on a fixed exchange basis, for each share of AMFM Inc. held on the record date of the transaction (expected to be set for the second half of 2000). After giving effect to the transaction, which is expected to be a tax-free exchange, Clear Channel Communications will have approximately 582 million fully diluted common shares, with current AMFM shareholders owning approximately 37% and current Clear Channel Communications shareholders owning approximately 63% of the combined enterprise.

Clear Channel/AMFM Combined Assets

The combined entity will become the world's premier out-of-home media company reaching local, national and international consumers through a complementary portfolio of radio stations, radio broadcast networks, outdoor advertising displays and television stations located in 32 countries. Subject to actions taken to obtain regulatory clearances (it is expected that approximately 125 radio stations will be divested to comply with ownership limits), the merged company will include:

- 830 radio stations in 187 U.S. markets after anticipated divestitures;

- Equity interests in over 240 radio stations internationally primarily in Australia, New Zealand, Mexico, Norway, England and the Czech Republic;

- 425,000 outdoor displays. Clear Channel provides outdoor advertising services in over 35 domestic markets and 29 international markets;

- 19 television stations which are affiliated with various television networks, including FOX, UPN, ABC, NBC and CBS; and

- Katz Media, the only full-service media representation firm in the United States serving multiple types of electronic media.

Mr. Mays concluded, "I look forward to working with Tom Hicks and AMFM's great radio operating team led by Jim de Castro as well as Randy Michaels and their teams, in extending Clear Channel's unsurpassed record of growth for the benefit of our shareholders, advertisers, audiences and employees. We also believe the merger and the divestiture of certain stations may create new acquisition opportunities for minority-owned broadcasting entities, a sector that the Clear Channel organization is committed to supporting."

The merger has been approved by the Boards of Directors of both AMFM Inc. and Clear Channel Communications, Inc. The transaction is expected to be consummated in the second half of 2000, subject to a vote by stockholders of both companies, FCC and other regulatory approvals (including expiration of the applicable Hart-Scott-Rodino waiting period) and other customary closing conditions. Hicks, Muse, Tate & Furst Incorporated and its affiliates, AMFM's largest shareholders with approximately 27% of AMFM's outstanding shares, and Lowry Mays who holds approximately 9% of Clear Channel's outstanding shares, have indicated they will vote in favor of the transaction.

Salomon Smith Barney acted as financial advisor to Clear Channel and Morgan Stanley Dean Witter & Co., Greenhill & Company, Deutsche Banc Alex Brown and Chase Securities, Inc. served as financial advisors to AMFM.

| EX-99.1 | *Last Page of 3* | TOC | 1st | Previous | Next | Bottom | Just 3rd |

About Clear Channel Communications

Clear Channel Communications, Inc. (http://www.clearchannel.com/) is a global leader in the out-of-home advertising industry with radio and television stations and outdoor displays in 32 countries around the world. Including announced transactions, Clear Channel operates 512 radio and 19 television stations in the United States and has equity interests in over 240 radio stations internationally. Clear Channel also operates more than 425,000 outdoor advertising displays.

About AMFM Inc.

AMFM Inc., the nation's largest radio broadcasting entity, consists of the AMFM Radio Group, including the AMFM Radio Networks and the Chancellor Marketing Group, and the AMFM New Media Group, including Katz Media and AMFM's Internet operations. Reflecting announced transactions, AMFM Radio Group with approximately 443 stations in 100 markets reaches a weekly listener base of 64 million people. The AMFM Radio Networks offers syndicated programming nationwide. Chancellor Marketing Group is a full-service sales promotion firm developing integrated marketing programs for Fortune 1000 companies. AMFM's Katz Media is the only full-service media representation firm in the United States serving multiple types of electronic media. AMFM's Internet operations focus on developing AMFM's e-commerce web sites, streaming online broadcasts of AMFM's on-air programming and other media, and promoting emerging Internet and new media concerns.

AMFM Inc. was formed in January 1994 with the acquisition of two radio stations in Sacramento, California by Hicks, Muse, Tate & Furst Incorporated. Upon completion of the proposed merger between AMFM and Clear Channel, Hicks, Muse, Tate & Furst Incorporated and its affiliates will own approximately 10% of Clear Channel Communications and will be the Company's largest shareholder.

This news announcement contains certain forward-looking statements that are based upon current expectations and involve certain risks and uncertainties within the meaning of the U.S. Private Securities Litigation Reform Act of 1995. Key risks are described in Clear Channel's and AMFM's reports filed with the U.S. Securities and Exchange Commission. Readers should note that these statements may be impacted by several factors, including economic changes and changes in the broadcasting industry generally, the ability of Clear Channel and AMFM to consummate a merger and successfully integrate operations and, accordingly, the Company's actual performance and results may vary from those stated herein and Clear Channel and AMFM undertake no obligation to update the information contained herein.

Contact:

     Randall Mays
     Chief Financial Officer
     Clear Channel Communications Inc.
     210/822-2828

         or

     D. Geoffrey Armstrong
     Chief Financial Officer
     AMFM Inc.
     214/922-8700

or

Joseph N. Jaffoni
Stewart A. Lewack
Jaffoni & Collins Incorporated
212/835-8500; afm@jcir.com

---

## Dates Referenced Herein  *and*  Documents Incorporated By Reference

| *This 8-K Filing* | *Date* | *Referenced-On Page* | | *Other Filings* |
| | | *First* | *Last* | |
| For The Period Ended | 10/2/99 | | | |
| | 10/4/99 | 1 | | |
| Filed On / Filed As Of | 10/5/99 | | | |

Top                                                                 List All Filings

---

Filing Submission  -  Alternative Formats (Word / Rich Text, HTML, Plain Text, SGML, XML, et al.)

---

*Copyright © 2008 **Fran Finnegan & Company**  All Rights Reserved.*
*www.secinfo.com - Sun, 6 Apr 2008 17:54:21.0 GMT - Help at SEC Info*

## NEWS

# Clear Channel buys AMFM, for world's largest radio chain

*Some 800 stations reaching 100 million*



Clear Channel has agreed to buy AMFM, in a deal that will create the nation's and the world's largest radio network and a high level of anxiety on the part of media buyers.

The $23.5 billion deal will bring together 830 stations in 87 markets and in 45 of the top 50 markets with a total audience reach of 100 million.

Clear Channel, the nation's largest radio chain, in buying the second-largest, will have to dump 125 stations in overlapping markets under existing ownership rules of the Federal Communications Commission.

Those station will be eagerly sought as competitors seek to bulk up in the ongoing race for consolidation of U.S. media. Likely bidders include CBS's Infinity Broadcasting, Disney, owner of ABC, and Cox Radio.

The deal, like many similar consolidation deals over recent months, deeply alarms media buyers, who see with each a restriction of options, especially in individual markets, and the risk of higher prices as fewer companies have control over more inventory.

The deal follows by only weeks the announced merger of Viacom and CBS and Justice Department approval of the purchase by Lamar Advertising of AMFM's billboard business, making Lamar the largest outdoor company in the U.S., with 125,600 displays in 42 states.

At the time of the deal, the eight largest companies controlled 62 percent of the outdoor market. Similarly but a handful of companies control radio in the top 100 markets.



# Clear Channel Comm. to acquire AMFM for 11.60 times revenue

## Weekly Corporate Growth Report, Oct 11, 1999

- E-mail
- Print
- Link

The Deal: Clear Channel Communications Inc. has agreed to acquire AMFM Inc. for $23 billion in stock and the assumption of $6.1 billion in debt. The acquisition will double its stations and create the world's largest radio company. Clear Channel will exchange 0.94 share, or $75.55, \for each share of AMFM. The price is an 18.0% premium for AMFM shareholders. Clear Channel expects to receive .regulatory approval after it sells 100 to 125 radio stations. CBS Corp.'s Infinity Broadcasting Corp. is expected to capitalize on the sales by purchasing stations in large markets. On the news, AMFM rose $2.75, or 4.3%, to $66.625/share, while Clear Channel fell $2.1875, or 2.7%, to $78.1875/share.

More Articles of Interest
> AN ACCIDENT THAT...
> Editorial: T. Milton...
> Don't vote for...
> T-34 medium tank
> Shindaiwa T242

Most Popular Publications in Business
> Business Wire
> Black Enterprise
> Real Estate Weekly
> Los Angeles Business ...
> Communication World
> **More** »

▼ Ad Feedback



Discussion: The acquisition represents the changes in the U.S. radio industry, which consisted of many small, independently-owned stations five years ago. Loosened federal station ownership rules have influenced acquisitions since 1996, and as a result, three major U.S. radio station owners, Clear Channel, AMFM, and Infinity, evolved.

The combined Clear Channel and AMFM will have 830 radio stations with outlets in 47 of the 50 largest markets. In addition to the radio stations, Clear Channel will have 425,000 outdoor advertising displays and 19 television stations. Its operations will span 32 countries with stakes in 240 radio stations in countries such as Czech Republic, Australia, and the U.K. The combined company will generate $5 billion in revenue for the year 2000 and along with Infinity, will dominate the U.S. radio and billboard industries.

Copyright Quality Services Company Oct 11, 1999
Provided by ProQuest Information and Learning Company. All rights Reserved

- 1
- 2
- Next »

**Sponsored Links**

**2008 Stock Mkt Prediction**
Where the Money Will Be in 2008. Free Stock Market Investor Report.
www.wealthdaily.com

**Radio Broadcast Training**
Want to Work in Radio Broadcasting? Train With a Pro at a Local Studio!
www.getamentor.com

**PKF Hospitality Research**
Hotel financial solutions Quick publications & tools
www.pkfc.com

**10 Rules Losing Belly Fat**
I Fought To Lose Fat, with These 10 Rules I Lost 9 lbs every 11 Days.
www.fatloss4idiots.com

(about)

Case 1:08-cv-01519    Document 27-3    Filed 04/07/2008    Page 41 of 61

**Find Featured Titles for: Business**

CLICK TO VIEW

**Find Research Guides for:**

CLICK TO VIEW

BNET

Site Help & Feedback

About CNET Networks
Jobs
Advertise
Partnerships
Site Map
RSS Site Map

Visit other CNET Networks sites: Select Site

Copyright © 2008 CNET Networks, Inc. All Rights Reserved. Privacy Policy | Terms of Use

# EXHIBIT  D



## Radio monitoring -- See and hear same-day radio spot logs

| | | | | | |
|---|---|---|---|---|---|
| 09:55:40 | 00:53 | Verizon Wireless | Verizon Communications, Inc. | Cellular & Paging Equipment & Systems | |
| 09:56:33 | 00:58 | Disney On Broadway | Disney Entertainment | Live Theater, Opera, Music, Dance | |
| 09:57:31 | 00:58 | Jersey Gardens | Glimcher Realty Trust | Shopping-Entertainment Complex | |
| 09:58:33 | 03:33 | Because Of You | Kelly Clarkson | | |
| | | **12/8/2005 10:00:00 AM** | | | |
| 10:02:20 | 03:08 | You And Me | Lifehouse | | |
| 10:05:40 | 03:33 | Let Me Go | 3 Doors Down | | |
| 10:09:26 | 03:02 | Blue Christmas | Elvis Presley | | |
| 10:12:59 | 03:17 | This Is How A Heart Breaks | Rob Thomas | | |
| 10:16:22 | 03:50 | Man! I Feel Like A Woman | Shania Twain | | |
| 10:20:19 | 03:27 | Jolly Old Saint Nicholas | Chicago | | |
| 10:24:38 | 01:00 | Macy's | Federated Department Stores, Inc. | Department Stores | |
| 10:25:38 | 01:00 | Lowe's | Lowe's Companies, Inc. | Home Centers & Hardware Stores | |
| 10:26:38 | 01:00 | Mamma Mia | Littlestar Services, Ltd. | Live Theater, Opera, Music, Dance | |

Our patented radio monitoring technology listens to top-rated radio stations in major markets.

While our computers automatically track millions of recurring commercials hour after hour, 365 days a teams of spot data specialists research and identify hundreds of new advertisers and commercials every

It's this combination of expert human attention coupled with highly-sophisticated computer hardware an that allows you to create same-day online reports anytime you want them, 24 hours a day.

**What you'll get** from our radio monitoring service:

- Powerful online search tools for radio stations in your market
- On-demand capability to compare newspaper ads
- One-click data export to Microsoft Excel® spreadsheets for further analysis
- Same-day radio data availability
- Ability to generate new, updated reports whenever you want

**What you can do** with it:

- Examine spot break placement, length and spot loads per hour
- View any station's log of spots and songs as aired
- See actual time each radio spot aired
- Hear audio of any spot or song from any computer
- See client spots on competing stations in a market
- Generate lists of spots and songs
- Create combined panel of stations, then analyze their spot schedules
- See which accounts are not buying specific stations

**Why you'll profit** from this powerful tool?

- Great for prospecting - generate instant sales leads
- Advertising campaign verification
- View and/or listen to your ad campaign
- Make more powerful decisions with more current information
- Create competitive intelligence reports for advertisers

**Media Monitors proudly serves major radio groups, newspapers, media analysts and ad agenci**

**Ask about** availability in your market.

| Home | Privacy Policy | Site Map |

© 2002-2008 Media Monitors, LLC. All Rights Reserved. The Media Monitors broadcast content recognition process is protected by U.S. Patent 5,437,050 and additior Ten is a registered trademark, and Media Monitors, its logo, "The New Broadcast Monitoring" and "Newspaper Ad Tracking" are service marks, of Media Monitors, LLC property of their respective owners.



# MEDIA MONITORS ℠

Identifying advertising content in major markets & providing same-day online reports.

Home   Demo   News   Services   Training   Company   Contact Us   Partners

▲ More media and many new markets added: Click Here!

User Name
Password
Forgot Password



The best resource available!

Rick Cummings
President, Emmis Radio

Sunday, April 06, 2008

- I LEFT MY HEART IN... - Mar. 31, 2008
- Election 2008 - Mar. 31, 2008
- Lucknow radio stations now being monitored - Mar. 10, 2008
- Media Monitors to Link with Arbitron PPM Ratings - Feb. 11, 2008
- Media Monitors Welcomes Scott Musgrave - Jan. 28, 2008
- Experience the Expenditures - Dec. 20, 2007

More N...

## SpotTen® Top 40 Radio

Monitored data of the most-played radio commercials on CHR (Contempor
Rhythmic stations in major markets.

| LW | TW | Account | Parent |
|----|----|---------|--------|
| 1 | 1 | HD Digital Radio Alliance | HD Digital |
| 2 | 2 | McDonald's | McDonald' |
| 3 | 3 | Verizon | Verizon Co |
| 4 | 4 | GEICO | Berkshire |
| 5 | 5 | Wal-Mart | Wal-Mart |
| 6 | 6 | Fox Television Network | Fox Broad |
| 7 | 7 | Taco Bell | Yum! Bran |
| 8 | 8 | Shane Co. | Shane Co. |
| 9 | 9 | Wendy's | Wendy's 1 |
| 10 | 10 | RadioShack | RadioShac |

◀€ Featured RADIO Spot: This week's Sp

📷 Featured NEWSPAPER Ad: This week':

Radio Monitoring                    Bro
Newspaper Ad Tracking℠              Lo

**MRC accreditation audit in progress**

**1-800-67-MEDIA**



SAY "SPOTS COST?" SEVERAL TIME:

Ⲙ MEDIA MONITOR

**Click Here for a FREE Trial**

© 2002-2008 Media Monitors, LLC. All Rights Reserved. The Media Monitors broadcast content recognition process is protected by U.S. Patent 5,437,050 and additional patents pending. S trademark, and Media Monitors, its logo, "The New Broadcast Monitoring" and "Newspaper Ad Tracking" are service marks, of Media Monitors, LLC. All other marks are the property of thei



**MM Executives**
**USA Headquarters :**

Philippe Generali, President
Joseph McCallion, Executive VP
Frank Cammarata, VP, Sales
Brice Kirkendall, VP, Engineering & Operations

**International :**

Robin Prior, VP, Johannesburg, South Africa
Ross Langbell, GM, Vancouver, Canada
Keith Williams, GM, Sydney, Australia

**MM at a glance**

**Media Monitors, LLC** is a world leader in radio spot monitoring and Newspaper Ad Tracking℠, providing for broadcasters, newspapers, media research firms and advertising agencies. Our services include F Monitoring, Newspaper Ad Tracking, Spot Ten® weekly charts of radio advertisers, and custom researc upon request.

**Why we exist:** For decades, it was expensive and tedious for radio advertisers to verify the number spot played or whether the right copy ran on-air. Now, using the patented technology of Media Monit Executives can have details on a particular radio spot or an entire radio and print campaign at their fii seconds. Every day, Media Monitors matches audio to fingerprints of millions of radio commercials provides newspaper ad data for its customers.

Media Monitors is a subsidiary of **RCS, Inc.** RCS is the world's leading provider of broadcast and Webcas serving over 7,000 radio stations, TV music channels, cable companies, satellite music networks an stations worldwide. The Media Monitors broadcast content recognition process is protected by U 5,437,050 and additional patents pending.

**Privacy Policy**

Media Monitors, LLC
445 Hamilton Avenue, 7th floor
White Plains, NY 10601

1-800-67-MEDIA

Tel: (914) 428-5971
Fax: (914) 259-4541

| Home | Privacy Policy | Site Map |

© 2002-2008 Media Monitors, LLC. All Rights Reserved. The Media Monitors broadcast content recognition process is protected by U.S. Patent 5,437,050 and addition Ten is a registered trademark, and Media Monitors, its logo, "The New Broadcast Monitoring" and "Newspaper Ad Tracking" are service marks, of Media Monitors, LLC property of their respective owners.



**Media Monitors is honored to be working with some of the industry's largest companies**

ABC Radio
Billboard Radio Monitor
Bonneville
CBS Radio
Clear Channel Communications
Colorado Broadcasters Association
Cox
Cumulus
Emmis Communications
Entravision
Entercom
FMQB
Greater Media
Interep
Jones Media America
Katz Radio
Maryland - DC - Delaware Broadcasters Association
New York State Broadcasters Association
Northern California Broadcasters Association
Radio Advertising Bureau
Radio & Records
Radio / TV Business Report
Radio Ink
Radio World
Texas Association of Broadcasters
Westwood One Radio Network
Zimmerman Advertising

Exhibit E

# EXHIBIT E





# ABOUT US

**Miller, Kaplan, Arase & Co., LLP,** is a full service CPA firm with offices in L Angeles, San Francisco and Las Vegas. Since its inception in 1941, Miller, Ka Arase & Co., LLP has had one specific mission in mind: To provide its clients highest quality accounting and advisory services while offering personal atte the firm's partners and professionals. This vision has allowed the firm to mee needs of its clients in innovative ways – the firm has robust practices in Lice Royalties, Media revenue reporting, and Systems Development, among othe

Miller, Kaplan has developed an extensive architecture to manage and report for the media industry, where it has provided confidential revenue reporting 20 years. More than 2,000 media properties rely on Miller, Kaplan for confide market intelligence.

Click Here to visit Miller, Kaplan, Arase & Co., LLP

Copyright © Miller, Kaplan, Arase & Co., LLP. All rights reserved. Please send comments to technical@radiosleadingadvertisers.com

LOGIN

# Media Market X-Ray»»

More detailed and interactive than the top line Market Revenue Report, MKA's Media Market X-Ray provides subscribers with an advertiser-by- advertiser look at market spending. Sales management and account executives are empowered with the ability to query and export results by agency, advertiser and product code. The inclusion of Newspaper and Television expenditure data arms subscribers with a useful tool to prospect, strategically plan and track performance.

Media Market X-Ray Brochure

For additional information: contact us



# Media Market X-RAY

Long relied upon as an essential research tool in 35 major markets. Market X-RAY allows subscribers to view their share of each advertiser's radio expenditures monthly. Utilizing over 40 different queries all with the ability to sort, export and create optional filter criteria, subscribers are armed to prospect, strategically plan and track performance.

## Advertiser History

Equipping Account Executives with tools to better prospect and negotiate, X-RAY's Advertiser History Query provides a detailed map of an advertiser's Radio spending displayed chronologically with month-by-month and cumulative year-to-date spending.

## Key Accounts

X-RAY's Key Accounts Query provides subscribers with the ability to monitor their major accounts' Radio spending. X-Ray displays overall spending, your share of the spending and your rank on the buy.



Miller, Kaplan, Arase & Co., LLP
CERTIFIED PUBLIC ACCOUNTANTS
www.Millerkaplan.com



## Industry Shares

Categorized by Industry, X-Ray's Industry Shares Query provides a detailed view of a specific product category's relative advertiser-by-advertiser spending. This provides account executives with additional perspective on category spending.

## Agency Sales

Aiding in Agency prospecting, X-RAY's Agency Sales Query examines Radio spending by agency. This query discloses the Agency's overall placements by advertiser and your share and rank among competitors in the marketplace.

For additional information or a WebEx presentation, please contact:



Miller, Kaplan, Arase & Co., LLP
CERTIFIED PUBLIC ACCOUNTANTS
www.MillerKaplan.com

**George Nadel Rivin, CPA**
Partner-In-Charge, Broadcast Services
grivin@millerkaplan.com
818/ 769-2010 | f 818/ 769-3100

LOGIN

# X-Ray ADvantage»»»

X-Ray ADvantage furnishes subscribers with specific quarterly listings of 25 market advertisers that spend little or nothing on their station(s), but have the greatest potential revenue benefit based on their audience's demographics and format.

In addition to listing the 25 advertisers with the greatest potential revenue benefit, X-Ray ADvantage includes each advertiser contact information, and through the application of category specific power ratios by format, a suggested proposal amount.

In order to subscribe to X-Ray ADvantage, you must participate in MKA's Media Market X-Ray.

For additional information: contact us



# HOME

"Radio's Leading Advertisers" unlocks the mystery of how the top 100 advertisers in local market spending allocate their media expenditures and which radio formats they buy.

The added insight from "Radio's Leading Advertisers" will enable both Account Executives and Sales Management to better understand the spending patterns of these large advertisers and to better tailor their presentations.

**Full Year 2007 Data Now Available Online!**

---

Copyright © Miller, Kaplan, Arase & Co., LLP. All rights reserved. Please send comments to technical@radiosleadingadvertisers.com



# PRODUCT

From the Providers of Media Market X-Ray, the foremost authority on radio a
revenue metrics, Miller, Kaplan, Arase & Co., LLP has published "Radio's Lea
Advertisers" unlocking the mystery of how the top 100 advertisers in local m
spending allocate their media expenditures and which radio formats they buy
innovative publication aggregates radio advertiser expenditure data from 35
Markets (including 19 of the top 20) and accounts for approximately 60% of
Nationwide spot radio spending.  This user-friendly guide organizes and profi
nationwide radio spending trends of leading advertisers alphabetically, by ra
station format.  In addition to individual profiles for the top 100 advertisers,
advertisers in each format are listed.

**Click Here** to see examples of our Radio's Leading Advertisers Reports

Miller, Kaplan, Arase & Co., LLP has built a reputation within the radio advert
industry and we are excited to now offer this informative guide.  The added i
from "Radio's Leading Advertisers" should enable sales executives to better u
the spending patterns of these large advertisers and to better tailor their
presentations.

---

Copyright © Miller, Kaplan, Arase & Co., LLP.  All rights reserved.  Please send comments to
technical@radiosleadingadvertisers.com



# GEICO INSURANCE COMPANY

■ TOTAL MEDIA SEASONALITY BY QUARTER

■ RADIO SEASONALITY BY QUARTER

2006 Rank - 9 / 2005 Rank - 12

■ R A D I O   S E A S O N A L I T Y   B Y   M O N T H

## MEDIA SPENDING MIX (000)

|  | 2006 | 2005 | GROWTH |
|---|---|---|---|
| NEWSPAPERS | $4,365 | $3,595 | 21.4% |
| TELEVISION | $105,329 | $70,988 | 48.4% |
| RADIO | $43,554 | $35,331 | 23.3% |
| TOTAL | $153,247 | $109,913 | 39.4% |
| % SPENT ON RADIO | 28.4% | 32.1% | |

©Miller, Kaplan, Arase & Co., LLP

## GEICO INSURANCE COMPANY vs. INSURANCE COMPANIES

|  | 2006 | | | 2005 | | |
|---|---|---|---|---|---|---|
|  | CATEGORY | ADVERTISER | SHARE | CATEGORY | ADVERTISER | SHARE | CHANGE |
| NEWSPAPERS | $227,336 | $4,365 | 1.9% | $179,151 | $3,595 | 2.0% | -0.1% |
| TELEVISION | $614,742 | $105,329 | 17.1% | $591,221 | $70,988 | 12.0% | 5.1% |
| RADIO | $215,772 | $43,554 | 20.2% | $183,952 | $35,331 | 19.2% | 1.0% |
| TOTAL | $1,057,850 | $153,247 | 14.5% | $954,324 | $109,913 | 11.5% | 3.0% |
| % SPENT ON RADIO | 20.4% | 28.4% | | 19.3% | 32.1% | | |

## Radio Expenditure By Format

Based on data submitted to Miller, Kaplan, Arase & Co., LLP By 811 Stations

Page 9

# Leading Advertisers by Format for

## ACTIVE ROCK

ACTIVE ROCK

| Advertiser Name | 2006 Rank | Revenue | 2005 Rank | Revenue | Advertiser Name | 2006 Rank | Revenue | 2005 Rank | Revenue |
|---|---|---|---|---|---|---|---|---|---|
| MCDONALDS | 1 | 2,065,650 | 1 | 2,033,141 | VOLKSWAGEN MOTOR CORPORATION | 27 | 451,620 | 48 | 290,625 |
| AT & T | 2 | 2,041,674 | 6 | 1,620,159 | HEINEKEN USA | 28 | 449,470 | 11 | 835,433 |
| VERIZON WIRELESS | 3 | 1,833,603 | 4 | 1,703,571 | TWEETER HOME ENTERTAINMENT GROUP | 29 | 446,165 | 38 | 373,835 |
| ANHEUSER BUSCH | 4 | 1,755,105 | 2 | 2,001,318 | ROCK FINANCIAL | 30 | 439,972 | 17 | 621,830 |
| GUITAR CENTER | 5 | 1,500,717 | 7 | 1,395,041 | AMERICAN EQUITY MORTGAGE | 31 | 438,129 | 10 | 884,120 |
| MILLER BREWING COMPANY | 6 | 1,468,100 | 5 | 1,666,390 | TIME WARNER CABLE | 32 | 419,302 | 54 | 279,512 |
| COCA COLA | 7 | 1,426,633 | 8 | 1,288,470 | BUENA VISTA PICTURES | 33 | 413,665 | 182 | 99,340 |
| BURGER KING | 8 | 928,235 | 46 | 301,990 | MASTERCARD | 34 | 408,330 | 35 | 380,465 |
| STERLING JEWELERS | 9 | 921,474 | 21 | 527,234 | FORD DEALER ASSOCIATION | 35 | 400,788 | 22 | 523,746 |
| TACO BELL | 10 | 888,888 | 12 | 767,376 | PEPSI | 36 | 393,887 | 55 | 275,686 |
| COMCAST CABLE | 11 | 844,399 | 9 | 927,792 | TOYOTA DEALER ASSOCIATION | 37 | 387,947 | 45 | 310,276 |
| NBC TV NETWORK | 12 | 818,498 | 39 | 368,500 | CAR TOYS | 38 | 373,016 | 36 | 380,460 |
| FOX TV NETWORK | 13 | 797,420 | 18 | 615,570 | SUBWAY | 39 | 345,825 | 24 | 513,919 |
| MOLSON COORS BREWING COMPANY | 14 | 769,876 | 3 | 1,722,653 | LIONS GATE PICTURES | 40 | 341,880 | 213 | 88,355 |
| GEICO INSURANCE COMPANY | 15 | 691,680 | 20 | 577,483 | DUNKIN DONUTS | 41 | 339,732 | 67 | 233,588 |
| STATE LOTTERIES | 16 | 658,340 | 16 | 625,234 | APPLEBEES | 42 | 313,942 | 409 | 52,045 |
| UNIVERSAL PICTURES | 17 | 640,765 | 59 | 259,675 | SONY PICTURES | 43 | 311,055 | 70 | 229,375 |
| WENDYS RESTAURANT | 18 | 588,803 | 34 | 382,691 | UPS | 44 | 303,215 | 605 | 33,915 |
| LIVE NATION | 19 | 587,878 | 28 | 477,607 | CHEVROLET MOTOR CORPORATION | 45 | 288,815 | 40 | 335,600 |
| IYG HOLDING COMPANY | 20 | 580,100 | 29 | 459,925 | OREILLY AUTO PARTS | 46 | 286,200 | 99 | 163,365 |
| SHANE COMPANY JEWELERS | 21 | 570,732 | 19 | 590,749 | HOME DEPOT | 47 | 284,806 | 15 | 633,564 |
| DAIMLER CHRYSLER PLYMOUTH DODGE JEEP CORPORATION | 22 | 550,557 | 23 | 517,425 | NFL | 48 | 282,315 | - | 0 |
| COMPUTERTRAINING.COM | 23 | 475,684 | 31 | 434,254 | MAZDA MOTORS OF AMERICA | 49 | 279,135 | 57 | 263,518 |
| ABC TV NETWORK | 24 | 471,900 | 25 | 512,088 | BOSTON BEER | 50 | 267,280 | 83 | 191,185 |
| PARAMOUNT PICTURES | 25 | 462,099 | 37 | 378,370 | | | | | |
| LOWES HOME IMPROVEMENT | 26 | 459,243 | 77 | 212,295 | | | | | |

Based on data submitted to Miller, Kaplan, Arase & Co., LLP by 11 ACTIVE ROCK stations

©Miller, Kaplan, Arase & Co., LLP

Page 101





Miller, Kaplan, Arase & Co., LLP's

# Radio's Leading Advertisers
### Profiling the top 100 Advertisers in Local Spot Radio Revenue

**Home**

**Product**

**FAQ**

**Order**

**About**

**Contact**

# FAQ

**1. What information is contained in the book?**

The book features detailed profiles of the Top 100 Radio advertisers that disc
seasonality, media mix and distribution of Radio spending by format togethe
of the Top 50 advertisers on each of 21 formats.

**2. How do you determine the seasonality?**

Based on an analysis of the month-by-month expenditures, we present bar c
Total Media seasonality by Quarter, Radio seasonality by Quarter and Radio :
by Month.

**3. Where do you get your data from?**

Radio stations submit their billing files to us each month and we compile tota
based on these submissions of actual advertiser expenditures. The Newspap
Television data is obtained from TNS Media—CMR (Competitive Media Report

**4. Where does TNS Media-CMR get its data from?**

TNS Media-CMR's Television data gathering follows the BAR report methodol
monitoring all over-air television stations with at least an audience share of a
assigning rate. Similarly, TNS Media-CMR measures column inches in Newsp
assigns rate to derive the expenditure amounts they provide to us.

**5. Is the data included in RADIO'S LEADING ADVERTISERS reliable?**

We are confident that the data being published can be relied upon. Market re
from 19 of the Top 20 Radio markets'are among the 35 markets included in
database. Collectively, they account for approximately 60% of U.S. Radio rev

**6. How do you determine which formats to assign to each station so as to ac
reliable distribution of advertiser Radio spending by format?**

We assign formats to stations consistent with those assigned by the leading
trade publication RADIO & RECORDS.

**7. How do you determine the pricing for RADIO'S LEADING ADVERTISERS?**

We have made every effort to price this publication within the reach of all int
parties. The limited market for this information and the extent of the researc
to compile the data are reflected in the price.

**8. Have advertisers granted their permission to be included in RADIO'S LEAD
ADVERTISERS?**

We have not sought the permission of those advertisers included in the book providing only composite spending data, we have not compromised any adve station specific contractual information.

9. Can you invoice me in advance and provide login information upon receipt check?

We understand that those companies that require an invoice to pay from mu: this request. When you place an order, you will be presented with a confirma form.  Please mail in the confirmation form with a check and we will send you account information upon receipt of payment.

10. Is there another source for this information?

To our knowledge this is the only source for comprehensive profiles of Radio spending including distribution by format.

11. When will updates be available on line and how will I be notified of their

The quarterly information is available for all licensees online. Quarterly updat posted approximately 50 days after each quarter-end. E-Mails containing link data will be sent to all licensees as notification that the quarterly update has posted.

12. What form will the quarterly updates be in?

Quarterly updates will be presented in downloadable pdf files.   If you do not Adobe Acrobat Reader, you can download it by visiting their website at www.adobe.com or by clicking the image below.



Frequently Asked Questions

_____

Copyright © Miller, Kaplan, Arase & Co., LLP.  All rights reserved.  Please send comments to technical@radiosleadingadvertisers.com